# POLLOCK *v.* FARMERS' LOAN AND TRUST COMPANY.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE SOUTHERN DISTRICT OF NEW YORK.

No. 893. Argued March 7, 8, 11, 12, 13, 1895. — Decided April 8, 1895.

A court of equity has jurisdiction to prevent a threatened breach of trust in the misapplication or diversion of the funds of a corporation by illegal payments out of its capital or profits.

Such a bill being filed by a stockholder to prevent a trust company from voluntarily making returns for the imposition and payment of a tax claimed to be unconstitutional, and on the further ground of threatened multiplicity of suits and irreparable injury, and the objection of adequate remedy at law not having been raised below or in this court, and the question of jurisdiction having been waived by the United States, so far as it was within its power to do so, and the relief sought being to prevent the voluntary action of the trust company and not in respect to the assessment and collection of the tax, the court will proceed to judgment on the merits.

The doctrine of *stare decisis* is a salutary one, and is to be adhered to on proper occasions, in respect of decisions directly upon points in issue; but this court should not extend any decision upon a constitutional question, if it is convinced that error in principle might supervene.

In the cases referred to in the opinion of the court in this case, beginning with *Hylton* v. *United States,* 3 Dall. 171, (February Term, 1796,) and ending with *Springer* v. *United States,* 102 U. S. 586, (October Term, 1880,) taxes on land are conceded to be direct taxes, and in none of them is it determined that a tax on rent or income derived from land is not a tax on land.

A tax on the rents or income of real estate is a direct tax, within the meaning of that term as used in the Constitution of the United States.

A tax upon income derived from the interest of bonds issued by a municipal corporation is a tax upon the power of the State and its instrumentalities to borrow money, and is consequently repugnant to the Constitution of the United States.

So much of the act "to reduce taxation, to provide revenue for the government, and for other purposes," 28 Stat. 509, c. 349, as provides for levying taxes upon rents or income derived from real estate, or from the interest on municipal bonds, is repugnant to the Constitution of the United States and is invalid.

Upon each of the other questions argued at the bar, to wit: 1, Whether the void provision as to rents and income from real estate invalidates

the whole act ?   2, Whether as to the income from personal property as such, the act is unconstitutional as laying direct taxes ?   3, Whether any part of the tax, if not considered as a direct tax, is invalid for want of uniformity on either of the grounds suggested ? — the Justices who heard the argument are equally divided, and, therefore, no opinion is expressed.

THIS was a bill filed by Charles Pollock, a citizen of the State of Massachusetts, on behalf of himself and all other stockholders of the defendant company similarly situated, against the Farmers' Loan and Trust Company, a corporation of the State of New York, and its directors, alleging that the capital stock of the corporation consisted of one million dollars, divided into forty thousand shares of the par value of twenty-five dollars each ; that the company was authorized to invest its assets in public stocks and bonds of the United States, of individual States, or of any incorporated city, or county, or in such real or personal securities as it might deem proper; and also to take, accept, and execute all such trusts of every description as might be committed to it by any person or persons or any corporation, by grant, assignment, devise, or bequest, or by order of any court of record of New York, and to receive and take any real estate which might be the subject of such trust; that the property and assets of the company amounted to more than five million dollars, of which at least one million was invested in real estate owned by the company in fee ; at least two millions in bonds of the city of New York ; and at least one million in the bonds and stocks of other corporations of the United States; that the net profits or income of the defendant company during the year ending December 31, 1894, amounted to more than the sum of $300,000 above its actual operating and business expenses, including losses and interest on bonded and other indebtedness ; that from its real estate the company derived an income of $50,000 per annum, after deducting all county, state, and municipal taxes ; and that the company derived an income or profit of about $60,000 per annum from its investments in municipal bonds.

It was further alleged that under and by virtue of the pow-

ers conferred upon the company, it had from time to time taken and executed, and was holding and executing, numerous trusts committed to the company by many persons, copartnerships, unincorporated associations, and corporations, by grant, assignment, devise, and bequest, and by orders of various courts, and that the company now held as trustee for many minors, individuals, copartnerships, associations, and corporations, resident in the United States and elsewhere, many parcels of real estate situated in the various States of the United States, and amounting, in the aggregate, to a value exceeding five millions of dollars, the rents and income of which real estate collected and received by said defendant in its fiduciary capacity annually exceeded the sum of two hundred thousand dollars.

The bill also averred that complainant was and had been since May 20, 1892, the owner and registered holder of ten shares of the capital stock of the company, of a value exceeding the sum of $5000; that the capital stock was divided among a large number of different persons who as such stockholders constituted a large body; that the bill was filed for an object common to them all; and that he, therefore, brought suit, not only in his own behalf as a stockholder of the company, but also as a representative of and on behalf of such of the other stockholders similarly situated and interested as might choose to intervene and become parties.

It was then alleged that the management of the stock, property, affairs, and concerns of the company was committed under its acts of incorporation to its directors, and charged that the company and a majority of its directors claimed and asserted that under and by virtue of the alleged authority of the provisions of an act of Congress of the United States entitled, "An act to reduce taxation, to provide revenue for the government, and for other purposes," passed August 15, 1894, the company was liable and that they intended to pay to the United States before July 1, 1895, a tax of two per centum on the net profits of said company for the year ending December 31, 1894, above actual operating and business expenses, including the income derived from its real estate and

its bonds of the city of New York; and that the directors claimed and asserted that a similar tax must be paid upon the amount of the incomes, gains, and profits, in excess of $4000, of all minors and others for whom the company was acting in a fiduciary capacity. And further, that the company and its directors had avowed their intention to make and file with the collector of internal revenue for the second district of the city of New York a list, return, or statement showing the amount of the net income of the company received during the year 1894 as aforesaid, and likewise to make and render a list or return to said collector of internal revenue, prior to that date, of the amount of the income, gains, and profits of all minors and other persons having incomes in excess of $3500, for whom the company was acting in a fiduciary capacity.

The bill charged that the provisions in respect of said alleged income tax incorporated in the act of Congress were unconstitutional, null, and void, in that the tax was a direct tax in respect of the real estate held and owned by the company in its own right and in its fiduciary capacity as aforesaid, by being imposed upon the rents, issues, and profits of said real estate, and was likewise a direct tax in respect of its personal property and the personal property held by it for others for whom it acted in its fiduciary capacity as aforesaid, which direct taxes were not in and by said act apportioned among the several States as required by section 2 of article I of the Constitution; and that if the income tax so incorporated in the act of Congress aforesaid were held not to be a direct tax, nevertheless its provisions were unconstitutional, null, and void in that they were not uniform throughout the United States as required in and by section 8 of article I of the Constitution of the United States, upon many grounds and in many particulars specifically set forth.

The bill further charged that the income tax provisions of the act were likewise unconstitutional in that they imposed a tax on incomes not taxable under the Constitution and likewise income derived from the stocks and bonds of the States of the United States and counties and municipalities therein,

which stocks and bonds are among the means and instrumentalities employed for carrying on their respective governments, and are not proper subjects of the taxing power of Congress, and which States and their counties and municipalities are independent of the general government of the United States, and the respective stocks and bonds of which are, together with the power of the States to borrow in any form, exempt from Federal taxation.

Other grounds of unconstitutionality were assigned, and the violation of articles IV and V of the Constitution asserted.

The bill further averred that the suit was not a collusive one to confer on a court of the United States jurisdiction of the case, of which it would not otherwise have cognizance, and that complainant had requested the company and its directors to omit and refuse to pay said income tax, and to contest the constitutionality of said act, and to refrain from voluntarily making lists, returns, and statements on its own behalf and on behalf of the minors and other persons for whom it was acting in a fiduciary capacity, and to apply to a court of competent jurisdiction to determine its liability under said act, but that the company and a majority of its directors, after a meeting of the directors, at which the matter and the request of complainant were formally laid before them for action, had refused and still refuse, and intend omitting to comply with complainant's demand and had resolved and determined, and intended to comply with all and singular the provisions of the said act of Congress, and to pay the tax upon all its net profits or income as aforesaid, including its rents from real estate and its income from municipal bonds, and a copy of the refusal of the company was annexed to the complaint.

It was also alleged that if the company and its directors, as they proposed and had declared their intention to do, should pay the tax out of its gains, income, and profits, or out of the gains, income, and profits of the property held by it in its fiduciary capacity, they will diminish the assets of the company and lessen the dividends thereon and the value of the shares; that voluntary compliance with the income tax provisions would expose the company to a multiplicity of suits, not only by and

on behalf of its numerous shareholders, but by and on behalf of numerous minors and others for whom it acts in a fiduciary capacity, and that such numerous suits would work irreparable injury to the business of the company, and subject it to great and irreparable damage, and to liability to the beneficiaries aforesaid, to the irreparable damage of complainant and all its shareholders.

The bill further averred that this was a suit of a civil nature in equity; that the matter in dispute exceeded exclusive of costs the sum of five thousand dollars, and arose under the Constitution or laws of the United States; and that there was furthermore a controversy between citizens of different States.

The prayer was that it might be adjudged and decreed that the said provisions known as the income tax incorporated in said act of Congress passed August 15, 1894, are unconstitutional, null, and void; that the defendants be restrained from voluntarily complying with the provisions of said act, and making the lists, returns, and statements above referred to, or paying the tax aforesaid; and for general relief.

The defendants demurred on the ground of want of equity, and the cause having been brought on to be heard upon the bill and demurrer thereto, the demurrer was sustained and the bill of complaint dismissed with costs, whereupon the record recited that the constitutionality of a law of the United States was drawn in question, and an appeal was allowed directly to this court.

An abstract of the act in question will be found in the margin.[1]

---

[1] By sections 27 to 37 inclusive of the act of Congress entitled "An act to reduce taxation, to provide revenue for the government, and for other purposes," received by the President August 15, 1894, and which, not having been returned by him to the House in which it originated within the time prescribed by the Constitution of the United States, became a law without approval, (28 Stat. 509, c. 349,) it was provided that from and after January 1, 1895, and until January 1, 1900, " there shall be assessed, levied, collected, and paid annually upon the gains, profits, and income received in the preceding calendar year by every citizen of the United States, whether residing at home or abroad, and every person residing therein, whether said gains, profits, or income be derived from any kind of property, rents, inter-

By the third clause of section two of Article I of the Constitution it was provided : " Representatives and direct taxes shall

---

est, dividends, or salaries, or from any profession, trade, employment, or vocation carried on in the United States or elsewhere, or from any other source whatever, a tax of two per centum on the amount so derived over and above four thousand dollars, and a like tax shall be levied, collected, and paid annually upon the gains, profits, and income from all property owned and of every business, trade, or profession carried on in the United States by persons residing without the United States."  .  .  .

" SEC. 28. That in estimating the gains, profits, and income of any person there shall be included all income derived from interest upon notes, bonds, and other securities, except such bonds of the United States the principal and interest of which are by the law of their issuance exempt from all Federal taxation; profits realized within the year from sales of real estate purchased within two years previous to the close of the year for which income is estimated; interest received or accrued upon all notes, bonds, mortgages, or other forms of indebtedness bearing interest, whether paid or not, if good and collectible, less the interest which has become due from said person or which has been paid by him during the year; the amount of all premium on bonds, notes, or coupons; the amount of sales of live stock, sugar, cotton, wool, butter, cheese, pork, beef, mutton, or other meats, hay, and grain, or other vegetable or other productions, being the growth or produce of the estate of such person, less the amount expended in the purchase or production of said stock or produce, and not including any part thereof consumed directly by the family; money and the value of all personal property acquired by gift or inheritance; all other gains, profits, and income derived from any source whatever except that portion of the salary, compensation, or pay received for services in the civil, military, naval, or other service of the United States, including Senators, Representatives, and Delegates in Congress, from which the tax has been deducted, and except that portion of any salary upon which the employer is required by law to withhold, and does withhold the tax and pays the same to the officer authorized to receive it. In computing incomes the necessary expenses actually incurred in carrying on any business, occupation, or profession shall be deducted and also all interest due or paid within the year by such person on existing indebtedness. And all national, state, county, school, and municipal taxes, not including those assessed against local benefits, paid within the year shall be deducted from the gains, profits, or income of the person who has actually paid the same, whether such person be owner, tenant, or mortgagor; also losses actually sustained during the year, incurred in trade or arising from fires, storms, or shipwreck, and not compensated for by insurance or otherwise, and debts ascertained to be worthless, but excluding all estimated depreciation of values and losses within the year on sales of real estate purchased within two years previous to the year for which income is estimated : *Provided,* That no deduction shall be made for any amount paid out for new buildings, permanent im-

be apportioned among the several States which may be included within this Union, according to their respective num-

provements, or betterments, made to increase the value of any property or estate: *Provided further,* That only one deduction of four thousand dollars shall be made from the aggregate income of all the members of any family, composed of one or both parents, and one or more minor children, or husband and wife; that guardians shall be allowed to make a deduction in favor of each and every ward, except that in case where two or more wards are comprised in one family, and have joint property interests, the aggregate deduction in their favor shall not exceed four thousand dollars: *And provided further,* That in cases where the salary or other compensation paid to any person in the employment or service of the United States shall not exceed the rate of four thousand dollars per annum, or shall be by fees, or uncertain or irregular in the amount or in the time during which the same shall have accrued or been earned, such salary or other compensation shall be included in estimating the annual gains, profits, or income of the person to whom the same shall have been paid, and shall include that portion of any income or salary upon which a tax has not been paid by the employer, where the employer is required by law to pay on the excess over four thousand dollars: *Provided also,* That in computing the income of any person, corporation, company, or association there shall not be included the amount received from any corporation, company, or association as dividends upon the stock of such corporation, company, or association if the tax of two per centum has been paid upon its net profits by said corporation, company, or association as required by this act.

"SEC. 29. That it shall be the duty of all persons of lawful age having an income of more than three thousand five hundred dollars for the taxable year, computed on the basis herein prescribed, to make and render a list or return, on or before the day provided by law, in such form and manner as may be directed by the Commissioner of Internal Revenue, with the approval of the Secretary of the Treasury, to the collector or a deputy collector of the district in which they reside, of the amount of their income, gains, and profits, as aforesaid; and all guardians and trustees, executors, administrators, agents, receivers, and all persons or corporations acting in any fiduciary capacity, shall make and render a list or return as aforesaid, to the collector or a deputy collector of the district in which such person or corporation acting in a fiduciary capacity resides or does business, of the amount of income, gains, and profits of any minor or person for whom they act, but persons having less than three thousand five hundred dollars income are not required to make such report; and the collector or deputy collector shall require every list or return to be verified by the oath or affirmation of the party rendering it, and may increase the amount of any list or return if he has reason to believe that the same is understated; and in case any such person having a taxable income shall neglect or refuse to make and render such list and return, or shall render a wilfully false or fraudulent list or return, it shall be the duty of the

bers, which shall be determined by adding to the whole number
of free persons, including those bound to service for a term of

collector or deputy collector, to make such list, according to the best infor-
mation he can obtain, by the examination of such person, or any other evi-
dence, and to add fifty per centum as a penalty to the amount of the tax due
on such list in all cases of, wilful neglect or refusal to make and render a list
or return; and in all cases of a wilfully false or fraudulent list or return hav-
ing been rendered to add one hundred per centum as a penalty to the amount of
tax ascertained to be due, the tax and the additions thereto as a penalty to be
assessed and collected in the manner provided for in other cases of wilful
neglect or refusal to render a list or return, or of rendering a false or
fraudulent return." A proviso was added that any person or corporation
might show that he or its ward had no taxable income, or that the same had
been paid elsewhere, and the collector might exempt from the tax for
that year. "Any person or company, corporation, or association, feeling
aggrieved by the decision of the deputy collector, in such cases may appeal
to the collector of the district, and his decision thereon, unless reversed by
the Commissioner of Internal Revenue, shall be final. If dissatisfied with
the decision of the collector such person or corporation, company, or associa-
tion may submit the case, with all the papers, to the Commissioner of Internal
Revenue for his decision, and may furnish the testimony of witnesses to
prove any relevant facts having served notice to that effect upon the Com-
missioner of Internal Revenue, as herein prescribed." Provision was made
for notice of time and place for taking testimony on both sides, and that no
penalty should be assessed until after notice.

By section 30 the taxes on incomes were made payable on or before July
1 of each year, and five per cent penalty levied on taxes unpaid, and
interest.

By section 31, any non-resident might receive the benefit of the exemp-
tions provided for, and "in computing income he shall include all income
from every source, but unless he be a citizen of the United States he shall
only pay on that part of the income which is derived from any source in
the United States. In case such non-resident fails to file such statement,
the collector of each district shall collect the tax on the income derived
from property situated in his district, subject to income tax, making no
allowance for exemptions, and all property belonging to such non-resident
shall be liable to distraint for tax: *Provided,* That non-resident corpora-
tions shall be subject to the same laws as to tax as resident corporations,
and the collection of the tax shall be made in the same manner as provided
for collections of taxes against non-resident persons."

"Sec. 32. That there shall be assessed, levied, and collected, except as
herein otherwise provided, a tax of two per centum annually on the net
profits or income above actual operating and business expenses, including
expenses for materials purchased for manufacture or bought for resale,
losses, and interest on bonded and other indebtedness of all banks, banking
institutions, trust companies, saving institutions, fire, marine, life, and other

years, and excluding Indians not taxed, three-fifths of all other
persons." This was amended by the second section of the

insurance companies, railroad, canal, turnpike, canal navigation, slack
water, telephone, telegraph, express, electric light, gas, water, street rail-
way companies, and all other corporations, companies, or associations
doing business for profit in the United States, no matter how created and
organized but not including partnerships."

The tax is made payable " on or before the first day of July in each year;
and if the president or other chief officer of any corporation, company, or
association, or in the case of any foreign corporation, company, or associa-
tion, the resident manager or agent shall neglect or refuse to file with the
collector of the internal revenue district in which said corporation, com-
pany, or association shall be located or be engaged in business, a state-
ment verified by his oath or affirmation, in such form as shall be prescribed
by the Commissioner of Internal Revenue, with the approval of the Secre-
tary of the Treasury, showing the amount of net profits or income received
by said corporation, company, or association during the whole calendar
year last preceding the date of filing said statement as hereinafter required,
the corporation, company, or association making default shall forfeit as a
penalty the sum of one thousand dollars and two per centum on the amount
of taxes due, for each month until the same is paid, the payment of said
penalty to be enforced as provided in other cases of neglect and refusal to
make return of taxes under the internal revenue laws. .

"The net profits or income of all corporations, companies, or associa
tions shall include the amounts paid to shareholders, or carried to the
account of any fund, or used for construction, enlargement of plant, or any
other expenditure or investment paid from the net annual profits made or
acquired by said corporations, companies, or associations.

"That nothing herein contained shall apply to States, counties, or mu-
nicipalities; nor to corporations, companies, or associations organized and
conducted solely for charitable, religious, or educational purposes, includ-
ing fraternal beneficiary societies, orders, or associations operating upon
the lodge system and providing for the payment of life, sick, accident, and
other benefits to the members of such societies, orders, or associations
and dependents of such members; nor to the stocks, shares, funds, or
securities held by any fiduciary or trustee for charitable, religious, or
educational purposes; nor to building and loan associations or companies
which make loans only to their shareholders; nor to such savings banks,
savings institutions or societies as shall, first, have no stockholders or
members except depositors and no capital except deposits; secondly, shall
not receive deposits to an aggregate amount, in any one year, of more than
one thousand dollars from the same depositor; thirdly, shall not allow an
accumulation or total of deposits, by any one depositor, exceeding ten thou-
sand dollars; fourthly, shall actually divide and distribute to its depositors,
ratably to deposits, all the earnings over the necessary and proper expenses
of such bank, institution, or society, except such as shall be applied to sur-

Fourteenth Article, declared ratified July 28, 1868, so that the whole number of persons in each State should be counted,

plus; fifthly, shall not possess, in any form, a surplus fund exceeding ten per centum of its aggregate deposits; nor to such savings banks, savings institutions, or societies composed of members who do not participate in the profits thereof and which pay interest or dividends only to their depositors; nor to that part of the business of any savings bank, institution, or other similar association having a capital stock, that is conducted on the mutual plan solely for the benefit of its depositors on such plan; and which shall keep its accounts of its business conducted on such mutual plan separate and apart from its other accounts.

"Nor to any insurance company or association which conducts all its business solely upon the mutual plan, and only for the benefit of its policy holders or members, and having no capital stock and no stock or shareholders, and holding all its property in trust and in reserve for its policy holders or members; nor to that part of the business of any insurance company having a capital stock and stock and shareholders, which is conducted on the mutual plan, separate from its stock plan of insurance, and solely for the benefit of the policy holders and members insured on said mutual plan, and holding all the property belonging to and derived from said mutual part of its business in trust and reserve for the benefit of its policy holders and members insured on said mutual plan.

"That all state, county, municipal, and town taxes paid by corporations, companies, or associations, shall be included in the operating and business expenses of such corporations, companies, or associations.

"SEC. 33. That there shall be levied, collected, and paid on all salaries of officers, or payments for services to persons in the civil, military, naval, or other employment or service of the United States, including Senators and Representatives and Delegates in Congress, when exceeding the rate of four thousand dollars per annum, a tax of two per centum on the excess above the said four thousand dollars; and it shall be the duty of all paymasters and all disbursing officers under the government of the United States, or persons in the employ thereof, when making any payment to any officers or persons as aforesaid, whose compensation is determined by a fixed salary, or upon settling or adjusting the accounts of such officers or persons, to deduct and withhold the aforesaid tax of two per centum; and the pay roll, receipts, or account of officers or persons paying such tax as aforesaid shall be made to exhibit the fact of such payment. And it shall be the duty of the accounting officers of the Treasury Department, when auditing the accounts of any paymaster or disbursing officer, or any officer withholding his salary from moneys received by him, or when settling or adjusting the accounts of any such officer, to require evidence that the taxes mentioned in this section have been deducted and paid over to the Treasurer of the United States, or other officer authorized to receive the same. Every corporation which pays to any employé a salary or compensation exceeding four thousand dollars per annum shall report the same to the collector or

Indians not taxed excluded, and the provision as thus amended, remains in force.

---

deputy collector of his district and said employé shall pay thereon, subject to the exemptions herein provided for, the tax of two per centum on the excess of his salary over four thousand dollars: *Provided,* That salaries due to state, county, or municipal officers shall be exempt from the income tax herein levied."

By section 34, sections thirty-one hundred and sixty-seven, thirty-one hundred and seventy-two, thirty-one hundred and seventy-three, and thirty-one hundred and seventy-six of the Revised Statutes of the United States as amended were amended so as to provide that it should be unlawful for the collector and other officers to make known, or to publish amount or source of income under penalty; that every collector should " from time to time cause his deputies to proceed through every part of his district and inquire after and concerning all persons therein who are liable to pay any internal revenue tax, and all persons owning or having the care and management of any objects liable to pay any tax, and to make a list of such persons and enumerate said objects;" that the tax returns must be made on or before the first Monday in March; that the collectors may make returns when particulars are furnished; that notice be given to absentees to render returns; that collectors may summon persons to produce books and testify concerning returns; that collectors may enter other districts to examine persons and books; and may make returns; and that penalties may be imposed on false returns.

By section 35 it was provided that corporations doing business for profit should make returns on or before the first Monday of March of each year " of all the following matters for the whole calendar year last preceding the date of such return:

"First. The gross profits of such corporation, company, or association, from all kinds of business of every name and nature.

" Second. The expenses of such corporation, company, or association, exclusive of interest, annuities, and dividend.

" Third. The net profits of such corporation, company, or association, without allowance for interest, annuities, or dividends.

"Fourth. The amount paid on account of interest, annuities, and dividends, stated separately.

" Fifth. The amount paid in salaries of four thousand dollars or less to each person employed.

" Sixth. The amount paid in salaries of more than four thousand dollars to each person employed and the name and address of each of such persons and the amount paid to each."

By section 36, that books of account should be kept by corporations as prescribed, and inspection thereof be granted under penalty.

By section 37 provision is made for receipts for taxes paid.

By a joint resolution of February 21, 1895, the time for making returns of income for the year 1894 was extended, and it was provided that " in com-

Statement of the Case.

The actual enumeration was prescribed to be made within three years after the first meeting of Congress and within every subsequent term of ten years, in such manner as should be directed.

Section 7 requires "all bills for raising revenue shall originate in the House of Representatives."

The first clause of section 8 reads thus: "The Congress shall have power to lay and collect taxes, duties, imposts, and excises, to pay the debts and provide for the common defence and general welfare of the United States; but all duties, imposts and excises shall be uniform throughout the United States." And the third clause thus: "To regulate commerce with foreign nations, and among the several States, and with the Indian tribes."

The fourth, fifth, and sixth clauses of section 9 are as follows:

"No capitation, or other direct, tax shall be laid, unless in proportion to the census or enumeration hereinbefore directed to be taken.

"No tax or duty shall be laid on articles exported from any State.

"No preference shall be given by any regulation of commerce or revenue to the ports of one State over those of another; nor shall vessels bound to, or from, one State, be obliged to enter, clear, or pay duties in another."

It is also provided by the second clause of section 10 that "no State shall, without the consent of the Congress, lay any imposts or duties on imports or exports, except what may be

---

puting incomes under said act the amounts necessarily paid for fire insurance premiums and for ordinary repairs shall be deducted;" and that "in computing incomes under said act the amounts received as dividends upon the stock of any corporation, company, or association shall not be included in case such dividends are also liable to the tax of two per centum upon the net profits of said corporation, company, or association although such tax may not have been actually paid by said corporation, company, or association at the time of making returns by the person, corporation, or association receiving such dividends, and returns or reports of the names and salaries of employés shall not be required from employers unless called for by the collector in order to verify the returns of employés."

absolutely necessary for executing its inspection laws;" and, by the third clause, that "no State shall, without the consent of Congress, lay any duty of tonnage."

The first clause of section 9 provides: "The migration or importation of such persons as any of the States now existing shall think proper to admit, shall not be prohibited by the Congress prior to the year one thousand eight hundred and eight, but a tax or duty may be imposed on such importations, not exceeding ten dollars for each person.

Article V prescribes the mode for the amendment of the Constitution, and concludes with this proviso: "Provided that no amendment which may be made prior to the year one thousand eight hundred and eight shall in any manner affect the first and fourth clauses in the ninth section of the first article."

This case was argued with *Hyde* v. *Continental Trust Company*, No. 894 and *Moore* v. *Miller*, No. 915. *Hyde* v. *Continental Trust Company* is disposed of. (*post*, 654.) in accordance with the opinion and judgment in this case. *Moore* v. *Miller* is still undecided; but, as *Mr. Edmunds's* argument for the appellant formed an important part of the general discussion, it is reported in this connection.

The reporter has had the advantage of consulting stenographic reports of all the arguments here reported, except that of *Mr. Whitney*, who has been good enough to furnish material for the report of his argument.

*Mr. W. D. Guthrie* for Pollock, appellant in 893, and Hyde, appellant in 894. *Mr. Benjamin H. Bristow, Mr. David Willcox*, and *Mr. Charles Steele* were with him on his brief.

The provisions as to an income tax contained in the act of August 28, 1894, are unconstitutional, in that they violate the requirement of the Constitution as to apportionment in respect of direct taxes, or as to uniformity in respect of duties, imposts, and excises.

Congress has no constitutional power to impose taxes, duties, or excises which shall vary according to ownership of the subject-matter of the tax, and which shall be at one rate upon the income of individuals, and at an entirely different rate upon the income of corporations and of those who derive their income from corporate profits. It has no power to foster and aid favored classes of corporations and associations by arbitrarily exempting them from taxation. It is the fundamental rule of all taxation that there shall be equality of burden among those of the same class; and that, under well-settled principles, if a tax be levied upon any citizens at a higher rate than is imposed upon others of the same class, having like property, it is depriving the former of their property without due process of law and taking the same for public use without just compensation. It is also submitted that Congress cannot tax income derived from state, county, and municipal bonds.

The issues in No. 893 and No. 894 are substantially the same; but in the Pollock suit, No. 893, the interests involved are larger and more important, and I shall confine the statement of facts to that case. The Farmers' Loan & Trust Company is one of the largest trust companies in the United States, and is a private trading corporation organized under the laws of the State of New York. It carries on no business which a partnership could not transact; it exercises no special privileges; it performs no public duty; its business is impressed with no public interest; its capital stock is $1,000,000, divided into 40,000 shares scattered over the United States and abroad. The present capital and accumulations exceed the sum of $5,000,000, and the annual profits amount to over $300,000. The company owns in its own right real estate which brings in an income from rents of $50,000 a year. It also owns $2,000,000 of municipal bonds of the city of New York, the income of which is over $60,000. It holds one hundred parcels of real property for minors and other beneficiaries of the value of over $5,000,000, and collects as trustee, annually, rents exceeding $200,000.

The provisions of the act of 1894 impose a tax of two per

cent upon the gains, profits, and income derived from any kind of property, including rent and the growth and produce of land and profits made upon the sale of land if purchased within two years. Every element that could make real or personal property a source of value or income to an owner is taxed. An excise or duty is also imposed upon income derived from any profession, trade, employment, or avocation. The tax upon persons generally is not upon their entire income, but upon the excess over and above $4000. All persons having incomes of $4000 or under are exempted. The whole burden of the tax falls upon less than two per cent of the population of the country.

The rate of taxation upon corporations and associations is in excess of the rate imposed upon individuals and associations. Persons having incomes of $4000 or under pay nothing; corporations having like incomes pay two per cent. Persons having incomes of over $4000 pay on the excess. Corporations having like incomes, derived from like property and like values, pay two per cent upon the entire amount. Partnerships are expressly exempted from the operation of the act. An individual owning lands, the rents of which net him $8000, pays $80, or two per cent upon the excess over $4000. A corporation or association having like property pays a tax of two per cent upon the whole $8000, or $160, double the tax upon the individual. Five individuals as partners own property or carry on business netting them, after paying all taxes and expenses, $20,000, which they divide equally. The partnership is entirely exempted from taxation, and each member is exempted. If those same five individuals organized a private trading corporation or association under the laws of one of the States, and held the property in that form, they would have to pay an income tax of $400, simply and solely because they had united their interest in a corporate or associate form instead of a partnership. In a word, the rate varies according to the form or nature of ownership. Citizens whose income is $4000 and under, derived from profits and dividends of corporations, are deprived of the benefit of the exemption, because their shares or interests

in the profits of corporations are subjected to a tax of two per cent, while the same income derived from similar business and similar property by those who carry on business individually or as partners would be wholly exempted. If the exemption of the $4000 was to cover the expenses of a household, certainly all persons having all their means invested in corporate shares equally have their household expenses. Why not exempt them?

The act of 1894 is new in the provisions discriminating against those whose income is derived from dividends of corporations and in the exemptions from taxation of favored private corporations and associations. Under the old income tax laws, the business of certain selected classes of corporations, such as banks, saving institutions, insurance companies and railroads was taxed. The language of the present act is "all corporations, companies, or associations, doing business for profit in the United States, no matter how created and organized, but not including partnerships." The tax upon classes of corporations under the old law was sustained, not because it was a tax upon the property of the corporations selected, but upon the distinct ground that it was an excise upon their business. Such was the reason assigned by Mr. Justice Swayne in the case of *Pacific Insurance Co.* v. *Soule,* 7 Wall. 433, and such the ground reiterated by Mr. Justice Miller in delivering the opinion of the court in *Railroad Co.* v. *Collector,* 100 U. S. 595. The bank tax was held to be a tax, not upon property or income, but upon the act of issuing notes; not on the obligation itself, but on its use in a particular way. The judgment in *Veazie Bank* v. *Fenno,* 8 Wall. 533, followed by *National Bank* v. *United States,* 101 U. S. 1, clearly shows this to be the true ground.

The act of 1894 not only exempts charitable, religious, and educational institutions, but it specially excepts from the operation of the tax certain private business concerns, such as building and loan associations, savings banks and mutual insurance companies — not merely mutual life companies, but all mutual insurance companies or associations, whether life, fire, marine, inland, or accident. The exemption is granted without regard

to the amount of property or income. If the business of an insurance company is conducted on the stock plan for the benefit of its shareholders, every dollar of profit is taxed; if it is carried on for the benefit of its members or policy-holders, who are but another form of shareholders, it is wholly exempted. The census reports show the immense accumulations of estates in the hands of these exempted corporations or institutions. In the State of New York, the act exempts hundreds of millions of property.

The census reports show that when the statistics were compiled in 1890 there were 1926 insurance companies transacting insurance business relating to property, of which 1689 were doing business on the mutual plan. The assets of all these companies are not reported, but taking those ascertained, we find $278,000,000 of assets owned by stock insurance companies and $1,200,000,000 of assets owned by mutual companies: the former are subjected to the income tax; the latter are absolutely freed from any such burden simply because the method or manner of conducting the very same business happens to be the mutual plan. The amount of tax saved to these favored mutual companies is at least $1,200,000 per annum.

It is not contended that any doubt exists as to the power of Congress to tax the property or income of private corporations organized under state laws in the same manner and at the same rate that it taxes the property and income of individuals; but it is insisted that the property or income of corporations or of citizens deriving their income therefrom cannot be singled out to be assessed and taxed at a higher rate than the property or income of other individuals or partnerships. If exemptions are to be granted, then such exemptions must be equally allowed to those who have their means invested in corporations and who derive their income from the corporate profits. The question is not whether Congress can select particular classes of property or income for taxation, — whether it can tax one article at one rate and another article at a different rate, — but whether it can prescribe rules of taxation upon like property or like income which shall vary as it is held or collected by individuals and partnerships on the one

hand·or by corporations and their stockholders on the other. The power of Congress to impose an excise upon certain peculiar or distinct businesses or occupations is not challenged; the question is regarding its right to impose an excise tax upon a particular business or occupation which shall vary as it is carried on by individuals or by corporations.

Congress has no power, at the expense of others owning property of the same character, to foster and aid private trading corporations, such as building and loan associations, savings banks and mutual life, fire, marine, inland, and accident insurance companies or associations, which serve no national purpose or public interest whatsoever and which exist solely for the pecuniary profit of their members. There seems to be a notion that the courts have held that the right to exempt is one of legislative discretion, and that there is no check upon it and no limit to its exercise. With us, under the American system, no power of government is untrammelled or unrestrained. The exercise of the discretion to exempt must be regulated by some public·interest; it cannot be arbitrary or capricious; there must be some principle of public policy to support the presumption that the public and not private interests will be subserved by the exemptions which are allowed. Private enterprises for the pecuniary profit·of their members can never be aided under the guise of the exercise of the discretion to exempt. *Loan Association* v. *Topeka,* 20 Wall. 655; *Parkersburg* v. *Brown,* 106 U. S. 487; *Cole* v. *La Grange,* 113 U. S. 1; *People* v. *Eddy,* 43 California, 331, 339; *State* v. *Indianapolis,* 69 Indiana, 375, 378; *Barbour* v. *Louisville Board of Trade,* 82 Kentucky, 645, 654, 655; *Railroad Co.* v. *Smith,* 23 Kansas, 745, 751; *Brewer Brick Co.* v. *Brewer,* 62 Maine, 62, 72; *Lexington* v. *McQuillan's Heirs,* 9 Dana, 513, 516, 517; *Sutton's Heirs* v. *Louisville,* 5 Dana, 28, 31.

We now come to the question whether these gross inequalities and discriminations are unconstitutional. Section 8 of Article I of the Constitution is as follows: " The Congress shall have power to lay and collect taxes, duties, imposts, and excises; to pay the debts and provide for the common defence and

general welfare of the United States; but all duties, imposts, and excises shall be uniform throughout the United States." The contention of the government and of the appellees, in support of the act, seems to be that the uniformity required is simply geographical in character, and does not prohibit inequality among persons in regard to the same property or subject of the tax, provided the inequality be uniform throughout the United States. This contention is without merit, and is certainly not sustained by authority. The true meaning of that clause in the Constitution is that duties, imposts, and excises shall bear equally upon the subject of taxation and be uniform throughout the United States. *Loan Association* v. *Topeka*, 20 Wall. 655; *Parkersburg* v. *Brown*, 106 U. S. 487; *Cole* v. *La Grange*, 113 U. S. 1; *People* v. *Salem*, 20 Michigan, 452; *Albany Bank* v. *Maher*, 9 Fed. Rep. 884; *Mobile* v. *Dargan*, 45 Alabama, 310; *Davis* v. *Litchfield*, 145 Illinois, 313, 327; *City of Lexington* v. *McQuillan*, 9 Dana, 513; *State* v. *Readington*, 36 N. J. Law, 66; *State* v. *Newark*, 37 N. J. Law, 415; *Tide-Water Co.* v. *Coster*, 18 N. J. Eq. 518; *S. C.* 90 Am. Dec. 634; *State* v. *Express Co.*, 60 N. H. 219, 252; *Gatlin* v. *Tarboro*, 78 N. C. 119, 122; *Durach's Appeal*, 62 Penn. St. 491, 494; *Taylor* v. *Chandler*, 9 Heisk. 349, 356; see also *Washington Avenue*, 69 Penn. St. 352, 363; *Hammett* v. *Philadelphia*, 65 Penn. St. 146, 153; *Talbot County* v. *Queen Anne's County*, 50 Maryland, 245, 260.; *Ryerson* v. *Utley*, 16 Michigan, 269; *McCormack* v. *Patchin*, 53 Missouri, 33.

A tax which imposes one rate upon individuals and a higher rate upon corporations, which exempts individuals generally to the extent of $4000, but practically denies any such exemption to those deriving their income from corporate investments, and which arbitrarily exempts immense accumulations of property in the hands of favored private corporations and associations, is not uniform in any sense or in any part of the United States.

The court cannot strike out the exemptions and itself remodel the act so as to make it uniform. The act of 1894 must fall because of its utter lack of uniformity. It is not within the judicial province to make a new law. It would be

decreeing as law what Congress deliberately refused to enact. If these immense accumulations of property had not been exempted, if corporations had not been discriminated against, the law might never have been passed: at all events, the rate of taxation would probably have been reduced to one per cent. The court will not strike out these exceptions and exemptions so as to give the act an operation which Congress confessedly never meant. If you annul the exemptions, what warrant of law would exist for collecting a tax from these mutual concerns? As Mr. Justice Matthews said in the case of *Spraigue* v. *Thompson*, 118 U. S. 90, 95, delivering the opinion of the whole court, this would confer " upon the statute a positive operation beyond the legislative intent, and beyond what any one can say it would have enacted in view of the illegality of the exceptions."

But, irrespective of the constitutional limitation, the grant to Congress of the power to tax necessarily implied the limitation that all taxes should be equal, impartial, and uniform as to all similarly situated.

The requirement of approximate equality inheres in the very nature of the power to tax, and it exists whether declared or not in the written Constitution. It may be difficult, if not impracticable, to obtain absolute equality as between all classes of property. We recognize that ; but there must be absolute equality as between persons or owners of the same kind of property. The taxing power may select land and omit personal property, or select any particular kind of personal property and omit land, and the courts cannot interfere ; but on whatever subject the tax is imposed, it must apply equally and uniformly to all owning similar property ; it cannot vary according to ownership ; it cannot tax one and arbitrarily exempt another ; it cannot be at one rate for the individual, and at another rate for the corporation.

The provisions of the Fifth Amendment, prescribing due process of law and just compensation if private property be taken for public use, restrain the Federal government from enforcing unequal and partial tax laws.

When the Constitution was adopted, the people expressed

their apprehension that powers not intended to be conferred might be claimed and exercised by the Federal government, and that there might be an abuse of taxation. Hamilton had argued in the Federalist that adequate precautions had been inserted, and that the door had been closed to partiality and oppression; but the people insisted on further specific restrictions upon Congress, and to that end ten amendments were proposed at the first session of the First Congress in March, 1789.

The Fifth Amendment, thus adopted to restrict the powers of Congress, provides that no person shall be deprived of life, liberty, or property, without due process of law, nor shall private property be taken for public use without just compensation. We contend that an act of Congress which imposes the burden of a tax upon the property or income of certain citizens, while others owning like property or having like income are exempted, or which imposes a rate of taxation upon like subjects which varies according to their ownership, deprives those discriminated against of their property without due process of law and arbitrarily takes such property for public use without just compensation. To impose a tax on A and B, and exempt C and D similarly situated, is not taxation, but exaction and confiscation. Our conception of the rights of our clients under the shield and protection of due process of law finds its definition in the language of the Chief Justice in *Caldwell* v. *Texas*, 137 U. S. 692, 697: "'Due process of law' is so secured by laws operating on all alike and not subjecting the individual to the arbitrary exercise of the powers of government, unrestrained by the established principles of private right and distributive justice."

And further, there can be no doubt that in enacting the income tax law of 1894, it was the deliberate intention of Congress to tax the income derived from state, county, and municipal securities. The precise question as to the power of Congress to tax income derived from state, county, and municipal bonds has never been decided, but it has often been held that the instrumentalities of the state governments cannot be, directly or indirectly, taxed, and of course, a municipal corpo-

ration is but a branch of the government of the State.   The authorities fully sustain the proposition that Congress cannot tax the borrowing powers of the States or their munici- palities ; for clearly if the right to tax existed, it would place the borrowing powers of the States completely at the mercy of a majority in Congress.   *Holy Trinity Church* v. *United States,* 143 U. S. 457 ; *Blake* v. *National Banks,* 23 Wall. 307 ; *Jennison* v. *Kirk,* 98 U. S. 453 ; *United States* v. *Union Pacific Railroad,* 91 U. S. 72 ; *American Net & Twine Co.* v. *Worth- ington,* 141 U. S. 468 , *Collector* v. *Day,* 11 Wall. 113 ; *United States* v. *Railroad Company,* 17 Wall. 322 ; *Weston* v. *Charleston,* 2 Pet. 449 ; *Wisconsin Central Railroad* v. *Price County,* 133 U. S. 496, 504 ; *Van Brocklin* v. *Tennessee,* 117. U. S. 151, 178 ; *Ward* v. *Maryland,* 12 Wall. 418, 427 ; *Fifield* v. *Close,* 15 Michigan, 505 ; *Jones* v. *Estate of Keep,* 19 Wis- consin, 369, 373 ; *Sayles* v. *Davis,* 22 Wisconsin, 225 ; *Union Bank* v. *Hill,* 3 Coldwell, 325 ; *Warren* v. *Paul,* 22 Indiana, 276 ; *State* v. *Garton,* 32 Indiana, 1, 4.

The discrimination in the present case cannot be sustained upon the theory that the taxing power may classify the various kinds of property or the various kinds of business for purposes of taxation.   It is not classification to impose a tax at one rate on the income or business of corporations and at a different rate upon the same income or the same business if carried on by individuals or partnerships.   Classification to be lawful must distinguish between different kinds of property, not differ- ent ownership, or between different business pursuits, not between particular or selected individuals or corporations of the same class.   If the difference in the rate of taxation is not based upon the nature of the property, nor upon the use made of the property, irrespective of its ownership, then it is based on ownership and involves a discrimination against particular owners, which is unlawful.   In the present case, corporations have not been classified as a class, but the same tax is imposed upon companies or associations as distinguished from corpora- tions, no matter how created and organized.   Besides, under this act, a large class of these corporations, companies, and associations are withdrawn from the operation of the act, and

it cannot be said, therefore, that Congress has classified corpo-rations as a class, even if it had the power to do so.

We are not instructed to present any argument which shall abridge the taxing power of Congress or embarrass the gov-ernment in any emergency that may now exist or hereafter arise. Let Congress remodel the act, apportioning direct taxes and equalizing indirect taxes, within the limitations of the Constitution, and none more willingly than our clients will contribute their share of the burden to maintain, defend, and preserve the national government, even if it shall take all their property. We ask you to impose no limitation upon the right of Congress to tax up to the full measure of the requirements of the Nation. Recognizing that authority to tax in its nature must be without limitations except equality of burden, and that it involves the power to destroy, we are here to plead that the destruction must result from some necessity or peril of the Union, and that however the occasion may arise, the destruction must be equal and uniform and not of selected individuals or classes: we are here to plead that Congress cannot sacrifice one — the lowliest or the richest — for the benefit of others.

*Mr. Clarence A. Seward* for Pollock, appellant in 893, and Hyde, appellant in 894.

Is an income tax a direct tax within the provisions of the Federal Constitution? This is a question of fact, to be deter-mined by the meaning of the term " direct tax " at the time of the adoption of the Constitution.

There is no doubt that that term as used in state statutes and constitutions at the present day is universally construed not to be limited to a tax on land, but to include also a tax on income. How was it in the year 1787? The theory that the words " direct taxes," as used in the Constitution, did not include a tax on income was first judicially voiced in the *Springer case*, decided in 1880, 102 U. S. 586. This case was founded upon *Hylton* v. *United States*, 3 Dall. 171, decided in 1796. Alexander Hamilton, as counsel for the govern-

ment in that case, undertook to define the phrase "direct taxes" so as to exclude from it a tax on carriages. He said: "The following are *presumed* to be the only direct taxes: Capitation or poll taxes; taxes on lands and buildings; general assessments, whether on the whole property of individuals, or on their whole real or personal property. All else must of necessity be considered as indirect taxes."

When the case passed into the hands of the court, Mr. Justice Paterson said: "Whether direct taxes, in the sense of the Constitution, comprehend any other tax than a capitation tax and a tax on land, is a questionable point." Mr. Justice Chase said: "I am inclined to think, but of this I do not give a judicial opinion, that the direct taxes contemplated by the Constitution are only two; to wit, a capitation or poll tax simply, and a tax on land. I doubt whether a tax by a general assessment of personal property within the United States is included within the term 'direct tax.'" Mr. Justice Iredell said: "Perhaps a direct tax, in the sense of the Constitution, can mean nothing but a tax on something inseparably annexed to the soil. A land or poll tax may be considered of this description. In regard to other articles, there may possibly be considerable doubt."

There was no evidence adduced by Mr. Hamilton in support of his presumption. The question arose solely and wholly upon the statement by him that that was his presumption. It is upon this presumption of Mr. Hamilton and these three doubtful expressions of judicial opinion that the subsequent decisions of this court in *Pacific Insurance Company* v. *Soule*, 7 Wall. 433 ; *Veazie Bank* v. *Fenno*, 8 Wall. 533; *Scholey* v. *Rew*, 23 Wall. 331; and *Springer* v. *United States*, 102 U. S. 586, were founded.

If the conclusion reached in the *Hylton case* was unsupported by evidence — was in direct antagonism to the evidence as it exists — and which was not produced or passed upon — and if a time of peace is more favorable for an absolute disassociation from political atmosphere than was possible when the *Springer case* was decided, then the rule of *stare decisis* ought not to constitute a bar to a new exami-

nation of the question involved, upon grounds not heretofore presented, nor the reaching of a different conclusion, if such a conclusion can be judicially justified. *Leloup* v. *Mobile*, 127 U. S. 640.

In considering this question, this court has supplied in *Martin* v. *Hunter's Lessee*, 1 Wheat. 304, 323; *Gibbons* v. *Ogden*, 9 Wheat. 1, 188; and *Rhode Island* v. *Massachusetts*, 12 Pet. 657, 721, rules for the interpretation of the Constitution. Words are to be taken in their natural sense, and the courts may resort to such sources of judicial information as are resorted to by all courts in construing statutes.

Is there any persuasive evidence that the framers of the Constitution did not use the words "direct taxes" in their "natural and obvious sense?" Would there be any absurdity or injustice in holding that they did so use them, and that they intended precisely what they said? Is there any persuasive evidence that they intended to restrict the present meaning of the phrase to a more limited signification, and to reject therefrom the inclusion of a tax on income?

It would seem, from a reference to such sources of judicial information as are resorted to by the courts in construing the Constitution, that these questions must be answered in the negative. There is no evidence that either the constitutional convention or the assenting conventions of the several States, or the people who attended both, used the words "direct taxes" with any restricted meaning, in an unnatural sense, or that they intelligently excluded a tax on incomes therefrom. The only qualification of this explicit statement is to be found in the language of this court in *Veazie Bank* v. *Fenno*, 8 Wall. 533, 546, where, in treating of the decision in the *Hylton case*, the court spoke of Mr. Justice Paterson's statements as "testimony." There is nothing either in Elliott's Debates or Madison's Reports which shows that the question of the definition of the words "direct tax" or "direct taxes" ever came before the Philadelphia convention. It was not there discussed, debated, or decided. Under these circumstances, any opinion which Justice Paterson expressed was an opinion rendered nine years after the conven

tion had ceased its labors — was his individual opinion, and was not fortified by any reference to the evidence. Such an opinion ought not to be construed as "*testimony*." Apart from this so-called testimony no evidence has been produced before the courts in antecedent cases tending to show that a tax upon incomes was intentionally excluded by the people and by the framers of the Constitution from the meaning of the phrase "direct taxes," or that such taxes were limited to taxes on land only. This conclusion has been reached only as a matter of opinion, and not as a conclusion founded upon the weight of evidence.

At the date of the Constitution (1787) the words "direct taxes" and "indirect taxes" were household words. They were borrowed from the literature and practice of Great Britain and the continent of Europe. They are to be found in the literature of the period, and in the debates of both Federal and state conventions. They had been used in Europe as meaning taxes which fell directly upon property and its owner, like a land tax or a tax on incomes, and as meaning taxes of which the ultimate incidence might fall upon another than the one who originally paid them, like taxes upon consumption. The inquiry, therefore, now is, whether, when adopted in this country, they carried with them the signification which universally obtained elsewhere, or whether they were accepted with a limited and restricted signification, which confined the meaning of the words to taxes on land and capitation taxes.

The Articles of Confederation, as originally adopted, provided for a common treasury, to be supplied by the several States, in proportion to the value of all land within each State, the taxes for paying that proportion to be levied by the authority and direction of the state legislatures. But in 1783 this was amended by providing that this treasury should be "supplied by the several States in proportion to the whole number of white and other free citizens and inhabitants, of every age, sex, and condition, including those bound to servitude for a term of years, and three-fifths of all other persons, not comprehended in the foregoing description, except Indians not paying taxes, in each State; which number

shall be triennially taken and transmitted to the United States in Congress assembled, in such mode as they shall direct and appoint." 1 Ell. Deb. 95.

Why was this phrase "land, buildings, and improvements thereon," in the original Articles, stricken out by this amendment? Mr. Rufus King answers this inquiry. He said: "According to the Confederation, ratified in 1781, the sums for the general welfare and defence should be apportioned according to the surveyed lands and improvements thereon in the several States; but that it hath never been in the power of Congress to follow that rule, the returns from the several States being so very imperfect." 2 Ell. Deb. 36. "In 1778, Congress required the States to make a return of the houses and lands surveyed; but one State only complied therewith — New Hampshire. Massachusetts did not. Congress consulted no rule. It was resolved that the several States should be taxed according to their ability." 2 Ell. Deb. 45. "Massachusetts has paid while other States have been delinquent. . . . Requisitions on the States for that money were made. Who paid them? Massachusetts and a few others. . . . But $1,200,000 have been paid. And six States have not paid a farthing of it." 2 Ell. Deb. 56.

Therefore, there is this concurrent testimony that the words "land, buildings, and improvements thereon" were intelligently rejected by the Confederate Congress as not being either a just, an equal, or a convenient source of revenue for the Federal government, and if that was the opinion prior to the adoption of the Constitution, how comes it at a later day that the phrase "direct taxes" is to be interpreted as relating only to a tax on "land, buildings, and improvements thereon," and thus to place the tax back upon that which had been previously rejected as the only source of Federal taxation?

In his letter to the Georgia convention of the 10th of October, 1787, Governor Randolph said: "There is another consideration not less worthy of attention — the first rule for determining each quota by the value of all lands granted or surveyed, and of the buildings and improvements thereon. It

is no longer doubted that an equitable, uniform mode of esti-
mating that value is impracticable; and therefore twelve States
have substituted the number of inhabitants, under certain
limitations, as the standard according to which money is to be
furnished." 1 Ell. Deb. 484.

This amendment to the Articles of Confederation was sent
forth by Congress to the people, accompanied by an address
prepared by Messrs. Madison, Ellsworth, and Hamilton. In
this, when speaking of population as the rule of taxation, they
said : "This rule, although not free from objection, is liable
to· fewer than any other that could be devised. The only
material difficulty which attended it in the deliberations of
Congress was to fix the proper difference between the labor
and industry of free inhabitants and of all other inhabitants.
The ratio ultimately agreed to was the result of mutual
concessions."

Two of the States accepted these amendments in full. All
the others accepted the first part, which related to the appro-
priation by them of substantial and effectual revenues for the
support of the general government, as they might deem most
convenient. Two of the States, New York and Georgia, did
not act upon the amendments at all (Jour. of Congress,
1783–4); but the fact remains that from the time of their
adoption by the Confederate Congress until the decision in
the *Hylton case*, land and buildings and improvements thereon
were never thereafter regarded as the source of revenue for the
Federal government. It results, therefore, that after "land,
buildings, and improvements thereon" were withdrawn as a
subject of Federal taxation, the requisitions of Congress were
met by the States by their own system of taxation. What
was that system ?

A careful examination of state legislation prior to 1787
establishes that the States of Vermont, Massachusetts, Con-
necticut, Pennsylvania, Delaware, New Jersey, Virginia, and
South Carolina assessed their citizens upon their profits from
their professions, trades, and employments, and collected a tax
thereon for the benefit of the States and of the general gov-
ernment.

In addition to these taxes upon income, nearly all the States imposed poll taxes, taxes on lands, on cattle of all kinds, and various kinds of personal property.

How were all these taxes known to the people of the States at the time when they were paying them ?

The Century Dictionary says: " In the United States, all state and municipal taxes are direct, and are levied upon the assessed valuations of real and personal property." Cooley and the American Cyclopædia also assert that all state taxes are direct taxes. But there is more persuasive evidence as to what kind of taxes the people at the time called those which they were paying in the States for the joint support of the States and of the general government.

In the Massachusetts convention, Mr. Dawes said : " Congress had it not in their power to draw a revenue from commerce, and therefore multiplied their requisitions on the States. Massachusetts, willing to pay her part, made her own trade law, on which the trade departed to such of our neighbors as made no such impositions on commerce; thus we lost what little revenue we had, and our only course was, to a direct taxation." 2 Ell. Deb. 41.

Mr. Nicholas, in Virginia, said : " Nine-tenths of the revenues of Great Britain and France are raised by indirect taxes; and were they raised by direct taxes, they would be exceedingly oppressive. At present the reverse of this proposition holds in this country, for very little is raised by indirect taxes. The public treasuries are supplied by means of direct taxes, which are not so easy for the people." 3 Ell. Deb. 99.

Mr. Iredell, of North Carolina, said: " Our state legislature has no way of raising any considerable sums but by laying direct taxes. Other States have imports of consequence. This may afford them a considerable relief; but our State, perhaps, could not have raised its full quota by direct taxes without imposing burdens too heavy for the people to bear." 4 Ell. Deb. 146.

Gouverneur Morris, in his observations on the Finances of the United States, says, two years after the Constitution was adopted : " There is a concurrent jurisdiction respecting internal or direct taxes."

In his report to Congress, in 1812, Albert Gallatin said: " The direct taxes laid by the several States during the last years of the Revolutionary War were generally more heavy than could be paid with convenience ; but during the years 1785 to 1789, an annual direct tax of more than two hundred thousand dollars was raised in Pennsylvania, which was not oppressive, and was paid with great punctuality."

This establishes the fact that all the taxes which the people were paying in 1787 were, according to their common understanding, expressed in their conventions, and expressed afterwards in the writings of those who had been constituents of the State at the time, direct taxes ; that such direct taxes were paid out of income, and were so paid for the support of the Federal government. True, they were collected by state officers, but the fact that it is now proposed to collect them out of income by Federal officers, does not seem to change the income tax from the direct tax of 1787 into the indirect tax of 1894.

The inquiry now arises, whether the practical interpretation given to the words " direct taxes " by the people and the laws of the several States, was in any way limited or restricted by the proceedings of the Philadelphia convention. In speaking of this convention this court said, in *Daniels* v. *Tierney*, 102 U. S. 415, 419 : " The circumstances which surrounded the convention and controlled its action are a part of the history of the times, and we are bound to take judicial notice of them."

In examining the debates it must be borne in mind that the words " direct taxation " do not occur in the Constitution. That instrument is limited to the words " direct tax " and " direct taxes." A careful examination of the debates warrants the assertion that the phrase " direct taxation " as used in the Philadelphia convention was not always used as a synonym for " direct taxes." The term " direct taxes " implies one of two things ; either the objects upon which the tax is placed, or the incidence of the tax upon the property and upon the person of its owner. " Direct taxation," in very many instances, refers to the *modus operandi* of collecting

the tax ; that is, whether the power should be given to Congress to collect the tax by direct taxation, or whether the power to collect Federal taxes should be exercised only after requisitions upon the States had been dishonored.

Mr. Pinckney's draft of the Constitution regulated direct taxation according to the whole number of inhabitants and left the power to Congress. Mr. Paterson's resolution authorized Congress to make a requisition upon the basis of population, estimated according to the old Articles of Confederation. Mr. Wilson introduced a resolution providing that in order to ascertain the alterations that may happen in the population and wealth of the several States, a census should be taken ; thus reaffirming the original doctrine that population was the true criterion and index of wealth, and this resolution was thereupon adopted : "That in order to ascertain the alterations that may happen in the population and wealth of the several States, a census shall be taken."

Then came the appearance of representation, and it was moved, and agreed to, that direct taxation ought to be proportioned according to representation, thus striking out population and substituting the number of representatives as the basis for the apportionment of direct taxes. The amendment rejected representation as the basis of taxation, and substituted the old rule of population, computed in the given manner. It was again moved that representation ought to be proportioned according to direct taxation, and in order to ascertain the alterations in the direct taxation which might be required, that a census should be taken. This was the introduction of the rule finally adopted, that representation ought to be proportioned in the same manner as taxation.

There was an animated contest over this proposition, and there were extended debates over the question whether direct taxation should be proportioned to representation or according to population. Finally, on the 16th of July, 1787, this resolution was adopted : " Representation ought to be proportioned according to direct taxation. And in order to ascertain the alteration in the direct taxation which may be required, from time to time, by changes in the relative circumstances of the

States — Resolved, That a census be taken, . . . and that the legislature proportion the direct taxation accordingly."

There was again a debate over this suggestion, which culminated in the draft of a constitution which apportioned direct taxation according to the number of the representatives. This was remodelled, and on the 12th of September, 1787, a revised draft of the Constitution was introduced, which provided that " representatives and direct taxes shall be apportioned on the basis of population," and under the rule prescribed by the Articles of Confederation. On this same 12th of September, 1787, the revised draft of the Constitution contained these words : " That no capitation tax shall be laid unless in proportion to the census hereinbefore directed to be taken." Then there came a debate in which these questions were discussed : The States are asked to give the power of internal taxation, now exercised by them respectively for the benefit of the general government, directly to Congress, so that it may exercise such power concurrently with the States, and directly upon the property and inhabitants of the States. This was the understanding of what the States were asked to do, and, after the constitution was adopted, of what they had done.

In the Massachusetts convention, Mr. Parsons said : " Congress have only a concurrent right with each State, in laying direct taxes, not an exclusive right ; and the right of each State to direct taxation is equally extensive as the right of Congress." 2 Ell. Deb. 93.

In New York, Chancellor Livingston said : " It is observed that, if the general government are disposed, they can levy taxes exclusively. But they have not an exclusive right. . . . Their right is only concurrent." 2 Ell. Deb. 346.

Mr. Hamilton said : " Unless, therefore, we find that the powers of taxation are exclusively granted, we must conclude that there remains a concurrent authority." 2 Ell. Deb. 363.

The States were also asked to give up their right of laying imposts and duties on imports and exports, the surrender of which right would confine them thereafter to their own internal taxes. They said in substance : If we surrender the right to imposts and duties, and if we divide the power of direct

taxation by giving to Congress a concurrent right with our-selves to lay direct taxes, such as have heretofore existed in our States, how are we to guard the exercise of this power so that it shall not be used oppressively? How is it to be restricted so that Congress will not have the right to impose undue burdens upon the States?

The answer to this was: Such restriction can be properly imposed with justice to ourselves and to Congress by limiting the exercise of this concurrent power to the rule of population, which is the index and criterion of wealth. If we give this power to the Federal government to come into the States and tax the same objects which we are there taxing, the amount of such tax on behalf of Congress must be apportioned upon the basis heretofore obtaining, and so that each State will know precisely how much it is called upon to contribute.

It would indeed be singular if, when the States were giving to the Federal government a concurrent right to levy and col-lect the direct taxes which they themselves were collecting, only the right to collect this unjust, unequal, and inconvenient tax on lands actually passed. This limitation, if it exists, does not arise from the language which the States used, " direct taxes," but only from an interpretation which, without support-ing evidence, excludes the residue.

The struggle was, first, to require Congress to apply to the States before having the right of direct taxation ; and second, if that could not be carried, then to limit the right of direct taxation to population. Mr. Martin voiced this when he said : " Many of the members, and myself in the number, thought that States were much better judges of the circumstances of their citizens, and what sum of money could be collected from them by direct taxation, . . . and that the general gov-ernment ought not to have the power of laying direct taxes in any case but in that of the delinquency of a State." 1 Ell. Deb. 369.

That the States believed that they had limited the power of assessing and collecting direct taxes to the rule of population, is further clearly shown in the debates in the state conven-tions. Having relinquished imposts and duties, and given to

Congress a concurrent power to collect direct taxes, they limited the exercise of the collection of such taxes to the rule of population. Hence the phrase, "representation and direct taxes;" hence the phrase, "no capitation tax shall be laid unless in proportion to the census hereinbefore directed to be taken." This latter phrase was, on the 14th of September, 1787, amended on motion of Mr. Read of Delaware. He "moved to insert after 'capitation' the words 'or other direct tax.' He was afraid that some liberty might otherwise be taken to saddle the States with the readjustment by this rule of past requisitions of Congress, and that his amendment, by giving another cast to the meaning, would take away the pretext." 5 Ell. Deb. 545. Mr. Williamson seconded the motion, which was agreed to.

The effect of adding the words "or other direct tax," so that the sentence should read "No capitation or other direct tax shall be laid, unless in proportion to the census," was to include therein not only a capitation tax, but also all the other taxes which the States at that time were collecting to pay their indebtedness to the general government.

Thus far, therefore, there is nothing in the debates to indicate that the words "direct tax" were to have a restricted and limited meaning, or were to apply only to taxes on land and taxes on polls.

Mr. Madison's Journal is printed as the fifth volume of Elliot's Debates. He there states that "Gouverneur Morris moved to add to the clause empowering the legislature to vary the representation according to the principles of wealth and number of inhabitants, a proviso that taxation should be in proportion to representation. . . . He admitted that some objections lay against his motion, but supposed they would be removed by restraining the rule to direct taxation. With regard to indirect taxes on exports and imports and on consumption, the rule would be inapplicable."

Mr. Morris, having so varied his motion by inserting the word "direct," it passed as follows: "Provided always, that direct taxation ought to be proportioned to representation." 5 Ell. Deb. 302.

Mr. Ellsworth moved to amend, in substance, (Id. 302,) so that the rule of contribution by direct taxation for the support of the government of the United States should be the rule as stated in the Articles of Confederation.

In the debates on the 20th of August, 1787, (Id. 451,) Mr. King of Massachusetts asked what was the precise meaning of direct taxation? No one answered. This inquiry, it is to be observed, was not "What is meant by a direct tax, or by direct taxes?" If so, there would doubtless have been an answer that by direct taxes was meant such taxes as the States were then paying; but having asked the question "What was meant by direct taxation?" he left it to be inferred that he used the phrase "direct taxation" not with reference to the objects upon which direct taxes were to be assessed and collected, but that he had reference to the same question of *modus operandi*, and he asked "What was meant by direct taxation?" that is, whether Congress should have power to levy and collect the tax, or whether requisitions therefor should be first made upon the States. The question was answered by Mr. Gerry, if it related to the *modus operandi* of taxation, for he moved, (5 Ell. Deb. 451,) that "from the first meeting of the legislature of the United States, until a census shall be taken, all moneys for supplying the public treasury by direct taxation shall be raised from the several States according to the number of representatives respectively in the first branch."

The motion was lost. The practical result, therefore, was that the old words of the amended Articles of Confederation were taken as affording the standard for both taxation and representation. The South secured the exclusion of two-fifths of its slaves in apportioning the taxes, and the North secured the exclusion of the same two-fifths in apportioning the representatives. The latter object was attained, as Mr. Morris said, "incidentally," leaving the ostensible exclusion as referable to taxes only, as it had been under the Confederation. The North was satisfied to have the apportionment of representation controlled by the same rule of taxation, and to which latter rule the States had theretofore consented. So long as

the rule was adopted for controlling both representation and taxation, it was immaterial whether such rule was introduced "incidentally" or otherwise. The attempt to limit taxation by representation was defeated, and representation was subjected to the old rule, which had been in force as to taxation since 1783.

It is evident, therefore, that the interpretation given by the people and the laws of the several States to the words "direct taxes" was not limited or restricted by any of the proceedings of the Philadelphia convention.

And further: It is conclusively and affirmatively established that the people, as represented by their delegates to the state conventions called to adopt and ratify the Federal Constitution, did not limit the phrase "direct taxes" to a tax on land only. The language used by Mr. Dawes and Mr. Adams in Massachusetts, by Mr. Ellsworth in Connecticut, by Chancellor Livingston and Mr. Jay in New York, and by Mr. Nicholas, Mr. Mason, and John Marshall in Virginia, proves this. The latter said: "The objects of direct taxes are well understood. They are but few. What are they? Lands, slaves, stock of all kinds, and a few other articles of domestic property." 5 Ell. Deb. 229.

What were the direct taxes to which he was referring? Not the direct taxes of the United States, because the United States had yet no power to levy any tax, whether direct or indirect. Therefore, when he spoke of "direct taxes" he was speaking of them as he understood them and as they existed in the States and in the State of Virginia, from which he was a delegate.

Mr. Wolcott, in his Report to Congress, when speaking of taxes assessed under the laws of Virginia of 1781, 1782, said that "taxes were assessed on lots and houses in towns;" being the "lands" of Mr. Marshall; on "slaves," being the "slaves" of Mr. Marshall; on "stud horses, jackasses, other horses and mules," being the "stock of all kinds" of Mr. Marshall; and on "billiard tables, four-wheeled carriages, phaetons, stage wagons, and riding carriages with two wheels," being the "few other articles of domestic property" referred to by Mr. Mar-

shall, as being the objects of direct taxes which were then well understood.

It is fair to infer from this statement of Mr. Marshall that if he had been a member of the court at the date of the decision in the *Hylton case*, he would not have concurred in the opinions of Justices Chase, Paterson and Iredell. When Congress undertook to pass the law which was under judgment in the *Hylton case*, Mr. Madison said that he should vote against it because it was unconstitutional. Why? Because the tax was a direct tax.

It is evident, therefore, that the delegates to the state conventions understood that by " direct taxes," which the Constitution gave Congress the power to levy and collect, they meant not taxes on lands only, but all such taxes as the States were then levying and collecting, under the name of " direct taxes," exclusive of duties and imposts on exports and imports. Chancellor Livingston and Mr. Jay said that direct taxes meant taxes on land and specific duties, and these were the kind of taxes which all the States were then levying and collecting, with the exception of New York, which had a property tax. The other States had direct taxes on property ; on incomes, on slaves, on stock, and two of them on carriages. All were taxing by direct taxes that description of property more or less enumerated by Mr. Marshall. Recalling the fact that in 1787 there was no standard of Federal taxation from which can be drawn a definition of the words " direct taxes ; " bearing in mind that " direct taxes " were known to the people of all the States by that name and as " direct taxes," and that in various of the States such taxes included a tax on incomes, the conclusion is inevitable that both in the Philadelphia convention and in the state conventions the " direct taxes " referred to by the delegates were those to which they were accustomed in their own States ; that those delegates used the words " direct taxes " in their natural sense, as the people then understood them ; that they used the phrase " direct taxes " as a noun of multitude, as Congress to-day speaks of the Supreme Court, the Army, the Navy, and the United States without particularizing any member of either.

The phrase " direct taxes " was a household phrase known to all, and is susceptible of definition only in accordance with the literature; in accordance with the definition placed upon it by other nations, or it must include the taxes of the period which the people were then paying in their respective States for the joint support of the States and of the Federal government; and those " direct taxes " were not limited to a tax on lands, but included all the internal taxes which fell upon the property and upon the person of the citizen of the State who owned it.

The " presumption " advanced by Mr. Hamilton is overcome by the historic evidence here produced. Possibly such evidence was not accessible when the *Hylton case* was argued.

One word as to the literature.

Adam Smith's Wealth of Nations was published in 1776. It was referred to by the court in the *Hylton case.* It is spoken of by Judge Cooley as a book whose maxims had secured for them universal acceptance. It was a recognized authority on both sides of the Atlantic. Smith made it clear that by " direct taxes " he meant taxes on persons assessed according to property or income, and as opposed to " indirect taxes " on expenses or consumption.

Turgot, the French author, lived from 1727 to 1781. He published in 1764 a work on taxation. He says of its forms: " There are only three possible: Direct upon the funds; direct upon the person, which becomes a tax upon labor; the indirect imposition, or that which is placed upon consumption."

In the American Museum for January, 1787, this work of Turgot is quoted, showing that it was then in circulation in America.

Inasmuch as these words of the Constitution are written words selected deliberately and discussed, after they were selected, anxiously and patiently by the several States, and that no question was ever raised until the carriage case as to what was meant by the term " direct taxes," — as to whether such phrase in the Constitution had a different interpretation from what it had when used in the States — the inquiry arises whether the States have ever given to the judiciary the power

to say that the language so selected and so discussed was to have a more limited and restricted signification than the natural sense of the words as they were understood by those who used them.

If the words "direct taxes" are to be interpreted as being a tax on land only, then it is to be said that the interpretation was not placed upon them by the Philadelphia convention, and was repudiated by the conventions of the several States. It is a new interpretation, equivalent to substituting a new word.

That the Philadelphia convention, or the conventions of the States, would have assented to and adopted this new and restricted meaning, and surrendered their judgment as to what they were then doing to the new meaning, cannot now be affirmed.

The words had a natural sense; they were commonly understood to mean what they imported; they were used for the purpose of expressing a fact then existing, and if a new interpretation is to be placed upon them, it must be so placed without the assent of either Federal or state conventions.

If the court is to strike out "direct" and insert "land," either by expunging the word "direct" or by interpreting it as confined in its meaning only to land, it is in effect inserting a new phrase in the Constitution, which is not there to be found, and to which the States have never given their assent.

It results, therefore:

(1) That an income tax as a direct tax existed long before the Constitution; existed in some of the States after the Constitution, and in one of the States until the present day. It was as well recognized in the localities as any other tax. It was known and called a direct tax, as one of the taxes imposed by the States.

(2) When the words were introduced into the Constitution, they were used, as Chief Justice Marshall said, "in their natural sense," and are to be taken, as he also said, "in their natural and obvious sense." It is not a "natural sense" nor a "natural and obvious sense" to reject from the taxes which the people were paying when the words were used, all of such taxes except a tax on land, and to limit and restrict the words

whi·h they did use to that individual tax. The people have never assented to that restriction in any convention.

(3) If an income tax be a direct tax, then, in order to be a constitutional tax, it must be apportioned and collected as such.

(4) Such apportionment and collection do not involve any practical difficulty.

*Mr. Assistant Attorney General Whitney*, who appeared by leave of court, for the United States.

The method by which the questions are presented in the *Pollock* and *Hyde cases* was not chosen with the consent of the government. The corporations have ample remedy at law, either by standing on the defensive, or by paying the tax under protest and suing to recover the amount paid. Plaintiffs would be sufficiently protected by a decree restraining the corporations from *voluntary* payment. ·Yet the bills do not allege that the corporations intend to pay voluntarily. No injunction, it is believed, has ever been granted against the payment of a tax to the United States government; or against the execution of a law of the United States on the ground that the law was unconstitutional. It is believed that in no case can such an injunction properly be granted; and it is regarded as important not to break the chain of precedent against such relief. These objections, however, are not jurisdictional in the strictest sense. *Hollins* v. *Brierfield Coal Co.*, 150 U. S. 371, 380, 381, and cases cited; *Insley* v. *United States*, 150 U. S. 512, 515, and are not taken by defendants. In view of the great public interest aroused, and of the fact that no cases in proper form ·are now pending, these objections are waived on behalf of the government, so far as it is in the power of its officers to waive them.

As to the method in which the questions are presented in the *Moore case*, the objection to the form of action is not waived. The appellant had full remedy by suit, to recover taxes paid under protest (*Elliott* v. *Swartwout*, 10 Pet. 137; *Insurance Co.* v. *Ritchie*, 5 Wall. 541; *City of Philadelphia*

v. *Collector*, 5 Wall. 720; *Railroad Co.* v. *Jackson*, 7 Wall. 262; *Assessors* v. *Osbornes*, 9 Wall. 567; *Collector* v. *Day*, 11 Wall. 113; *Collector* v. *Hubbard*, 12 Wall. 1; *Erskine* v. *Van Arsdale*, 15 Wall. 75; *Barnes* v. *The Railroads*, 17 Wall. 294; *Stockdale* v. *Insurance Cos.*, 20 Wall. 323; *Cheatham* v. *United States*, 92 U. S. 85; *Railroad Co.* v. *Commissioners*, 98 U. S. 541; *Railroad Co.* v. *Collector*, 100 U. S. 505; *Wright* v. *Blakeslee*, 101 U. S. 174; *James* v. *Hicks*, 110 U. S. 272; *Manhattan Co.* v. *Blake*, 148 U. S. 412); because the general laws concerning collection of internal revenue apply to the income tax. See *Stuart* v. *Maxwell*, 16 How. 150; *United States* v. *67 Packages of Dry Goods*, 17 How. 85; *Ring* v. *Maxwell*, 17 How. 147; *Saxonville Mills* v. *Russell*, 116 U. S. 13. Hence a remedy by injunction will not lie. *Cheatham* v. *United States*, 92 U. S. 85; *United States* v. *Pacific Railroad*, 4 Dill. 66. This is confirmed by a declaratory statute, Rev. Stat. § 3224; *Snyder* v. *Marks*, 109 U. S. 189; *State Railroad Tax Cases*, 92 U. S. 575. A taxpayer cannot have a vested right in any particular remedy. *Collector* v. *Hubbard*, 12 Wall. 1. Proceedings to collect taxes have been, are, and always will be arbitrary. *Fong Yue Ting* v. *United States*, 149 U. S. 698, and cases cited; *Origet* v. *Hedden*, 155 U. S. 228. The execution of a law will not be enjoined on the ground that the law is unconstitutional. *Mississippi* v. *Johnson*, 4 Wall. 475; *Gaines* v. *Thompson*, 7 Wall. 347; *Robbins* v. *Freeland*, 14 Int. Rev. Dec. 28, approved in *Snyder* v. *Marks, supra*. This follows from the doctrines that injunction is a remedy correlative to mandamus (*Gaines* v. *Thompson, supra; Noble* v. *Union River Logging Railroad*, 147 U. S. 165); and that mandamus will not lie when the law is doubtful. *Bayard* v. *White*, 127 U. S. 246. The constitution does not guarantee to the citizen all common law and equitable remedies known in 1787. Notwithstanding its provisions he may have a right without any remedy in a judicial tribunal. *McIntyre* v. *Wood*, 7 Cranch, 504; *Cary* v. *Curtis*, 3 How. 236.

The government presents no synopsis or review of economic writings relating to direct and indirect taxation, or of the discussions upon this point prior to the excise laws of 1794. This

is because the definition of "direct taxes" has been settled, and the constitutionality of the income tax sustained, by decisions of this court which the government assumes will not be reconsidered.

Economic definitions are inapplicable. By general consensus of the economists of the present century, a direct tax is a tax which can be shifted by the taxpayer on to the shoulders of some other person, as upon a buyer, mortgagor, or tenant. Whether or not a particular tax can be shifted is in many instances a difficult question upon which economists are not agreed. Some taxes can be shifted in part only. It cannot have been intended that the validity of a tax law should depend upon such abstruse discussion. See *State Tax on Railway Gross Receipts*, 15 Wall. 284, 294. Nor was there any settled definition of "direct taxes" in the last century. The French economists, who then had great influence in America, held that poll taxes and land taxes were direct and all others indirect. No general income tax was then known in Europe. The English partial income tax of 1759 on salaries, professional receipts, etc., was called a "duty," as distinguished from a "tax" like the land tax. The inapplicability of the economic definition, however, was settled during Washington's administration by Congressional construction, confirmed by a decision of this court. The excise laws of 1794 were hotly contested in Congress upon constitutional grounds, the opposition being led by Madison. Shortly after the passage of these laws, a test case was made in Virginia, doubtless upon consultation with Madison and the other leaders. This was the carriage tax case of *Hylton v. United States*, 3 Dall. 171. According to strict economic definition, a carriage tax is part direct and part indirect. It is direct as against pleasure carriages kept for use of their owners; indirect as against carriages belonging to livery stables. The tax is usually classified by economists as direct. It was held, however, to be a "duty," as it had been called by Congress. The inapplicability of economic definitions was further confirmed by practical construction during the period of the war of 1812 by the levy under the rule of uniformity of taxes which economists would classify

as direct. Acts of July 24, 1813, c. 24, 3 Stat. 40; Dec. 15, 1814, c. 12, 3 Stat. 148; Jan. 18, 1815, c. 23, 3 Stat. 186; Feb. 27, 1815, c. 61, 3 Stat. 217. Similar legislation during and after the civil war, completed a course of practical construction which should of itself be conclusive. The economic definition was then again repeatedly disavowed by this court. In *Pacific Insurance Co.* v. *Soule*, 7 Wall. 433, the taxes under discussion included a tax upon dividends and undistributed sums, — in fact, a complete corporation income tax, — in *Scholey* v. *Rew*, 23 Wall. 331, a succession tax upon real estate was discussed; and in *Springer* v. *United States*, 102 U. S. 586, an individual tax. All of these were unanimously sustained. All would be construed direct taxes by economists. That the true definition is not the economic definition is indeed shown by the Constitution itself. The distinction there drawn is not between direct taxes and indirect taxes, but between direct taxes on the one hand and "duties, imposts, and excises" on the other. This is radically different from the economic definition. Many or most excises are direct taxes as understood by economists.

The constitutional definition as "direct taxes," as thus far settled, is negative in character. The best evidence of the intentions of the friends of the Constitution is to be found in the *Hylton case*, in which two of the concurring Justices were not only prominent members of the Constitutional Convention, but members who gave especial attention to questions of taxation. Without definitely so deciding, the court intimated, as stated by Mr. Justice Chase, "that the direct taxes contemplated by the Constitution are only two, to wit: a capitation or poll tax simply, without regard to property, profession or any other circumstance, and a tax on land" (3 Dall. 175) — in other words, the French definition. After a series of cases in which this question was considered (see particularly *Veazie Bank* v. *Fenno*, 8 Wall. 533), this court finally and deliberately laid down in the *Springer case* the following proposition through Mr. Justice Swayne: "Direct taxes within the meaning of the Constitution are only capitation taxes as expressed in that instrument, and taxes on real estate." This definition, closing a controversy of 88 years'

standing, should be regarded as one upon which Congress might implicitly rely.

"Direct taxes," by a more practicable definition, would mean taxes falling directly upon the thing taxed and, at least primarily, collectible out of it. Familiar instances are poll taxes, and in many States land taxes chargeable only against the land and not a charge against its owner at all. An income tax is less direct than a carriage tax, which may be made to fall directly upon the carriages by distraint; or even than an import duty upon goods, which are seizable for non-payment of the tax. It is not a tax on property at all; it is a tax not on what a man now has, but on himself, measured by what he did have, although most of it he may have already spent.

Not only, however, has this court held an income tax not to be a direct tax; it has expressly held it to be an excise or duty. A tax on net income is similar in character to a tax on gross receipts, and is even less direct. Such taxes have been often defined as duties or excises. In the *Springer case* this court said : " The tax of which the plaintiff in error complains is within the category of an excise or duty.". 102 U. S. 602. Besides the *Pacific Insurance* and *Scholey cases*, we may refer to *State Tax on Railway Gross Receipts*, 15 Wall. 284, 293; *Railroad Co.* v. *Collector*, 100 U. S. 595, 598; *Memphis & Charleston Railroad Co.* v. *United States*, 108 U. S. 228, 234; *Maine* v. *Grand Trunk Railway*, 142 U. S. 217, 228; *Ficklen* v. *Shelby County*, 145 U. S. 1, 24; *Postal Telegraph Cable Co.* v. *Adams*, 155 U. S. 688, 699; see also 2 Steph. Com. 6th ed. p. 603; *Portland Bank* v. *Apthorp*, 12 Mass. 252, 256 ; *Commonwealth* v. *Hamilton Manufacturing Co.* 12 Allen, 298, 307, aff. 6 Wall. 632; *Commonwealth* v. *Lancaster Savings Bank*, 123 Mass. 493; *Connecticut Ins. Co.* v. *Commonwealth*, 133 Mass. 161; *Minot* v. *Winthrop*, 162 Mass. 113.

If the tax were an excise and also a direct tax, the former term governs. It is more specific, and, as held in the *Hylton case*, the rule of apportionment as applied to " direct taxes" was " the work of compromise " and " radically wrong " as

well as impracticable, and therefore "not to be extended by construction." The two words, however, are used exclusively by the Constitution, and whatever is an excise cannot be a direct tax within the meaning of that instrument.

Next as to the "uniformity clause." This is geographical in character and means that the tax must be the same in each State as it is in every other State. The construction is clear from a comparison of the two clauses under consideration. The words "uniform throughout the United States" are evidently used in contradistinction to the words "apportioned among the several States . . . according to their respective numbers." It is also well established. *Head Money Cases*, 112 U. S. 580, 594; Miller on Constitution, pp. 240, 241; Pomeroy's Constitutional Law, §§ 280, 287; 1 Story on the Constitution § 957. Moreover, the history of the Constitutional Convention of 1787 shows clearly that its members had in mind uniformity between the different States and not uniformity between different classes of individuals. The same phraseology is elsewhere used in the same article with reference to naturalization and bankruptcy. The uniformity requirement as to these has never been supposed to be other than geographical.

While the "uniformity clause" is merely geographical in character, there is, however, a certain degree of uniformity involved in the very word "tax;" a uniformity requirement involved in the definition of that word and guaranteed by the Fifth Amendment to the Constitution. While A cannot be taxed merely to benefit B (*Calder* v. *Bull*, 3 Dall. 386; *Loan Association* v. *Topeka*, 20 Wall. 655; *Cole* v. *La Grange*, 113 U. S. 1; Pomeroy's Constitutional Law, § 295 c; *Miles Planting & Manufacturing Co.* v. *Carlisle*, Ct. App. Dist. Columbia, January 8, 1895), so on the other hand, if A and B belong to the same class, we may concede that they are to be taxed alike. A special tax cannot be laid upon A simply because he is A and not B. Such a law would be an attempt to exercise not a taxing power, but the power of eminent domain, and would require compensation for the property taken. Thus the constitution of Pennsylvania provides that taxes shall be "uni-

form on the same class of subjects;" while the Supreme Court of that State has decided that this requirement is merely declaratory. *Kitty Roup's Case*, 82 Penn. St. 211.

The question, therefore, arises, how far the legislative power of classification extends. Most decisions in State courts are inapplicable, as they construe provisions not found in the Federal Constitution. Under the Pennsylvania requirement above quoted, the power of classification is very extensive. *Commonwealth* v. *Germania Brewing Co.*, 145 Penn. St. 83, 86, 89; *Commonwealth* v. *National Oil Co.*, 157 Penn. St. 516. In the absence of special Constitutional restrictions, similar latitude has been allowed by this and other courts. *Bell's Gap Railroad Co.* v. *Pennsylvania*, 134 U. S. 232, 237; *Home Ins. Co.* v. *New York*, 134 U. S. 594, 606, 607; *Pacific Express Co.* v. *Seibert*, 142 U. S. 339, 351; *Giozza* v. *Tiernan*, 148 U. S. 657, 662; *Matter of McPherson*, 104 N. Y. 306, 316, 317, 318; *Gibbons* v. *District of Columbia*, 116 U. S. 404, 408; Cooley on Taxation, 2nd ed., p 164.

Congress in this act has simply exercised its right of classification. The provisions now objected to are nearly all to be found in the income tax laws of the war and reconstruction period, and many are general in all similar fiscal systems. It is impossible to construe this law and discuss its constitutionality or application without understanding its underlying principle. This principle is one of compensation. Certain principles of taxation are well settled, and almost universally recognized: first, that taxes on consumption bear unduly hard upon the poor and upon what is called by the economists the lower middle class, financially speaking, because the comparatively poor consume all or nearly all of their income; second, that the fairest method of equalizing taxation is by an income tax with an exemption of all incomes below a certain amount. John Stuart Mill's Political Economy, Vol. 2, p. 476; Sir Robert Peel, quoted by Senator Sherman, Cong. Globe, May 23, 1870, p. 381; Senator Fessenden, Id. July 25, 1861, p. 255; Senators Sumner and Trumbull, Id. May 28, 1864, pp. 2512–15; Senator Sherman, Id. May 23, 1870, Appendix, pp. 377–380; and March 15, 1872, p. 1708. This exemption approximately

represents the incomes which, prior to the establishment of the income tax, bore more than their fair share of taxation. Economists and statesmen differ as to the advisability of adopting this method of compensation. Many urge that the familiar objections to it as inquisitorial, productive of dishonesty, discriminating against the honest, etc., are sufficient to counterbalance its advantages. Such practical considerations are exclusively for the economists and statesmen and not for the court to decide. *Pennington* v. *Coxe*, 2 Cranch, 33, 59.

The various objections upon the score of uniformity will now be considered in their order.

*The minimum of $4000.* This has already been explained. It is the limit fixed by Congress as dividing the incomes previously unduly taxed from those previously unduly favored. The whole attack on the justice of this *minimum* feature is based upon a fundamental fallacy; upon the notion that the income tax stands alone instead of forming part of a general fiscal system, the different parts of which are set to balance each other in approximation to that equality which in its perfection is "a baseless dream." *Head Money Cases*, 112 U. S. 580, 595. All our previous income tax laws contained a similar *minimum* provision, and some of them levied graduated taxes. The last previous one, that of July 14, 1870, c. 255, 16 Stat. 256, taxed only incomes over $2000. The same is true of all or nearly all similar laws, past and present, domestic and foreign. Personal property and succession taxes and many others carry a like exemption. The uniformity clause of the Constitution applies to import duties as well as to internal taxes. From 1846 to 1861 import duties were *ad valorem* entirely. At all other periods they have been partly specific, although specific duties are notoriously unequal, bearing harder on the poor than on the rich. Instances have also been common of compound duties classifying the same article according to value with a series of *minimum* rates (*Arthur* v. *Vietor*, 127 U. S. 572, 575; *Hedden* v. *Robertson*, 151 U. S. 520, 521), and exempting all imports below a certain value. *Arthur* v. *Morgan*, 112 U. S. 495, 498. Our first excise act taxed city distilleries at one rate and country distilleries at another. Act of

March 3, 1791, c. 15, 1 Stat. 199.   The next provided for draw-backs on distilled spirits, but not on any quantity less than 100 gallons.   Act of May 8, 1792, c. 32, 1 Stat. 267.   The early excise acts also contain *minimum* provisions.   Act of June 9, 1794, c. 65, 1 Stat. 397; acts of January 18, 1815, c. 22, 3 Stat. 180; c. 23, 3 Stat. 186.   This legislation is a Congressional assumption of the very widest possible powers of classification.   Having stood so long unquestioned, it constitutes a practical construction of the Constitution which should be conclusive.   *Field* v. *Clark,* 143 U. S. 649, 691; *McPherson* v. *Blacker,* 146 U. S. 1.   Similar *minimum* provisions are familiar in the succession taxes levied by the States.   *Minot* v. *Winthrop,* 162 Mass. 113; *Matter of McPherson,* 104 N. Y. 306.   In *Home Insurance Co.* v. *New York,* 119 U. S. 129; 122 U. S. 636; 134 U. S. 594, 607, this court sustained under the Fourteenth Amendment a law taxing corporations dividing over 6 per cent per annum by one system, and those dividing less at one wholly different, Mr. Justice Field saying: "All corporations, joint-stock companies, and associations of the same kind are subjected to the same tax.   There is the same rule applicable to all under the same conditions in determining the rate of taxation.   There is no discrimination in favor of one against another of the same class."   *Minimum* provisions are familiar in exemptions from levy on execution and bankruptcy laws, laws relating to criminal as well as civil procedure, right of appeal, qualification of jurors and sometimes of voters.

Objection is further made that but one exemption is allowed to each family, whether its income belong to one member or is contributed by more than one — that is, when the family consists of husband and wife, or parents and minor children, so that the income is combined by the common law.   This is a corollary to the reasoning upon which the law is based.   Two families of equal size and pecuniary ability may be presumed to suffer to the same extent from taxes upon consumption, whether the income all belongs to one member of the family, or not.

It is further said that a corporation is not allowed to deduct $4000 from its income before paying the tax, as is the case

with an individual. The reason is plain. This is not a tax upon gross income, but a tax upon net income. The net income of a corporation is radically different in character from that of an individual. Among the elements which go to make up the so-called net profits or income of an individual is that known to economists as "wages of superintendence" or the value of the labor of the individual himself. See *Muser* v. *Mayone*, 155 U. S. 240. The individual business man does not pay himself wages or keep any account representing his estimate of the value of his own services. Everything that he makes over and above what he pays out to somebody else must be returned as net income. The net income of a corporation, on the other hand, contains no such element. The "wages of superintendence" consist of the salaries of its managers and is counted as an expense. When the individual owner of a business incorporates it, he at once begins to pay himself a salary from the funds of the corporation. If, therefore, the corporation were allowed the same *minimum* as an individual, there would be a lack of uniformity prejudicial to the individual.

*Next as to exemptions.* The law exempts certain classes of corporations from taxation. Some of these exemptions are contained also in the prior income tax laws. The power to exempt is well settled. *Bank of Commerce* v. *New York City*, 2 Black, 620, 631; *Home of the Friendless* v. *Rouse*, 8 Wall. 430, 438; *Welch* v. *Cook*, 97 U. S. 541; *Bell's Gap Railroad* v. *Pennsylvania*, 134 U. S. 232, 237. Congress thought that by making these exemptions it was encouraging thrift and providence on the part of the poor. (Cong. Rec., April 29, 1894, p. 5190; June 2, 1894, pp. 6565, 6568; June 22, 1894, p. 7828; see Stat. 16 and 17 Vict. c. 34, §§ 49, 54; 5 and 6 Vict. c. 35, § 88; Barry on Bldg. Soc., §§ 1, 2, and pp. 48, 111, 112; Endlich Law of Bldg. Asso., § 1; *Loan Association* v. *Morgan*, 57 Alabama, 53; Acts of June 30, 1864, c. 173, § 120; July 14, 1870, c. 255, § 15.) The incomes exempted are comparatively small in total amount, although large in actual figures. Their inclusion cannot, therefore, be regarded as a vital part of the whole scheme of taxation; hence, if the

exemption is improper, it does not invalidate the law *in toto*. *Supervisors* v. *Stanley*, 105 U. S. 305, 312; *Huntington* v. *Worthen*, 120 U. S. 97, 102; *Field* v. *Clark*, 143 U. S. 649, 695-6.

The other objections to the law as a whole do not seem to be seriously pressed. It is no objection to a tax that it is measured in part by income received prior to the passage of the act. *Stockdale* v. *Insurance Companies*, 20 Wall. 323; *Railroad Company* v. *Rose*, 95 U. S. 78; *Locke* v. *New Orleans*, 4 Wall. 172; *Gray* v. *Darlington*, 15 Wall. 63, 66; *Wright* v. *Blakeslee*, 101 U. S. 174. If there be anything invalid in the administrative provisions of the law (a subject which we do not discuss), the whole law is not thereby invalidated.

*The claimed exemption of rentals.* Such a claim is made in briefs filed. It is submitted that this tax on income, so far as the income is from rentals, is not a tax on the land rented and is therefore not a direct tax. "The tax is payable by the person because of his income, according to its amount and without any reference to the way in which it was obtained. *Memphis & Charleston Railroad* v. *United States*, 108 U. S. 228, 234. See *State Tax on Railway Gross Receipts*, 15 Wall. 284; *Osborne* v. *Mobile*, 16 Wall. 479, 481; *Murray* v. *Charleston*, 96 U. S. 432, 446; *Philadelphia Steamship Co.* v. *Pennsylvania*, 122 U. S. 326, 344, 345.

This law does not contain any tax measured by land values. Land may have a good selling value, but little or no rental value; a high present rental value, but a low stipulated rental; a high stipulated rental, but little or no collections. Moreover, the value of land is quite independent of mere temporary taxes or assessments laid by States and municipalities; and is never affected by the question whether the losses by fire, incurred during the past year, were compensated to the owner by insurance. Nevertheless, in estimating for the income tax, he is allowed for all such taxes, and is allowed for all losses not compensated by insurance, while disallowed the rest. Finally, these net rentals thus estimated are then lumped with all other sources of income and subjected to a deduction to offset the estimated average excess of expenditure in duties

upon articles of consumption from the first $4000 of one's income. Hence, the measure of this tax does not bear the slightest proportion to the values of land.

Moreover, the tax on land, when it is a direct tax, is a tax upon, and collectible out of, the land itself. Here there is not even a lien, for the tax, upon the land whose rentals have entered into the gross income of the tax-payer.

An income tax is no more a tax on land than is a succession tax when the succession is to land. *Scholey* v. *Rew,* 23 Wall. 331, is, therefore, in point. In that case the tax was even made a specific lien upon the land itself. The government relied on authorities holding that a covenant in a lease to pay taxes on land does not cover a tax imposed on the landlord in respect to the land. The court held that it was not a tax on land. See also *Minot* v. *Winthrop,* 162 Mass. 113, and *cas. cit.; Wallace* v. *Myers,* 38 Fed. Rep. 184.

In political economy a tax on all property or all income is not regarded as the equivalent of a series of special taxes covering all parts of the property or income. The same distinction is recognized by the law. *Railroad Company* v. *Collector,* 100 U. S. 595; *United States* v. *Erie Railway,* 106 U. S. 327; *Society for Savings* v. *Coite,* 6 Wall. 594; *Hamilton Company* v. *Massachusetts,* 6 Wall. 632; *Home Insurance Co.* v. *New York,* 134 U. S. 594. See also *Van Allen* v. *The Assessors,* 3 Wall. 573, 583; *Bradley* v. *The People,* 4 Wall. 459; *Tennessee* v. *Whitworth,* 117 U. S. 129, 136–7; *Wilcox* v. *Middlesex County Commissioners,* 103 Mass. 544; *State Tax on Railway Gross Receipts,* 15 Wall. at p. 294.

If the tax on rentals is so vital an element in the whole scheme as to make void the entire law if the rentals are not taxable by the rule of uniformity, then the *Springer case* is in point. While Springer's own particular income included no rentals of real property, nevertheless, the question was involved in his case; for if the law was void *in toto* as to persons whose income was in part made up of rentals, so it was void *in toto* as to everybody else also.

If the rentals are regarded as separable from the rest of the tax, then the *Scholey case* is still in point as already shown.

We do not discuss the suggestion that income from personal property is non-taxable, for two reasons; first, that the *Hylton case* settles the rule that a tax on personal property, at least a tax other than on all personal property at a valuation, is a duty or excise; second, that these appellants did not appear to have any income from personal property other than municipal bonds.

*Municipal bonds.* It is settled that the bonds of one State or its municipalities may be taxed by another State. *Bonaparte* v. *Tax Court*, 104 U. S. 592; but it is not settled whether they may be taxed by the Federal government. See dissenting opinion of Mr. Justice Bradley in *Collector* v. *Day*, 11 Wall. 113, 128, 129. The remarks of Mr. Justice Matthews in *Mercantile Bank* v. *New York*, 121 U. S. 138, 162, are *obiter*. Chief Justice Marshall regarded the question as left open, whether the Federal government could tax state bonds, even if it were decided that the State could not tax Federal bonds. *McCulloch* v. *Maryland*, 4 Wheat. 316, 435, 436. It has never been decided that the State could not include Federal bonds in a general property tax (in the absence of express prohibition by Congress), except in *Bank of Commerce* v. *New York City*, 2 Black, 620. See *People* v. *Commissioners of Taxes*, 23 N. Y. 192; 26 N. Y. 163. The power of the States was asserted by the dissenting Judges in *Weston* v. *Charleston*, 2 Pet. 449. The question was not involved in that case, however, and not decided by the court; for that was not a general property or income tax, but a special tax on certain named securities (p. 450), and it is undoubted that a special tax cannot be laid by the State on Federal securities, since the power to tax in that manner is the power to destroy; and therefore such a tax may justly be described as a tax upon the borrowing power of the government. No such argument can be drawn from the inclusion of Federal bonds in a general income tax. The power to tax in that manner would not be the power to destroy, by any reasonable interpretation. The Federal borrowing power could not be destroyed without destroying all the property in the State and reducing all its laborers to a condition of slavery, except those

who were fortunate enough to divide its spoils. A general state income tax could not impede or disadvantage in any way the Federal right to borrow. The property of the lender was taxable before the loan. He simply changes its form. The tax goes on at the same rate. Exemption, on the other hand, is a positive advantage to the Federal borrower. If the citizen lends to the government, he will pay no more taxes to the State. He therefore is supposed to calculate the principal sum representing the interest he will thus save, and pays that principal sum, in the form of a premium, to the government. What is the net result? The government has confiscated the taxable value of some of the taxable property in the State, and then sold it to somebody for cash.

The question in the *Bank of Commerce case* never came before the court a second time, because Congress, by the act of February 25, 1862, c. 33, 12 Stat. 345, expressly exempted United States bonds from State taxation. The court's line of reasoning has not been sustained in other cases. The principle of the case has not been applied to other Federal agencies. *Railroad Co.* v. *Peniston*, 18 Wall. 5. The argument that, if the Federal bonds were taxable at all, the State could establish a general tax with exemptions, which would be the substantial equivalent of a special tax, and that the Federal courts would be unable to pass upon the propriety of the exemptions, has been overruled in *Mercantile Bank* v. *New York*, 121 U. S. 138, 161, 162.

*Mr. George F. Edmunds* for Moore, appellant in 915. *Mr. Samuel Shellabarger* and *Mr. Jeremiah M. Wilson* were with him on his brief.

I am first to consider whether my client, Mr. Moore, has any standing to be heard in this court. There are very important questions involved in this so-called income tax law. It is objected to his right to be heard by the judicial power of the United States against what he conceives to be, and what we believe and maintain to be an absolute and unauthorized invasion of his private rights, that Congress has said that he shall not be heard.

If he has no right under the Constitution to appeal to the courts of his country for protection against that which no law authorizes, and which is absolutely destitute of authority on the part of persons who thus undertake to invade his office, explore his books, and compel him to pay, and to finally decide in fact, so far as that goes, whether he has told the truth about it or not, and if they think he has not told the truth, to punish him by a penalty as a final judgment; if, in such a case, he cannot appeal to the courts, of course he has no business to be here.

But if the Constitution of our country has really created a judicial power of the United States, independent in itself, and standing on the rock of the Constitution — a department of the government to which the Constitution has imputed the authority and the duty to protect the citizen against unlawful and tyrannical invasions of his private rights — then he has a right to ask you to decide whether these invasions which are now threatened against him are those which the law has warranted, or are only those which have been invited by a body of respectable gentlemen, who had no right to speak, and who have now disappeared off the face of the political earth.

The Constitution declares that the judicial power shall extend to all cases in law and in equity arising under the Constitution and laws of the United States, and gives this Court original jurisdiction in such cases.   The judiciary act of 1789 put the judicial power in motion, and it has continued so without change, as to the point about which I am speaking.

The statute which is supposed to bar Mr. Moore of the right to be heard in equity is the provision in Rev. Stat. § 3224, that "no suit for the purpose of restraining the collection or assessment of any tax shall be maintained in any court."

If that means any lawful tax, it is absurd.   If it means, as it probably was intended to mean, to apply merely to questions of the amount of the assessment, of classification, of irregularities, of technicalities, etc., in one point of view it is consistent with public interest.   But if it is meant, as I assume it to be, as a prohibition against every citizen to whom a man falsely pretending to be a collector or assessor of taxes comes,

without any real act of Congress behind him, and by the sheer arbitrary force of an executive branch of the government, invades his office and his books, and decides whether he has reported truthfully or not, and finally seizes his property, I say it is a declaration that Congress had no power to make.

The Constitution certainly regarded cases in equity that accorded with acknowledged, settled, and well-known historical principles and the historic practice of jurisprudence for hundreds of years, as proper ones for an appeal to a judicial tribunal; it said so, and it meant what it said. And when it declared that the judicial power should consider and decide, in cases brought before it, all cases in equity arising under the Constitution and laws of the United States, it was a function that the Constitution implanted in the courts, and one which no so-called act of Congress could abolish or diminish.

Suppose Congress says that in exercising the original jurisdiction of this court no suit in equity shall be brought by one State against another, or respecting an ambassador. Can we think that there would be any want of unanimity in this supreme tribunal in holding that it was a matter beyond the competence of Congress to say that you could only exercise a part of what the Constitution had given you, and that you should not, in respect to particular States or ambassadors, or particular topics that fell within the range and scope of the Constitutional description and boundary of your powers, permit them to be heard while you did exercise your powers in all other cases?

All such action of Congress defies the Fourteenth Amendment, if that amendment applies to the United States (as I think it does) as well as to the States, for it declares that the equal protection of the laws is to be everywhere inviolable for the protection of everybody.

So that I maintain, with confidence and hope, that this court will have no difficulty in saying that this prohibition of Congress against this particular kind of suit, on account of its being a suit in respect of a tyrannical and unconstitutional attempt on the part of the person who holds a particular office to invade the private affairs of my client, is no impediment to your consideration of the case.

I come now to the question whether there is equity jurisdiction. It is insisted that where there is a plain and adequate remedy at law the courts of equity cannot be appealed to. We all grant that. Everybody knows it. And then it becomes a question in tax cases, as in every other, whether there is an adequate remedy at law. While courts are inclined in tax cases, as they are in some other cases (when it is a question of stopping a railroad or stopping a trespass), to refrain from issuing injunctions, etc., yet the courts everywhere in respect to these tax cases have been careful to express a saving clause, meaning that if there be the circumstance of multiplicity of suits, irreparable injury in respect of matters incapable of redress in a just sense, by a suit at law for damages, equity will intervene.

Now, do we fall within the principle? Here is a statute, so called — I call it a statute for brevity — here is a statute which declares that a particular officer of the government and his deputies appointed by himself — which the Constitution gives him no authority to appoint at all, he is not the head of a department — but we do not now stand on that — I only speak of it as one of the plants of vice that bloom in this tax garden of injustice in the last Congress — may compel every citizen of the United States, not only if he has $4000 a year, but if he has earned $3500, in respect to which no tax is to be assessed — to make a report to him, answering a series of questions under authority of this act — and I assume for the moment that they are authorized by the act — which invade every item of his private transactions, and affect the interests of everybody with whom he has been in connection, in situations of trust of the most sacred confidence, as a lawyer, for instance; in situations of trust of the most sacred confidence, as a physician; in situations of the most private character in business purely his own; in situations of the most sacred confidence, as the president of a bank, or a broker acting for thousands of customers in the market, and compel him to expose everything to, the satisfaction of this agent of the law, as he is called. And if he does not do it, what then? Then this so-called agent of the law is to make up his mind,

from such inquiries as he chooses to make, how much the man's income really is.   If the man has submitted to exaction far enough to make a return, and the collector or his deputy chooses to be dissatisfied, he may punish him by a penalty of 100 per cent added.   Then the citizen may appeal to the collector of internal revenue for final justice.   The collector is not a jury of his countrymen.   Probably it is an equity trial, such as the statute forbids to the Circuit Court and to this court, but an equity trial before the collector of internal revenue.   He decides upon the whole case, and the statute says it shall be final.   That is the end of the jurisdiction. The judicial power is not to be invoked at all.   It comes around to the question of whether the final disposition of these exactions under pretence of authority of law is to be determined by the judiciary, or whether it is to be determined by the administrative officers who are made the inquisitors as well as the final judges of everything.

We have been referred to the *Hylton. case*, decided in 1794. That was the case which allowed a duty on carriages as not a direct tax.   In the court below Mr. Justice Blair — and you will find the whole case an extremely amusing and suggestive one — was of the opinion that this tax on carriages was a direct tax.   The judges were divided in opinion.   But the judges in the Supreme Court who heard the case held that that tax was valid, and that it was not a direct tax.   Well, let us suppose for a moment that that is good law.   I believe that this was a chariot, if it will add anything to the dignity of the case.   But the tax on these was eight dollars each. The decision then was simply and solely that a tax on carriages was not a direct tax, but it was a duty, as the court called it, and how a duty in that sense differs from an impost I will not take up your time to discuss.

Now suppose that was so.   A carriage is a thing which is separable from the person of the owner.   There is no doubt that the owner is separable from the carriage when he is thrown out in a runaway.   A carriage is a thing which we have an idea of as a definite and complete thing, as distinguished from the personality of the owner.

Can you have any such idea about an income? I take it not. Therefore, whatever we may say as it respects a tax upon a thing which moves about as a physical object, it is a different idea and a different thing to the conception of a tax upon a person, and that is all this income tax is or professes to be — a tax upon a person, because of a particular circumstance inseparable from him. It is curious that in old English times, and in the law dictionaries, even since the Constitution was formed, an income tax was described as a capitation tax imposed upon persons in consideration of the amount of their property and their profits.

In fact there is no escape from the proposition that the Supreme Court of the United States made a mistake when it said, doubtingly and with hesitation, that a tax upon carriages fell over into the region of indirect taxes which, as everybody described them, were those which are intended to fall upon the movement of commodities, and the voluntary occupations of men. So much for the *Hylton case.*

Then we come along down through a series of corporation cases, of insurance and banks, etc., which I think your Honors would hardly excuse me for going over one by one, all of which, I submit, are entirely distinguishable from this.

At last we come to *Springer's case,* which did hold, although the facts as to the sources of income were not all clear, that that income tax was within the competence of Congress without regard to apportionment.

That decision I request your Honors to reconsider, and to come back again to the true rule of the Constitution. It is always well, it is always necessary in the progress of human affairs and society and in government, to remember that gradual and infinitesimal departures from the Constitutional line marked out for our march (if there be one, and we all believe there is) gradually depart further and further, one precedent following another, until at last we are obliged, like the mariner after a storm, or like the traveller in the wilderness, when the stars come out, to take a new observation and correct our course.

Now, I propose to prove that at the time this Constitution was proposed, at the time it was discussed, both in the conven-

tion and in public discussions, and in the conventions of the States that adopted it, the principles and practice of the government which led these gentlemen to employ these terms so industriously and carefully as they did, demonstrate beyond cavil or doubt that a tax upon the person in respect of his income did not fall within the category of the words, duties, imposts, and excises, but that it fell within the terms and description of capitation and other direct taxes. And if this be true, I submit that you ought to say so now. Every dictionary shows — I have looked at Johnson's dictionary — the great dictionary at that time — and in Jacob's, of the editions of those dates, and in the Acts of Parliament, and in Blackstone, and in Coke, and everywhere this distinction appears in the clearest way.

Our fathers who built this Constitution were as familiar with Blackstone as any of us below the bar are. They were as familiar with Coke. They knew as much of the meaning of the English language as anybody who has succeeded them. There can be no improvement upon the clearness and the style of the language of the Constitution. There are fewer phrases in it, probably, that are capable of different constructions and equivocal interpretations, than any other similar number of words in any document existing. It therefore does not do to say that they put words into the Constitution without consideration, and without intellectual and industrious selection of the terms which they intended to use, and without intending the clear and definite meaning that the universal practice of mankind at that time imputed to them.

There was Blackstone, for instance, whose work was printed in 1765, twenty-two years before this Constitution was formed. That book was undoubtedly on the tables of half the lawyers of the United States, and undoubtedly on the tables of the committees and on the tables of the constitutional convention. He treats of taxes in this first volume (the whole is very interesting, but I only read the phrase in question). First, there is the direct tax, the land tax, and the subsidies, and all that variety of things, there being no income tax, *eo nomine*, except upon official salaries, etc., and there were stamps, etc.,

but the idea of income at that time as being a measure of the contribution that the subject should make to the common treasury was found in the arrangement of their tax system in this way : The valuation was made of all the land and property, etc., in the several counties, and then when the Parliament or the kings, when they usurped the power — as this administration under the direction of Congress is usurping power now — wished to raise a levy of £100,000, this was apportioned among the counties, just as the Constitution says direct taxes shall be apportioned among the States, following the course of the English taxes.   Then it came at last to the idea of adjusting that amount, the amount usually paid on the land and the property, which was already in the tax book — and they did not have a new assessment every year, but the valuation stood a long time — and they provided in the Acts of Parliament that the tax, should be paid upon these ratable' properties in proportion to the amount of income that the owners of the property got out of them.   If the man's property was rated at £100, for instance, he was to pay a tax of a penny in the pound ; if his property was rated at £1000 and his income was £500, then he had to pay a tax at the rate of sixpence in the pound, and so on.

That was the state of that kind of taxation at the time our Constitution was formed.   That was the manner of regulating the burdens and taxes that were paid upon things and real estate and property by the inhabitants of the various counties of England ; and that our forefathers knew when they made this Constitution ; and our forefathers knew it was a direct tax as distinguished from duty, excise and impost.

But it may be said that the term " duties " covers any kind of taxes.   So it would in its broadest sense ; but when our Constitution distributes its description of subjects and modes of taxation, and says in one place " taxes," and in another says " duties " and " excises " and " imposts," is it not obvious that they intended to throw one part of the things into one class and the other part into the other class, and that duties were put into the association where they belonged according to Blackstone, as those imposts which were usually imposed

upon customs, sometimes upon exports, which our Constitution forbids, but always upon imports, which our Constitution allows.

Blackstone says of these taxes that they are "the customs, or the duties, toll, or tariff payable upon merchandise exported or imported." Supposing that this book lay upon the table, and we were framing a constitution, and wished to class this income tax and put it in its proper place among the descriptions of taxes which Congress should be authorized to raise, would anybody doubt where we must put it? So I say, that in all the dictionaries of the time, in all the commentaries of the time, in all the statutes of the time in that kingdom from which we drew our inspirations of public liberty and our principles of judicial justice, there was never a thought or a suggestion of an income tax except as direct taxation upon the body of the property of the kingdom, regulated from time to time and graduated as a direct tax, according to the ability of the person that owned the property, as shown sometimes by his income for one year and sometimes by the average for three years.

If that be so — and it is so — how is it possible for us in an intellectual sense, the matter being *res nova*, to conclude that a tax upon personal incomes falls under the head of duties, imposts, and excises, to be uniform throughout the United States? And a tax which, at that time, if the power had then been exerted in that way, would have accomplished the very mischief and the wrong that the founders of that Constitution intended to prevent, by imposing almost the entire burden of the government upon three or four States. And thus we see that, when this Constitution was adopted, the very point was in the discussions everywhere that those burdens from which the citizen could not ordinarily escape, or diminish by act of his own will, as he can in respect to how he lives and what he consumes, should not be committed to a mere majority of the voters to impose upon others, but that they should be apportioned among the States according to their population, and if it was found when it came to be applied that it would work injury and injustice, as sometimes all taxes do, then Congress need not adopt it.

Mr. Justice Harlan : — Have you formulated in your own mind any general rule by which we are to determine whether a tax is direct or indirect?

Mr. Edmunds : — I have.   I am perfectly ready to state it. But like most general rules, it requires exceptions, as all judicial courts know and all people acquainted with affairs know. It is almost impossible to state a general rule which will not have its exceptions, and its qualifications, and its variations.

But my definition is — and I believe it to be generally found to be universally true — that a direct tax is a tax upon every kind of property and upon every kind of person in respect of himself, or in respect of his property, either in existence or acquired, or to be acquired, and not in respect to his voluntary calling, pursuit or acts, as importing goods which he may import or not import as he pleases, not in respect of his being a trader or manufacturer, etc., in all of which cases he is taxed as a consequence of his free choice of business and in all of which the burden is to some degree moved on — but in respect of things that belong to the existence of property as an entity — a state of physical being.

Duties, imposts, and excises are, in large degree, and almost universally, heavy or light upon each person, depending upon his own will. If we say, as some writers do, that indirect taxes are those upon consumption, I repeat again what I believe I said before to some extent, that taxes upon consumption are not taxes which bear unequally upon the so-called poor and the so-called rich, because we all know — it is an everyday experience — that there are people in this very town and probably in this very room — I know there are — who live respectably and comfortably upon half that which it costs some who are their neighbors.

Mr. Justice Brown : — Is not the distinction somewhat like this : That direct taxes are paid by the taxpayer both immediately and ultimately; while indirect taxes are paid immediately by the taxpayer and ultimately by somebody else.

Mr. Edmunds : — Yes, sir; that is a much clearer definition than I have given, though I think the whole burden rarely falls on the last man.   It is, I think, borne partly by each

agent in the movement.   The income of a man is inseparable
from him.   It is as inseparable from a man as his character is,
or his name.   It is there.   It is personal.   It begins and ends
with him.   It was for that reason that I read the definitions
in existence at the time this Constitution was made — as a
capitation tax included an income tax.   It is an inseparable
quality, idea, entity that could not be grasped by the human
mind otherwise than in connection with the person.   It may
be that it should not have been so.   Perhaps our patriotic
friends who have left us would have made it some other way.
But our mission is to find out what it was, and not what it
ought to have been.   Personally, I think that if you were to
impose an income tax upon the gains of all property as
property according to valuation all over the United States,
according to their population, it would come much nearer
being uniform, man for man, throughout the United States,
than a great many politicians and philosophers suppose.

I come now, if your Honors please, to the point of uniform-
ity.   The dictionary meaning of "uniform" is: "Having
always the same form, manner, or degree; not varying, or
variable; unchanging; consistent; equable; homogeneous."

I have to submit that the phrase in the Constitution,
"duties, imposts, and excises shall be uniform throughout
the United States," is not merely a geographical phrase.
I take it that my learned friends on the other side will
agree that the word uniform is not a geographical word taken
alone.   And what the Constitution meant, after it had pro-
vided that direct taxes should be apportioned according to
population, and so on, by the requirement that duties, excises,
and imposts should be uniform throughout the United States,
was that they must be assessed and collected upon the princi-
ples of fundamental justice and of equality that are implied in
the very name of taxes in a constitutional government of free
men.   And I submit that it would not, in a direct tax case,
have been within the competence of Congress, having imposed
a direct tax upon lands and apportioned it among the States
according to population, to say that in any one State or all
States the owners of two hundred acres of land should pay

all the tax, and all the owners of less than two hundred acres should pay none, although the Constitution said nothing about it.

And so in regard to uniformity under the other class — duties, imposts, and excises. When it speaks of uniformity throughout the United States it means, I submit, literally and grammatically, not merely that it shall be everywhere the same, but, first, that it shall be uniform *per se*, and after being uniform *per se*, that the uniformity shall be universal as to places. That is the grammar of it; the common sense of it. That is the sense in which the word uniform is used in my learned brother's brief for the defense. That is the sense and very phrase in which the writers, Hamilton and the others, preceding the Constitution, and in the discussions in the Federalist, speaking of the principles of taxation and the imposition of burdens, that these were to be uniform, used the word.

Mr. Justice Harlan: — You think the word "uniform" necessarily implies equality?

Mr. Edmunds: — I do. The dictionary says so. One of its definitions is equable.

Mr. Justice White: — Then the use of both the words "equal" and "uniform" was mere tautology?

Mr. Edmunds: — Yes. The word "equal" was in the original draft, and when being revised it was stricken out, not by the committee that was reforming it, but by the committee on style, as tautology. Thus making of this instrument, as I said before, as perfect a model of symmetrical and concrete English as was ever printed in the world.

So I maintain that it is not merely or chiefly a geographical word, but also a word qualifying duties, imposts, excises, thus made equable and homogeneous in respect of the things and the persons to which they applied, and that the equality shall be everywhere.

Mr. Justice White: — If your rule applies here, how do you meet the statement made by you a while ago in discussing the question of the exemption of a certain amount of furniture, which was universally not taxed?

Mr. Edmunds : — I meet it upon the principle and practice that existed when the Constitution was formed, and that has existed in every government since, that the lawmaking power does not tax things that are of so small value that the cost of collection of the tax is more than the amount of the tax; and in dealing affirmatively, by the implied consent prevailing in every constitution among civilized men, the principle and practice of leaving to the whole body of the citizens those small personal effects, etc., like furniture, family bibles, etc., free from taxation. And it is upon that principle and practice that charities and churches and schools and libraries and public buildings have been exempted; and also for these latter things that they are things devoted to the public use in one way and another, and therefore taxing them is merely taxing the public for itself, and, consequently, of no advantage. It seems so to me.

An illustration of this geographical notion of the uniformity, which has just occurred to me, might be stated, for I think it is a good one. It is the inscription that is still upon the old, cracked, but still inspiring Bell of Liberty, in Philadelphia. That bell was cast in England on the order of the colonial assembly before the Revolution, and had cast on it, very curiously enough and prophetically enough — in the land of Cromwell, and, perhaps, within reach of the ears of George III — these words: " Proclaim liberty throughout all the land, and to all the inhabitants thereof."

That was not geographical liberty. It was a liberty, *per se,* inherent in the rights of man, and that should expand and live everywhere, and among all. That was the uniformity, I think, that our fathers meant in using that phrase in the Constitution. There was the important and the fundamental principle of equal rights and justice embraced in the word uniform, and then there was the added requirement that everywhere within the borders of all the States that same principle of equality and justice should exist.

Mr. Justice White : — How do you meet the argument advanced by the other side in regard to the construction of the specific duties levied in all the tariffs during the last thirty

years? For instance, take the imposition of two cents per pound on cotton without reference to the value of the cotton. That would strike at the root of legislation which has existed since the foundation of the government. Is not that a necessary consequence of that construction?

Mr. Edmunds : — I think not, sir.

Mr. Justice White : — I would like to see why.

Mr. Edmunds : — The introduction of commodities from foreign countries into the United States is one that depends upon the free will of the importer. There is no statute of the United States that commands any citizen of Louisiana, of Vermont, of Iowa, or of Texas, or of California to do anything of the kind. Congress, having the power to exclude altogether, or to admit imports, has the power to say that they shall be admitted upon any qualification it likes. It may say you may bring them into the country upon the terms prescribed or not, as you please. It is the granting of a privilege. You may exclude or admit them, just the same as a State grants or refuses corporate rights. It may grant them on certain terms to A. and on entirely different terms to B. A. may have restrictions and B. may have none. There is another thing, it seems to me, and that is that in nearly all cases where specific duties have been assessed, and probably in all cases, those specific duties are based on the value of the article. For instance, cloths having forty threads to the inch and worth one dollar might be taxed ten cents a yard. Cloths having eighty threads to the square inch and worth two dollars shall pay so much more.

Then again, the language of this Constitution as applied to one set of subjects may have one meaning, and when applied to another set the meaning varies, as we all know it may, and as it has been decided by this court it may sometimes. Again, if all of a whole body of men or things are embraced in a tax or other burden the imposition would be uniform, without regard to any particular differences in the circumstantial characteristics or qualities of the men or things. A tax on polls does not distinguish between tall and short men, or their wealth or health. A tax on all horses, per head,

would be uniform.    A tax on all cotton at so much per pound would be uniform.    But in every such case the tax would be direct.

But when it comes to the case of a tax imposed upon the people, which the people must pay, and which does not depend upon the conduct of the man or anything he may do, but is one from which he cannot escape, then the principle of universal uniformity, as among men as well as within boundaries, is applied, and the language is capable of that expansion and application according to the different subjects to which it might be applied.

Some allusion has been made to the head money cases.    I will only say a word about this.    The taxes, so called, could not be geographically uniform, because it is perfectly clear that in a State like Montana, and many others which are not on the water, where no ship could possibly get in, such a tax could not apply.    But they could be and were intrinsically uniform as to men and things.

Congress had passed a law that people coming by vessel should pay a tax; but suppose Congress had said that in the port of New York the people coming by one line, the Cunard Line, should pay ten dollars; and that the people coming by the International Line (the Paris and New York), into the same port, should pay fifteen dollars a head.    What do you think would have been the decision in that case?    Would my brother Carter say that was uniform?    I take it not.    You would say that Congress had no power to do anything of the kind.

I shall ask your attention for only a few moments more with respect to the general aspects of this case.    I insist that the inherent quality of taxation in a government professed to be founded on democratic principles (as in England it exists on an unwritten constitution — for the government of England is founded on democratic principles — it is in some respects more democratic than ours — administrations come and go by the mere will of one branch of that government), with written constitutions, with equal rights, equal responsibilities, equal duties, is that the name and idea of taxation is the imposition of the burdens upon its people for their common benefit, and

that the imposition of the burdens in order to be just must be equal as far as human exertion can make it so. It must not be, as it is in this case, intentionally and tyrannically and mon- strously unequal. If it were a state tax in the State of Ver- mont which provided that all persons owning property worth more than $80,000 should pay all the taxes of the State, and those having less shall pay none, probably not exceeding one hundred persons in the rural and modest State to which I belong — certainly less than two hundred — would bear the whole expenses of the State.

I maintain, therefore, that pervading every line of the in- strument providing for the distribution and exercise of the powers of this government, the power to impose taxes, direct and indirect, must, to the greatest degree possible, be so exer- cised that the taxes bear upon its people equally in respect of the subjects, persons, and rates to which they can apply. Al- lowing large latitude as to where we draw the lines, still the taxes must be laid as nearly equal as fair human exertion can make them. And when you find a case where Congress or a state legislature has undertaken deliberately to make a dis- crimination which throws all the burden upon a very small minority of the people, and on purpose to do it, and not from any necessity of the situation, and a tax which relieves the vast majority, which is just as able to bear it as the minority, you must decide that the Congress has gone beyond the boundary of its powers, and that the judicial power, which Hamilton so prophetically said embraced the majesty and the justice of the government, is bound to see it and to hold the calm and reg- nant shield of the Constitution between the citizen and despotism.

So I maintain that it is a fundamental principle, written or unwritten, that the burdens of taxation should bear equally. But the fifth and fourteenth amendments of the Constitution certainly would relieve us of all difficulty, if any existed, in the fundamental principles I have stated. Take the Four- teenth Amendment. In terms it does not say that Congress shall not deny to all the people the equal protection of the laws. Suppose it had said that Congress may deny, although

the States may not, to all the people the equal protection of the laws? Everybody would have said that it was a monstrous proposition, and if this court had the power of the highest courts in Great Britain, you would have said such a provision in the Constitution was void as against natural law. But I believe it is now understood by this court, and everybody in this land, that the principle and the substantial application of the provisions of the Fourteenth Amendment are just as binding upon Congress as they are upon the States, and as Congress was and is a body of delegated powers, that it was not necessary to say that Congress is not to deny to anybody the equal protection of the laws, because no power was delegated to them to do such monstrous things. It is true that the attainment of perfect equality in taxation is a baseless dream, as has been said. But it does not follow that the legislative power can lawfully and purposely go to the other extreme and impose taxes broadly designed to be unequal, and by false and arbitrary classification set one great body of citizens in conflict with another.

If the Fourteenth Amendment applies to this case, is the taxing of this small minority — two per cent of the people of the United States — imposing upon them this burden, and denying to them the protection that the ninety-eight per cent have, and granting a privilege to the ninety-eight per cent to pay nothing, and imposing a duty on the two per cent to pay much or little as Congress may declare (for if it has the right to impose a two per cent tax, it can compel twenty or fifty or one hundred) warranted by the clause of equal protection? If such discrimination is to be upheld, then we have taken the first great step toward the destruction of all free government.

I believe I have said, in reference to the framers of this Constitution, that they must have been learned in the law, and that they must have understood clearly the meaning of the plain phrases and paragraphs which they used — I am sure I am right about that. All their writings, all their discussions in the conventions and in the Federalist and in other publications show that they were acquainted with the whole history of civilization in detail, from the Egyptian, and the Greek, and

the Roman governments, where the tyranny of taxation produced so much misery, down through all the performances of the French feudal times and British times, and the British administration at that time. Everything was before them. The past was present and the distant near. And now we are to be told that these gentlemen did not know what they were talking about, and that they did not mean what all the literature, all the lexicons, and the legislation, and all the law books of the time plainly imputed to those words; and all this for the purpose of allowing the majority to levy a tax upon the minority.

It appears to me, therefore, that it is the grand mission of this court of last resort, independent and supreme, to bring the Congress back to a true sense of the limitations of its powers. Hamilton in one of his letters stated the great truth, that "In framing a government which is to be administered by men over men, the great difficulty lies in this — you must first enable the government to control the governed; and, in the next place, *oblige it to control itself.* A dependence on the people is, no doubt, a primary control on the government; but experience has taught mankind to insist on auxiliary precautions" Of these, he said the chief is "in the distribution of the supreme powers of the State."

In the exercise of its clear jurisdiction it is the right of this court, and we hope it will find it to be its glad duty, to see that this fundamental principle of equality in taxation is not disregarded. If the Constitution has been invaded, and if recognition by the courts has been mistakenly given to that invasion heretofore, now is the time, before we depart wider and wider from that true line of equal justice and equal rights which cannot exist without equality of burdens, to return to the true paths of the Constitution.

*Mr. Attorney General,* by leave of court, for the United States in all the cases.

The chief interest of the government in the present litigations relates to the constitutional questions which the several

plaintiffs allege to be involved. Whether they are really involved or not, or whether the suits should and must be disposed of on different grounds, is a matter upon which I do not care to be heard. For present purposes, I am willing to assume that the plaintiffs are right in their claim, and that the constitutional issues they desire to have settled are so presented by these litigations that the court either must, or properly may, consider and determine them.

An examination of the plaintiffs' bills and briefs and arguments seems to show quite satisfactorily that many of the alleged objections to the validity of the income tax law are simply perfunctory in character. They are taken pro forma, by way of precaution, because of the possibility of a point developing in some unexpected connection, just as a good equity pleader, be his knowledge of his case and of the pertinent remedies ever so thorough, never fails to wind up his bill with the general prayer for other and further relief. There is nothing to criticise, of course, in the plaintiffs pursuing that plan. It only makes it proper to sift out at the outset the exact propositions upon which alone the plaintiffs can and do place any real reliance. For example, no time need be spent, I take it, in discussing the averments that the income-tax law is an invasion of vested rights, or takes property without due process of law. These propositions are pure generalities, glittering or otherwise, and if there is anything in them it is because they comprehend others which are more specific and which are the only real subjects of profitable discussion. Again, suppose it to be true that the income-tax law undertakes to ascertain the incomes of citizens by methods which are not only disagreeable, but are infringements of personal rights. The consequence is, not that the law is void, but that the hotly denounced inquisitorial methods which are merely ancillary to its operation cannot be resorted to. The like considerations apply to the objection that the law is to be pronounced void because taxing the agencies and instrumentalities of the governments of the several States.

I will not undertake to repeat the able and satisfactory argument of my associate on that point. There seems to be

no good reason why the income of state and municipal securities should not be taxable by the United States when it is assessed as part of the total income of the respective owners under a law assessing income generally and not discriminating between those securities and others of like character. In making that suggestion I do not overlook the able and elaborate opinion of the supreme court of the District, holding, largely on the ground of want of power in the United States, that this income-tax law properly construed has no application to the income from state and municipal securities. But suppose the contrary — suppose that the statute must be interpreted as taxing and unlawfully taxing state agencies and instrumentalities. The result is, not that the law is bad in toto, but that it is bad only as to the income of state and municipal securities. The plaintiffs seek to meet this view by alleging in their bill that the income from state and municipal securities throughout the country amounts to $65,000,000. Having made that allegation, they then declare that it was the intent of Congress and is necessary to accomplish the general purpose of the law, that this $65,000,000 should be taxed. But the declaration is mere assertion without evidence in its support either in the statute or outside of it. The plaintiffs do not even attempt to give the assertion an air of probability by comparing this $65,000,000 of income which the law cannot reach with the other and remaining income which the law does reach. Yet they certainly would have made the attempt if the comparison would show that this $65,000,000 of non-taxable income is so large a proportion of the entire income of all the people of the country as to make it inconceivable or even highly improbable that Congress could mean to tax income at all unless this $65,000,000 were included as part of it.

If I am right in these observations, the constitutional contention of the plaintiffs simmers down to two points. One is that an income tax is a direct tax and must be imposed according to the rule of apportionment. I do not stop to discuss the question what the constitutional rule of apportionment is. I do not think I ought to delay the court for any considerable

time with the question whether an income tax is direct or indirect. Scientifically, economically, practically, it may be either the one or the other without the result of the present cases being in the slightest degree affected. In them, the only material point is, is an income tax " direct " or otherwise in the sense in which the term " direct " is used in the Constitution? The answer is that it is not a " direct " tax within the meaning of the Constitution unless at least five concurring judicial expressions of opinion by this court, the earliest in 1796, when three leading spirits of the constitutional convention were on the bench, and the last in 1880, have all been erroneous and ought now to be reversed. But, whether or not they be erroneous is, when all is said, matter of the gravest doubt, and, were it ever so certain, no idea of reversing them ought now to be seriously considered. A constitutional exposition practically coeval with the Constitution itself, that has been acted upon ever since as occasion required by every department of the government, that is not irrational in itself nor vicious in its workings, and that indeed during a stress and strain such as that of the civil war was found of the greatest value to the Republic, deserves to be considered as immutable as if incorporated into the text of the Constitution itself. To reject it after a century's duration is to set a hurtful precedent and would go far to prove that government by written constitution is not a thing of stable principles, but of the fluctuating views and wishes of the particular period and the particular judges when and from whom its interpretation happens to be called for. In this connection, therefore, there is but one suggestion which I desire to very briefly notice. A part of the income taxable under the law is rents of land, and a tax upon rents is claimed to be a tax upon the land, and so to be a " direct " tax within the meaning of the Constitution. But the suggestion is by no means novel, and certainly is not to be accepted as sound. There is a practical commercial sense in which a tax upon rents is always a tax upon land. It affects the value of land; land, the income from which is subject to a tax, must sell for less in the market than land the income of which is not so subject. But, except in that view, a tax upon rents is not necessarily a

tax upon land, but may be a tax upon a wholly distinct subject-matter. Instead of being upon realty, it may be upon so much personalty wholly dissociated from the land. It is, of course, competent for the government to tax upon either plan — to tax rents under a scheme of taxation of personalty as personal property, or to tax them under a scheme of taxation as realty and as representing and measuring the value of real estate. The only question is of the intent — an intent to be looked for and found only in the statute imposing the tax. That test being applied, what is the purpose of Congress in the present income-tax law? Is it to tax land — rents being used as a ready mode of valuation — or is it to tax rents as so much personal property irrespective of its origin? It is difficult to see how that question can be answered except in one way. No land tax is aimed at or attempted by the statute — there is no lien on land for its payment — and the whole scope and tenor of the statute show the subject of the contemplated tax to be personal property and nothing else. It is well nigh conclusive on this point that there is no provision for the valuation and taxation of unproductive land — a provision that would almost certainly have been found if the object had been to make a real-estate tax. It may be suggested, however, that it may be the purpose to tax land but only such land as yields rent. But there is no sign or symptom of such an intent in any specific provision of the statute, while its general provisions, as already observed, contemplate nothing but a tax on personal estate. It may also be suggested that if a tax reaches rents in point of fact, it is a tax upon land no matter what the intent of the taxing statute may be. But that position is wholly untenable, because rents in the pocket of the owner are not intrinsically and of themselves land. They are money, like any other. If for the purpose of a tax they are to have any artificial character as the representative of land, it is a character impressed upon them from some source and can come from no other source than the taxing statute itself. I submit, therefore, with great confidence, that while a tax upon rents may under some circumstances be held to be in truth and in fact a tax upon land, it cannot be held to be such under a

statute like the present which taxes rents without regard to land and merely as one of the constituents of income.

This brings me to the only remaining point — to *the* constitutional objection which, notwithstanding all that has been so earnestly and forcibly said on the direct tax part of this controversy, is, I am satisfied, the plaintiffs' main reliance. The point is that the income tax imposed by the statute under consideration is not uniform. But what does the Constitution mean by "uniform" as applied to a tax? But for the strong pressure upon the plaintiffs' counsel to find objections to this statute there would be no controversy as to the meaning. It is clearly shown by the debates in the constitutional convention and by the repeated and unequivocal utterances of the framers of the Constitution themselves. It is set forth by the writers on constitutional law, who are unanimous in their interpretation. It is judicially expounded by this court in the well-known judgments in the so-called *Head Money cases*. The uniformity of tax prescribed by the Constitution is a territorial uniformity. A Federal tax, which is not a poll tax nor a tax on land, must be the same in all parts of the country. It cannot be one thing in Maine and another thing in Florida. The law providing for such a tax must be like a bankruptcy law or a naturalization law. It must have the same operation everywhere, wholly irrespective of state lines.

It is manifestly impossible for the plaintiffs to assent to this settled construction of the word "uniform," and they do not assent to it. They are compelled to insist that a tax, to be "uniform" within the meaning of the Constitution, must be uniform, not only geographically but as between taxpayers. In other words, they make it prescribe the nature and quality of a tax as well as its local application. I submit that their contention is hopeless and may fairly be regarded as already decided against them. Let it be, however, for present purposes that the adjective "uniform" describes and regulates the properties of a tax. I then beg leave to submit that the plaintiffs gain nothing by the concession, and that, so far as the validity of this income-tax law or any other tax law is concerned, the word "uniform" might as well be out of the

Constitution as in it.  The word is surplusage.  It simply designates and describes an essential element of every tax — an element which is inherent in every valid tax and the absence of which would be sufficient to annul any attempted exercise of the taxing power.

For the basis and the truth of this position it is only necessary to refer for a moment to the nature of the taxing power. The power to tax is wholly legislative, and in its essence is the power to raise money *from* the public *for* the public.  That the object of a tax must be public is undeniable.  To force money from the pockets of the people at large to enrich a private individual is so clear an abuse of the taxing power that every court would so declare on general principles without the aid of any express constitutional prohibition.  Conversely, to take the property of a single individual for public uses is not to exercise the power to tax but the power of eminent domain, and can be done only on the condition of rendering the individual full indemnity.  These inherent limitations of the taxing power necessarily enter into and control every scheme of taxation and determine the mode and extent of its operation upon private persons and estates.  Theoretically, a tax for the benefit of the public should fall equally upon all persons composing the public; should, as text writers and judges often express it, be ratable and proportional, and be so adjusted that every member of the community shall contribute his just and equal share toward the common defence and the general welfare. Moreover, under theoretical and ideal conditions such as can be conceived of, these general maxims would be actually and exactly applicable.  If, for example, every individual in a community were like every other in respect of property, of the ability to bear taxation, and of the benefit to accrue from taxation, the question how he should be taxed could receive but one answer.  Nothing would have to be done but to apply the rule of three, and any other rule would be inadmissible for obvious reasons.  To make one man pay a higher rate of tax than another when all the conditions in both cases are exactly alike would, to the extent of the excess be a taking of private property for public uses without making that special compensation which alone can justify such a taking.

Taxation, however, is an uncommonly practical affair. The power to tax is for practical use and is necessarily to be adapted to the practical conditions of human life. These are never the same for any two persons, and for any community, however small, are infinitely diversified. Regard being paid to them, nothing is more evident, nothing has been oftener declared by courts and jurists, than that absolute equality of taxation is impossible — is, as characterized in an opinion of this court, only "a baseless dream." No system has been or can be devised that will produce any such result. Suppose, for instance, manhood taxation were resorted to, as a sort of offset to manhood suffrage, and that the public exchequer were sought to be filled by a tax levied on adult males at so much per head — the inequity and impolicy of such a tax would be universally recognized and universally denounced. But if such would be the fate of a capitation tax employed as the sole source of public revenue, hardly less objection lies to an ad valorem property tax which should make every owner, without exception or discrimination of any sort, pay in exact proportion to the value of his estate. Logically and theoretically, no criticism could be made on such a tax. But practically it loses sight of a most important element, to wit, the ability to bear taxation, and ignores the fact that exacting $5 from a man whose annual income is $500 puts upon him an infinitely greater burden than the exaction of $500 from one whose annual income is $50,000. There is at first blush plausibility in the suggestion that the rule should be that every person should contribute to a tax ratably to the benefits derived from it. But nothing could be more objectionable or would be more certainly objected to than an attempt to collect the public revenue on any such plan. The principal beneficiaries of almost all taxes, of the taxes for highways and schools and sewers, and almost all other objects of state and municipal expenditure, are the poorer classes of the community. To impose taxes solely upon the principle of the ensuing advantages realized would in effect largely exempt the more fortunate and wealthy classes and place the greater part of the burden upon those least able to bear it.

These considerations serve to show the nature of the taxing power; that it offers little, if any, opportunity for the exploitation of theories or for experiment with abstract generalizations; that it calls for the highest practical wisdom to be applied to the actual and infinitely varied affairs of a particular community and people; and that in its exercise, in the selection of the subjects of taxation, in taxing some persons and estates and in exempting others, the legislature is vested with the largest and widest discretion. It by no means follows that the power to tax is without any limits. They are, so to speak, self-imposed, that is, as already observed, they result from the very nature of the power itself. No country, for example, no State of this Union, ever adopted a plan of taxation that did not except some portions of the community from a burden that was imposed upon others. The power to do so is unquestioned and is universally exercised. Nevertheless, the power to exempt has bounds. It cannot be used without regard to the end in view, nor to gratify a mere whim or caprice. A law, for instance, providing for a tax to be paid by the light-complexioned members of the community and exempting the dark, would be unhesitatingly pronounced void as being not a use but an abuse of the taxing power. It would be an abuse because the discrimination made by it could not be traced to any line of public policy. So, having classified the community for the purpose of a tax, the legislature cannot then proceed by arbitrary selection to take individuals out of the class to which they belong. That is the rule of uniformity — that is what "uniform" means as applied to a tax — and that is its whole meaning as used in the Federal Constitution, even when it is conceded that it prescribes the nature of a tax, not merely as between localities, but as between taxpayers. The rule of uniformity places no restrictions upon any division of the community into classes for taxable purposes which the legislature may deem wise. It merely declares that, the classes being formed, the members of each shall be on the same footing, and shall be taxed alike or be exempted alike without arbitrary discriminations in individual cases. Uniformity between members of a class

created for taxable purposes is required upon the same grounds which prevent a purely senseless and capricious division into classes. The classification must be such that it can be referred to some view of public policy. Being made and justified only on that principle, any exemption of particular members of a class is void because necessarily in conflict with the principle and preventing its operation.

For these reasons I maintain that the term "uniform" in the Constitution, even if it describes the properties of a tax, puts no limitations upon the taxing power of Congress that are not inherent in the very nature of the power. It is a power to enforce money from the public for public uses. Could it be exercised so as to produce equality of taxation, it could be exercised in no other manner. That not being feasible in the nature of things, it is for Congress and Congress alone to decide how the taxing power shall be applied so as best to approximate that result. In making that application, Congress is of course bound to keep in view the fundamental purpose of the power and to aim at its accomplishment. Hence, in taxing this class or exempting that, Congress must proceed upon considerations of public policy, and cannot adopt a classification which has no relation to the end to be attained and is founded only in whim or caprice. Hence, and on the same ground, classes for the purpose of taxation being consti- tuted, the rule of taxation or exemption must be uniform between members of the class. But, these limitations upon its taxing power being granted, the right of Congress to deter- mine who shall be taxed and what shall be taxed and all the ways and means of assessment and collection, is practically uncontrolled. It is quite beside the issue to argue in this or any other case that Congress has mistaken what public policy requires. On that point Congress is the sole and final author- ity, and its decision once made controls every other depart- ment of the government.

These familiar principles, so well established that any cita- tion of authorities and decisions is, I think, quite unnecessary, effectually dispose, I submit, of the plaintiffs' contention in the present cases. What do they complain of? It is not that

Congress has determined to tax and has taxed income generally. It is that Congress has made exemptions in favor of certain classes, and the plaintiffs' contention, if pushed to its logical conclusion, means that Congress cannot tax income at all without taxing ratably the income of every man, woman, and child in the country. The preposterously harsh and impolitic operation of any such tax as that it is not necessary to descant upon. Congress has rightfully repudiated any such plan. While taxing incomes generally, it had full power to make such exemptions as its views of public policy required, and the only real question now and here is, has it abused or exceeded that power of exemption ? The tests already stated are applicable, and being applied render but one answer to the question possible. The statute makes no exemption in favor of a class that is not based on some obvious line of public policy, and, the class being established, one uniform rule is applicable to its members. Take, for example, the principal classification of all — the grand division by which the entire population of the country is separated into people with incomes of $4000 and under who are non-taxable, and people with incomes of over $4000 who are taxable. It is manifest that in this distinction Congress was proceeding upon definite views of public policy and was aiming at accomplishing a great public object. It was seeking to adjust the load of taxation to the shoulders of the community in the manner that would make it most easily borne and most lightly felt. Having so much revenue to raise, it might have got it by a proportional tax upon the entire income of all the people of the country. But it bore in mind the fact that a small sum taken from a small income is an infinitely greater deprivation than a large sum taken from a large income ; that in the one case the very means of decent support might be impaired, while in the other the power to command all the luxuries of life would hardly be affected. Acting upon these considerations or considerations such as these, Congress undertook to exempt moderate incomes from the tax altogether. It had to draw the line somewhere, and it drew it at $4000. The same objections in point of principle would have existed if it had drawn

the line at $400, or at any other figure. But no objection in truth lies at all, because it is entirely evident that, as well in exempting incomes of $4000 and under as in taxing incomes of over $4000, Congress has been governed by what it deemed sound public policy. Take another illustration — an example of a class formed by way of exception to a larger class. The statutory general rule is that every taxpayer is entitled to a fixed deduction of $4000 before. taxable income is reached. In the case, however, of a family consisting of husband and wife, or parent and a minor child or children, there is but one $4000 deduction from the aggregate income of all the members of the family. Here is a differentiation of a special class whose members may be taxed higher than others having incomes of the same amount. But the discrimination is not arbitrary nor senseless, but is founded on obvious views of equity and policy. It assumes — what is undoubtedly true — that as a rule there is but one income and one breadwinner to one family, but, recognizing the fact that the rule has many exceptions, it makes the existence of several incomes to a family the just and proper basis of a somewhat higher rate of tax. It is an attempt, in short, to tax with some regard to the capacity of the taxpayer to bear it. Take another illustration — that of a class which the plaintiffs' counsel dwell upon at great length and with exceeding unction — the class, namely, of business corporations. Their net incomes are taxed at the standard rate of two per cent undiminished by the standard deduction of $4000. The result is that a man in business as a member of a corporation is taxable at a little higher rate than a man in the same business by himself or as a copartner. Here, it is claimed, is a distinction without a difference, is the establishment of a special class without special reasons of equity and policy to justify it. But I venture to submit that that is not so, and that the higher statutory rate of tax for corporate incomes is founded upon and vindicated by essential differences in the conditions under which corporations and individuals respectively carry on business. The advantages acquired by doing business as a corporation, rather than as individuals or partners, are plain and are notorious. The

interest of a corporator is in distinct and tangible shape, is marketable at any moment, and is unaffected by the insolvency or decease of other corporators. It is an interest attended with a definite and limited liability for debts. It is an interest through which the corporator ratably participates in all the benefits arising from the transaction of business on a large scale. These and other like commercial advantages of incorporation are wholly dependent upon legislative grant, which is the only fountain of corporate franchises. But so pronounced and so general has been the appreciation of these advantages that there is hardly a State of the Union which does not facilitate the formation of business corporations by a general corporation law, and that the great and ever-growing multitude and variety of such corporations is one of the striking phenomena of modern times. It is common knowledge, indeed, that corporations are so successful an agency for the conduct of business and the accumulation of wealth that a large section of the community views them with intense disfavor as malicious and cunningly devised inventions for making rich people richer and poor people poorer. When, then, this income-tax law takes a special class of business corporaations and taxes their incomes at a higher rate than that applied to the incomes of persons not incorporated, it simply recognizes existing social facts and conditions which it would be the height of folly to ignore. It but classifies and discriminates upon the plainest basis of equity and public policy, upon a superiority of business conditions both enabling those enjoying them to pay a special and higher rate of tax and making it just and equitable that they should pay it. Other like exemptions of the statute, covering religious, educational, charitable and semi-charitable companies, and embracing institutions where wage-earners lodge their scanty earnings and by which persons of small means are enabled to coöperate in various ways for mutual security and benefits, these exemptions rest firmly upon the same legal footing of a wise and humane public policy. It would be tedious and cannot be necessary to consider each in detail. Suffice it to say that the statute lays down a rule for the taxation of incomes generally,

and then adds qualifications, exceptions, and exemptions, as to no one of which can it be fairly said that it does not represent an honest attempt of Congress to make the operation of the tax just and equitable, and that it does not reflect the honest views of Congress respecting the requirements of true public policy. That being so, it avails nothing for the plaintiffs to point out instances in which the law taxes property twice over or produces other inequalities and incongruities in the way of taxation. Nothing else could be expected and nothing different, it is safe to predict, would result from any other law, even if the plaintiffs had the drawing of it. It avails nothing, also, for the learned counsel to convince themselves, and perhaps the court also, that Congress's views of public policy are quite mistaken. When they have done that, what have they accomplished? They have gone through an intellectual exercise which from the character of counsel is bound to be both interesting and brilliant. But they have accomplished nothing else because, be Congress's views of public policy ever so mistaken, this court cannot avoid ruling that it is absolutely bound by them.

My endeavor has been to eliminate and discuss such of the legal issues presented as are not already too conclusively settled to admit of discussion, and to do so succinctly, without unnecessary elaboration of details, and without being betrayed into those bypaths of metaphysical and economical and historical inquiry which, however fascinating in themselves, have so little connection with the real business of the case. It would be a mistake — I am aware that the court is in no danger of falling into it — but it would certainly be a mistake to infer that this great array of counsel, this elaborate argumentation, and these many and voluminous treatises miscalled by the name of briefs, indicate anything specially intricate or unique either in the facts before the court or in the rules of law which are applicable to them. An income tax is preëminently a tax upon the rich, and all the circumstances just adverted to prove the immense pecuniary stake which is now played for. It is so large that counsel fees and costs and printers' bills are mere bagatelles. It is so large

and so stimulates the efforts of counsel that no legal or constitutional principle that stands in the way, however venerable or .however long and universally acquiesced in, is suffered to pass unchallenged. It is matter of congratulation, indeed, that the existence of the Constitution itself is not impeached, and that we are not threatened with a logical demonstration that we are still living, for all taxable purposes at least, under the régime of the old Articles of Confederation. Seriously speaking, however, I venture to suggest that all this laborious and erudite and formidable demonstration must necessarily be without result on one distinct ground. In its essence and in its last analysis, it is nothing but a call upon the judicial department of the government to supplant the political in the exercise of the taxing power; to substitute its discretion for that of Congress in respect of the subjects of taxation, the plan of taxation, and all the distinctions and discriminations by which taxation is sought to be equitably adjusted to the resources and capacities of the different classes of society. Such an effort, however weightily supported, cannot, I am bound to believe, be successful. It is inevitably predestined to failure unless this court shall, for the first time in its history, overlook and overstep the bounds which separate the judicial from the legislative power — bounds, the scrupulous observance of which it has so often declared to be absolutely essential to the integrity of our constitutional system of government.

*Mr. Herbert B. Turner* filed a brief on behalf of The Farmers' Loan and Trust Company, appellee in 893.

*Mr. William Jay* and *Mr. Flamen B. Candler* filed a brief on behalf of The Continental Trust Company, appellee in 894.

*Mr. James C. Carter* for the Continental Trust Company, appellee in 894. *Mr. William C. Gulliver* was with him on the brief.

I appear here for the Continental Trust Company. This is one of the companies which, it might be supposed, represent interests which would be the especial subjects of income tax-

ation, and yet I am instructed by it to defend and maintain to the best of my ability the validity of the law. I am glad that there is at least one great corporation subjected to the tax, which avows its readiness to submit itself without controversy or contention to the law of the country, and to discharge the burdens which that law imposes upon it.

It admits by its demurrer to the bill that, unless restrained by the process of injunction, it will, in accordance with the requirements of the law, make the prescribed returns and pay the tax. Outside of this bill it admits, and indeed asserts, this determination; and if those circumstances constitute any reason why a court of equity should take jurisdiction of the case and listen to argument upon the questions which are raised, then there is some support for the equity jurisdiction invoked by the complainant.

Inasmuch as the main position of the other side, upon this branch of the inquiry, is that the taxes imposed by the act are unjust because they violate the true principle of equality in taxation, I shall be obliged to inquire, for a few brief moments, what that principle of equality is; how it has been stated and laid down by statesmen and economists; how far governments in practice adhere to it, and to what extent, and upon what occasions, they depart from it.

We begin, of course, with the admitted truth that governments must exact very large sums from those who live under them for the purposes for which governments are established, and the first principle or rule which, as I believe, is laid down and agreed to by the most approved statesmen and economists, representing, otherwise, every variety of opinion, is that taxes must be laid according to the several and respective abilities of the people upon whom they are imposed to bear them. It will be observed that this rule has regard, principally, to the different members of society considered as individuals, and its purpose is to fairly and justly arrange the public burdens as between them. Government, however, is a complex problem in which many different considerations are involved, and this rule or principle of equality is, in practice, in all countries, departed from in a variety of ways.

In the first place, the rule is departed from in most countries in favor of the very poor, and by various exemptions, either partial or total, and the effort is made to mitigate the burden which would otherwise fall upon them.

In the next place the expense of collecting taxes is an important item for consideration. To collect taxes with exact equality might require a very large expenditure and involve otherwise many difficulties. It is important that the revenues of a government should be cheaply and certainly and easily collected, and modes are, therefore, contrived with this end in view.

Again, moral purposes are taken into view. There are some consumable articles, such as intoxicating drinks, indulgence in which it is the policy of some States to endeavor to repress, and they seek and carry out this object by imposing duties upon such commodities, and thereby increasing their price and making the use of them more difficult. The wisdom of such enactments is the subject of much dispute.

Again, some forms of taxation, otherwise very desirable because just and equal, are avoided, because of the ease with which they may be evaded. The income tax is supposed to be particularly open to this objection. It is, however, not so much to be objected to on this account as the personal property tax in large communities. Notwithstanding this objection, however, it may be said that the income tax is at the present day everywhere among civilized States a part of the system of taxation.

There is another form of taxation which society adopts which flagrantly disregards the principle of equality, indeed, pays no regard to it whatever ; but which is recommended to statesmen and public administrators by some especial qualities which it possesses. This is the tax on consumable goods, whether foreign or domestic. It is said, with truth, that this mode of collecting the taxes saves great expense, and it is also said with truth, that it is a very desirable thing for the good of society, as a whole, to establish and maintain in every nation all the important industries upon which society depends for its convenience and its comfort. It is, indeed, a tax which,

when imposed for this purpose, is particularly liable to abuse, and the controversy concerning it turns for the most part upon the real or supposed abuses of it.

But there is another cause tending to introduce inequality in the burdens of taxation of far greater effect than all the instances of departure from the rule of equality which I have just mentioned; and this is a cause which does not arise from any consideration of the public good whatever, but from the inherent selfishness of men. In every community those who feel the burdens of taxation are naturally prone to relieve themselves from them if they can; and the extent of the effort which they make to relieve themselves is, in general, proportionate to the extent of the burden which they suppose has been laid upon them. One class struggles to throw the burden off its own shoulders. If they succeed, of course it must fall upon others. They also, in their turn, labor to get rid of it, and finally the load falls upon those who will not, or cannot, make a successful effort for relief. This is, in general, a one-sided struggle, in which the rich only engage, and it is a struggle in which the poor always go to the wall.

This struggle on the part of the wealthy and highly organized classes of society constantly, unceasingly exerted, must necessarily succeed, either completely or partially, and it does everywhere succeed. The consequence is that in every country and in every age the principal burdens of taxation have been borne by the poor. This fact is so universal that it furnishes no inconsiderable argument in support of the view that it ought to be so.

Now let me pass from this general view of the grounds, reasons and motives by which the systems of taxation are fashioned and shaped, to the conditions in which we in the United States stood at the period immediately preceding the enactment of the law before us. We were collecting annually for governmental expenditure $500,000,000; and the striking and impressive fact to which I call the attention of the court is that no one dollar of this amount was collected in accordance with that first and fundamental principle of taxation to which I have alluded, namely, that it should be proportioned

according to the ability to bear the burden.  The whole of this $500,000,000 was collected upon a rule which is a confessed departure from that principle, and which does not regard it in the slightest degree.  It was collected by duties upon consumable commodities; duties which went into and increased the price of the articles upon which they were imposed and were thus paid by every purchaser of them who purchased them for consumption.

It is alleged by the counsel for the appellant that the income tax — and this they consider its most monstrous form of injustice — falls upon two per cent only of the population of the United States; but what must we think of the fact that this two per cent have been paying but a trifle more than two per cent of the $500,000,000, while of the annual income of the nation, after deducting what would be sufficient to furnish a living for the people, they have been receiving probably more than fifty per cent?  At the same time another impressive and startling fact, not adverted to by them, has also been receiving more and more of the attention of the people of the country — I mean the growing concentration of large masses of wealth in an ever diminishing number of persons.

It was impossible to avoid the suggestion that there was some connection between these striking facts, and it was also impossible that they should not form the point of conflict around which political contentions would gather.  They did finally succeed in dividing the two great political parties of the country.  At last the party complaining of these things gained an ascendency in the législative counsels, and efforts were made to devise a remedy.  This income tax is a part of that remedy.

The view taken by the Congress which passed the tax law in question is plain upon its face.  The object was to redress in some degree the flagrant inequality by which the great mass of the people were made to furnish nearly all the revenue, and leave the very wealthy classes to furnish very little of it in comparison with their means.  Of course, nothing, therefore, was to be taken from the wages of labor, or from

very small incomes proceeding from other sources than labor. How much further the exemption should be carried was a question upon which great difference of opinion existed, and there was much contest.

Upon the passage of the law it was very naturally greeted by those upon whom the principal burden was imposed with much dissatisfaction. Efforts on the part of those who can afford to make such efforts to throw off the burdens of taxation were made, not only before the passage of the law, but they were resumed in another form after the law was passed. These suits are the result.

Some general criticisms made by way of objection to the law, and supposed to be sufficient to condemn it, are wholly lacking in merit : they amount to clamor only. It is said to be class legislation, and to make a distinction between the rich and the poor. It certainly does. It certainly is class legislation in that sense. That was its very object and purpose. This is a distinction which should always be looked to in the business of taxation. Unfortunately heretofore it has been observed in the wrong direction, as I have already pointed out, and the poorer class prodigiously over-burdened.

It is said also to be sectional legislation, and that too is true. It is so, not in terms, but in operation and effect; but it is so only because wealth has become sectional. If either of the two objections alluded to could be allowed to prevail, it would be forever impossible for this country to lay any income tax whatever. Such features belong to the very nature of an income tax.

There are two principal objections urged against the law. First, it is said that the income tax is a direct tax, and therefore an infraction of the constitutional requirement that such taxes should be apportioned among the States according to population, and in the next place it is said that if it is not a direct tax it must be a duty, impost, or excise, and then invalid because not uniform throughout the United States. There is, besides, a third objection applying to income drawn from a particular description of property, namely, state and municipal bonds, which objection insists that that form of property

is a subject withdrawn from jurisdiction of the Federal government.

As to the first of these questions, whether the taxes are direct or not, I begin by saying that it is not open to debate in this court. If it is possible to put a question at rest by solemn judicial decision, acquiesced in and undisturbed for a long series of years, this should be regarded as beyond the reach of further agitation. I am not one of those who make a fetich of the doctrine of *stare decisis*. Even this tribunal, as it has often told us, is liable to err, and it has on numerous occasions revised its decisions and corrected them for supposed error.

The question arose a very few years after the Constitution went into operation. It arose upon a dispute as to whether a carriage tax was a direct tax within the meaning of the Constitution. As is freely admitted by the counsel upon the other side, according to their interpretation, such a tax is a direct tax, and ought therefore to be apportioned. A supreme court, three of whose members had participated in the deliberations of the convention at Philadelphia, decided, without dissent, that such a tax was not, within the contemplation of the Constitution, a direct tax. The case was argued by the most eminent lawyers of the time. It was considered with the greatest deliberation. It is for these reasons entitled to the highest regard; but it has an authority far beyond that which these reasons would furnish. It was the decision of men who had themselves had a hand in the framing of these very provisions of the Constitution, who had participated in the debates which preceded their adoption, and who had qualifications, therefore, for construing its meaning far superior than any which have ever since been, or can now be, found.

The question has since that time, and after the passage of the internal revenue laws during and subsequent to the period of the war, in several distinct cases, come before this tribunal. In every instance the views which the learned counsel for the appellant have urged here have been rejected; and the views announced by the Supreme Court in the *Hylton case*, have been considered and adopted. When a court undertakes to review and correct the opinions of its predecessors it does so

upon the assumption that it occupies a superior position and enjoys better lights and assistances for the ascertainment of truth than those which were possessed and enjoyed at the time the decision was made.. Will this court think that, after the lapse of a hundred years, the Constitution can be construed upon a disputed point better than at the time when the instru-. ment itself was framed?

And then what good is to be gained by a reconsideration? Has it been found that the operation of the law as declared in *Hylton* v. *United States* has been productive of injustice which demands a remedy? And what is the new mode of laying a tax like this which the learned counsel for the appellant propose to substitute in place of the one required by the doctrine hitherto established? Simply this: they demand that the tax shall be an apportioned tax among the States according to population, when the very subject of taxation may not be found at all in some States, and in others found only to a very slight extent, and in others found in overwhelming measure. And all this to prevent a slight burden being lifted from the shoulders of the poor, who have borne it so long, and placed upon the shoulders of the rich who have been comparatively exempt!

It is said that the term " direct tax " had a distinct and well-understood meaning at the time of the adoption of the Constitution, and that such meaning should therefore be accepted. But upon looking into the literature of the time we find that this is far from being the truth, at least so far as any use of the term is concerned with which American statesmen and legislators may be supposed to have been acquainted. We find that the economists of that day were divided, as they have been from that time to this, in their views as to the incidence of taxation. Some faint support for the appellants may be found in the writings of Turgot, the celebrated French economist, but his book was not translated at the time, and we can hardly suppose it to have been known. beyond a very select few of the members of the convention. And as to Adam Smith, also referred to, there was doubtless a very considerable acquaintance among the most

prominent of American statesmen of the constitutional period with the works of that illustrious writer. But does he make any such distinction as that insisted upon? Does he draw any line of division between taxes as being direct or indirect? None whatever. He evidently considered the distinction of no value, and it certainly is of no value until economists have become so agreed upon the subject of the incidence of taxation that it can be made to import something far more definite than it has hitherto done.

In the convention which framed the Constitution the question was asked without being answered: "What is a direct tax?" No such definition, no such distinction, as the learned counsel for the appellants now insist upon is anywhere to be found in the constitutional debates of the time, or, if there is any, their eager research has failed to disclose it. In short, in place of a distinct and determinate meaning of the term we find nothing but doubt and obscurity. Is this the sort of clear signification of words which the law justifies us in assuming to have been intended wherever the words are found?

What is the true pathway which the law follows in such cases? When it cannot find any clear ordinary meaning of words sufficient to furnish a correct guide to determine the real thoughts of men, it carefully scrutinizes the instrument itself which is to be interpreted, and seeks to inform itself of the principal objects and purposes which the framers of it had in view, and puts such a meaning upon the language employed as will best carry out those things and purposes. Acting upon this sound principle we at once gain light. We observe, in the first place, that the injunction of the Constitution is that all direct taxes shall be apportioned among the States according to population, and therefore such taxes as could not, with some reasonable approach to justice and equality as between the States, be thus apportioned, could not have been regarded by the framers of the Constitution as direct taxes, even if, according to the preponderating opinion, or understanding, of the time among economists, such taxes would more properly be classed under the denomination of direct.

At that time, the ordinary method of collecting taxes known and in use in this country, other than capitation taxes, was the tax on land.  The principal revenues of the States were everywhere collected in this manner.  The tax upon personal estate may have had some feeble operation in some quarters, but no considerable amount of revenue, I think, was anywhere derived from it ; and, in most parts of the country, it amounted to nothing at all.  There was another tax which was resorted to as a partial tax designed to reach a class of persons who were able to pay a tax, and yet were not land-holders.  That was a tax upon particular trades, occupations and callings, such as lawyers, physicians, mechanics and traders.  This has been called an income tax.  In some respects it partakes of that character, but really is so no more than all taxes partake of that character.ᴵ  All taxes are eventually paid out of incomes, except where a nation makes such ruinous imposts as to encroach upon capital, but they are not for that reason income taxes.  The true income tax is a tax which disregards the matter of occupations and callings, personal property, land, or any source from which the income comes ; nor is it laid upon gross receipts, but upon the net receipts after the payment of expenses.  Now, it is the characteristic of these taxes, other than the general form of taxation then in use, that is land taxes and capitation taxes, that they are partial. They rest upon particular subjects of taxation, and are the incidental and supplementary methods of raising the revenue designed to complete a system.  In this respect they resemble imposts, duties and excises.  They are laid upon particular things, or upon particular sources of revenue.  A tax upon persons engaged in the sale of intoxicating liquors may indeed in one aspect be regarded as a direct tax ; but in the minds of men it is more naturally viewed as an excise.  Certainly it could not have been intended by the framers of the Constitution, that these partial and supplementary taxes, in use in some places and not in others, which fall upon particular subjects, which might, or might not, be found distributed in some degree proportionately to the population, should be apportioned, and such were not therefore within their con-

templation direct taxes. They certainly did not intend to limit the power of Congress to raise revenue, either in this, or in any other form of taxation. The broad power of taxation, in whatever form, was granted to Congress, and we cannot limit it by any implications. What, therefore, in their minds could not be apportioned, cannot be regarded as direct within the meaning of that word as employed by them. This is the precise reasoning which was adopted by the learned judges in *Hylton* v. *United States*.

Let me now call attention to a consideration which I do not think has as yet been adverted to, and which I do not find in any of the briefs. It is perfectly well known from the history of the time that the question of taxation was one which greatly excited local and state jealousies and apprehensions. A principal source of revenue, then as since, had been derived from duties on imports. That the States should still preserve this means of defraying their expenses was a lost hope. That concern, together with all others which touch the common interest, had necessarily to be surrendered to the new government. In surrendering it one care was taken, namely, that the power should not be used, so as to make distinctions between State and State, but should be exercised with uniformity throughout the United States. But how should these taxes be so imposed as to bear equally upon the different members of the new government? Apprehensions upon this point were very natural and they were very strong. One good general test would be to apportion and distribute them according to the wealth of the country. But how could the wealth of the country be ascertained by any reasonably correct assessment? This was an insuperable obstacle in the way of adopting that criterion. The next best criterion as between different communities is of course relative numbers.

But here a difficult question arose, and that was whether slaves should be treated as property, or as persons, and thus the subject of taxation became involved with the subject of representation. The Southern States preferred that in taking the population for the purposes of taxation the slaves should not be counted. The North did not wish to impose an injus-

tice upon the South, but it was determined that the slaves should not be counted for the purposes of representation, and left out for the purposes of taxation. The South felt that it was taking an additional burden if it allowed the slaves to be counted, but it preferred to assume it rather than lose the dearly prized representation. The same rule therefore was adopted as was provided for representation, and a compromise effected upon that.

Now in all this we perceive that while the minds of the members of the convention were intensely engaged upon the subject of how taxation should fall upon the States, they did not very much — indeed they did not apparently at all — consider how it was going to fall upon and affect different classes of individuals in the States themselves. I cannot find anywhere any proof that this subject even engaged their attention, and yet it was a most important one. I cannot help thinking that this omission to give attention to this consideration arose, not wholly from the fact that the minds of the members of the convention were chiefly bent upon securing their respective States from undue burdens, but also from the fact that by the term direct taxes they looked only to those general methods of raising revenue which prevailed at the time, and that in their minds the words embraced only those general and universal taxes laid upon subjects which were necessarily found wherever population was found, namely, capitation taxes, and taxes upon land.

I now pass to the other principal objection against the tax, and that is that if it be an impost, duty, or excise, it is invalid because not uniform throughout the United States. It is insisted by our adversaries that "uniform throughout the United States" means two things. First, that the tax itself should have a certain character; and, second, that when that character has once been impressed upon it, it should operate precisely the same throughout the country. We say, on the other hand, that in making this grant of power no limit was imposed by Congress as to the character of the tax itself, but that, whatever plan or method should be adopted for laying it, the same plan and method should operate alike in all the

States. Whatever subject is taxed anywhere, the same subject must be taxed everywhere, and at the same rate. This construction is demanded by the plain meaning of the phrase on its face.

It is, moreover, reinforced and strengthened by the consideration to which I have already alluded, namely, that while the convention gave the most studied attention to the matter of securing fairness and equality as between States, it did not give the like attention to securing equality of operation as between the individual citizens of each State. The notion of our adversaries is, that it was the design of this provision of the Constitution to secure equality between individuals upon whom the tax was imposed and upon whom the burden really rests — an equality which consists in exacting from one set of men under certain circumstances just the same sum and no more than that which is exacted from another set of men who are in the same circumstances. We must see that this could not have been the intention when we consider that this word "uniformity" is applied to the case of duties, imposts and excises alone.

The true interpretation to give to this constitutional requirement is, that it was designed to secure territorial uniformity in the operation of the taxation. This is what the plain meaning of the words requires on their face, and the real error of our opponents is that they read out of the provision the words "throughout the United States."

I admit, however, that, quite aside from this requirement of the Constitution, Congress is bound to observe, in laying duties, imposts and excises, a certain rule or principle, extremely ill expressed by the word "uniformity," and yet having some of the elements indicated by that word. This principle is one which has been declared many times by this court, and that is, that under our system of government, whether national or state, there is no room for the exercise of what is called arbitrary power. All the powers of government are, in a certain sense, given and held in trust that they will be exercised for public objects and on public grounds and reasons. What is arbitrary power? It is power exercised,

not as a trust, but as if it were the private and personal possession of those who exercise it. It is a power exercised in disregard of the idea that those who exercise it are morally accountable to those from whom it proceeds. It is, in short, a power exercised upon other than public grounds and public reasons. The business of determining what particular burdens of taxation shall fall upon particular classes of people, and how the classes shall be made and arranged, is the province of the legislature, and of the legislature alone, and the judicial tribunals have absolutely nothing to do with it except where there is some constitutional provision imposing a limit, or imposing a method, upon the exercise of the power of taxation. Whenever the legislature creates a class for the purpose of taxation, and differentiates that class by grounds and reasons which are public in their nature, and which, whether right or wrong, wise or unwise, are grounds and reasons upon which intelligent legislators might honestly act, it is within its province; it is not exercising arbitrary power; it is proceeding upon public grounds, and its action cannot be reviewed by the judicial tribunals. Applying this rule to the provisions exempting incomes to the amount of $4000, and to the exemptions of successions to realties, we say that it is a matter entirely within legislative discretion.

Then there are objections to certain exemptions of a quite different character. I mean those exemptions examples of which are savings banks. Indulgence to these is, in many forms, everywhere, and under all systems of taxation, extended, and such exemptions have many times received the approval of judicial tribunals, the practice of the making of small savings as a provision against old age, sickness, and disability, which is effected through the instrumentality of savings banks, is one of those practices and tendencies which every State ought to encourage. It raises the condition of every individual who engages in it. It makes him a property holder, and therefore makes him a friend instead of an enemy to the institution of property, an institution which lies at the very basis of our civilization, and which ought to be encouraged in every possible manner, and particularly to be encouraged by

those who have large interests and who are so apprehensive of the future.   Moreover, it indirectly furnishes a great relief to the whole community in the general burden of taxation, for by means of it individuals make provision for themselves for their support in old age and disability, without which provision they would become a direct burden upon the State.   All statesmen and economists are agreed that here is a most useful field for the exercise of legislative discretion — that here is a particular in which exemption from the burden of taxation may be made to bring the most solid and most general public advantages.

Another objection is against the exemption in favor of companies doing business on the mutual plan whilst stock companies doing the same business are not exempted.   Here it is strenuously urged is a distinction without a difference; but there is a very palpable difference, and one which furnishes a clear public ground which may properly engage the attention of legislators when employed in laying the burdens of taxation.   So far as respects life insurance companies doing business on the mutual plan, there are some distinct reasons in favor of exemption.   The business of life insurance performs a similar function in the State to that which is performed by savings banks.   It is a mode, not the same in its details, but very similar in principle, by which individuals are induced to save from time to time small sums from their incomes for the purpose of making provision, sometimes for themselves, sometimes for their children or those who are dependent upon them, in the cases of old age, disability, and death.   All this is in the highest degree a matter of public importance and of public interest.   It is a disposition which should be favored.   It is a disposition which, if indulged, leads men to look forward to the acquisition of property, even though it may be a small property.   It makes them friends to the institution instead of enemies.   It secures to them the blessings and enjoyments of private property.   Much ado is made on the other side about the enormous accumulations of these life insurance companies.   They are said to amount to a sum in the case of a single company of $200,000,000, and the intimation is that it is a gross

departure from reason to leave such an immense amount of property exempted from taxation. But those who exhibit these pictures to the court of enormous accumulations of property did not at the same time state the vast number of people who are interested in that property, and to whom in a just sense it belongs, and among whom its benefits are distributable. If the accumulated reserve of the life insurance company referred to exceeds $200,000,000, it is probable that the number of persons interested in it and to whom it equitably belongs, and among whom it will from time to time be distributed, amounts probably to half a million.

But it is insisted that the distinction made between mutual and stock companies of other kinds, such as those engaged in the ordinary business of insurance, has not these considerations to support it, nor, indeed, any consideration at all; that it is a distinction without a difference; but this is not so. There is a well-founded distinction between these classes of corporations. Take, for instance, the case of the business of marine insurance which is conducted by both stock and mutual companies. What is its nature when conducted by a stock company? Its general nature, whether conducted by a stock or a mutual company, is the prevention of serious loss and, perhaps, ruin to a single individual by the occurrence of a peril insured against, when, if the same loss were distributed among a large number it would not be sensibly felt. Private underwriters, whether incorporated or unincorporated, when they engage in such a business take from the other callings of life, and from productive employments, a certain amount of capital and put it aside as a sum from which to pay losses which may from time to time arise from particular perils. They insure against such perils, charge a price for such insurance, and make a profit for themselves upon which they live. The object of a mutual company is to enable those who require this insurance to dispense with the necessity of employing this outside capital and paying interest on it, by organizing themselves together and, their number being very large, creating a fund by small contributions of money and notes in the form of premiums, and thus become the insurers

of each other; in other words, by distributing a loss which falls, in the first instance, upon a particular one, upon a great number. Accordingly those who participate in mutual insurance pay their premiums, in cash, or partly in cash and partly in the shape of notes; and thus create a fund upon which an immediate draft can be made, in case of a particular loss, sufficient to furnish an indemnity against it, and if, at the end of the year, the whole amount paid in is not exhausted in paying losses, the residue is distributed, and paid back. They do not make a dollar of profit themselves in any instance.

Then it is said that there is a wholly inexcusable exemption in favor of individuals and against corporations generally, in that corporations are not allowed a deduction of $4000 from their incomes, although individuals engaged in precisely the same business enjoy it. I undertake to say that this discrimination is not only founded upon public considerations, but that it is entirely and indisputably right.

The case of building and loan companies has been alluded to, and it is said some of them have large accumulations of property. What is a building and loan company? It is a contrivance by which a large number of people of small means may unite together, and by their small contributions made from time to time, mainly from the savings of labor, get together a large fund which may be used in the purchase of property and its improvement by the building of houses for the occupation of the members, and which becomes their property when they shall have completed the requisite payments for it. It is an institution of the same character with savings banks and life insurance companies and calculated to perform the same useful services to the public. I wonder that large property holders should ever look with jealousy upon the extension of indulgence as to such enterprises as this. They are the most efficient agencies which can possibly be employed to induce the great mass of the community to make savings which will end eventually in their becoming private property holders, and thus attach them to the institution and make them ready at any time to defend it against all enemies.

There are other exemptions to which exception has been

taken, but what I have already said will sufficiently dispose of them. It will be obvious when they come to be considered that there is nothing arbitrary in any of them. They all of them stand upon public grounds and public reasons, and the aim of all of them is to extend benefits — very small benefits indeed — but still benefits which have a powerful tendency to encourage the disposition to make savings, to encourage the ambition and desire to become owners of property, and thus to strengthen at its foundation the basis upon which the prosperity and even the existence of states depends. So much for the question of uniformity.

There is another objection made to a distinct feature of this law, resting, not upon grounds of a failure to observe uniformity, but upon the allegation that the subject-matter upon the income of which the tax is imposed has been withdrawn from the field of federal authority and cannot be touched directly or indirectly. This is the case of state and municipal bonds, the income of which, it is said, is taxed under this law without authority. I do not doubt that it was the intention of the law to tax this income. It would be extremely unfortunate and unwise if, upon any view, this species of property were withdrawn from the sphere of federal taxation. The reasons upon which the claim to exemption is put are drawn from a series of decisions by this court upon the question of the right of a state to tax the agencies and instrumentalities of the Federal government, such, for instance, as United States bonds, and the United States banks.

I think the objection is untenable, first, because if the tax is a tax upon any state agency, it is a tax upon the borrowing power, and this is not necessary to municipalities, or even to States, in any such sense or degree, as it is necessary to the United States. The great exigency of war, which is the principal case calling for an exercise of the borrowing power, if not the only one in which loans are absolutely necessary, does not rest upon the States. Their existence with all their functions can be maintained by means of revenue derived from taxation, and perhaps it would be better if no other means had ever been resorted to by them. In the next place this court

has held what must undoubtedly be true, that each State has the right to tax the municipal and state bonds of every other State, and shall it be said that the United States do not have the power to tax a species of property which every other State in the Union has the power of taxing?

A few words in conclusion upon the general aspects of this case, and, especially, as they relate to the question of uniformity.

I am not one of those who believe in what is called a latitudinary construction of the powers of Congress, and who seek to circumscribe within the narrowest limits the power of this tribunal to sit in judgment upon the validity of congressional action. Ours is a government of delegated and limited powers, and I hope the day will never come when this court will hesitate to declare that the limit has been passed, when it is clearly convinced of the fact. But I also hope that it will forever decline the office of judgment in cases where the question does not assume a purely judicial form; and that it will especially refrain when there is mingled with the question any element of legislative discretion which cannot be separated from it. The powers of this court are limited as well as those of Congress, and those limits are already transgressed when it finds itself even considering whether this or that view of a question of political economy, or of the wisdom of taxation, is a sound one.

These suggestions are all the more weighty and important in those controversies which, like the present are calculated to arouse the interests, the feelings — almost the passions — of the people, form the subject of public discussion, array class against class, and become the turning points in our general elections. Upon such subjects every freeman believes that he has a right to form his own opinion, and to give effect to that opinion by his vote. Nothing could be more unwise and dangerous — nothing more foreign to the spirit of the Constitution — than an attempt to baffle and defeat a popular determination by a judgment in a lawsuit. When the opposing forces of sixty millions of people have become arrayed in hostile political ranks upon a question which all men feel is

not a question of law, but of legislation, the only path of safety is to accept the voice of the majority as final. The American people can be trusted not to commit permanent injustice; nor has history yet recorded an instance in which governments have been destroyed by attempts of the many to lay undue burdens of taxation on the few. The teachings of history have all been in the other direction.

*Mr. Joseph H. Choate* for Pollock, appellant in 893, and for Hyde, appellant in 894. *Mr. Charles F. Southmayd* was on his brief.

I look upon this case with very different eyes from those of either the Attorney General or his associate who has just closed. I believe there are private rights of property here to be protected; that we have a right to come to this court and ask for their protection, and that this court has a right, without asking leave of the Attorney General or of any counsel, to hear our plea. The act of Congress which we are impugning before you is communistic in its purposes and tendencies, and is defended here upon principles as communistic, socialistic — what shall I call them — populistic as ever have been addressed to any political assembly in the world.

Now, what is this law? My friend, Mr. Carter, has said that in the convention which created the Constitution there was one ever-present fear. There was; I agree with him as to that. It was that by a combination of States an unjust tax might be put upon a single State or upon a small group of States. Let us see about this act which, exempting all incomes under $4000 of individuals, but denying the exemption to corporations and to persons drawing their income from corporations, seeks to raise a sum, as has been stated here, of from $30,000,000 to $50,000,000. There are sources of information as to how such a law will strike, to which I wish to direct the attention of the court.

There was formerly an income-tax law, and the last year it was in force was the year 1873. The exemption then was $2000. In that year the collections for that tax were such in the States of New York, Pennsylvania, Massachusetts, and

New Jersey that even then, with that exemption, those four States paid four-fifths of the entire tax. What is their political power? What is their political representation in the lower House of Congress, which only can initiate and secure the passage of revenue bills? Eighty-three out of three hundred and fifty-six, or a little less than one-quarter. Anybody who knows anything about the operation of these income-tax laws and as to the effect of changing the exemption from $2000 to $4000, knows that that inequality of burden will, under the act of 1894, press upon those four States with vastly greater force. This most iniquitous result has been brought about by an express violation of two of the leading restraints of the Constitution.

Did your Honors observe what the learned counsel claimed, namely, that $20,000 might have been made the minimum of exemption of taxation of this law, and there would have been no help for it? If you approve this law, with this exemption of $4000, and this communistic march goes on and five years hence a statute comes to you with an exemption of $20,000 and a tax of 20 per cent upon all having incomes in excess of that amount, how can you meet it in view of the decision which my opponents ask you now to render? There is protection now or never. If it goes out as the edict of this judicial tribunal that a combination of States, however numerous, however unanimous, can unite against the safeguards provided by the Constitution in imposing a tax which is to be paid by the people in four States or in three States or in two States, but of which the combination is to pay almost no part, while in the spending of it they are to have the whole control, it will be impossible to take any backward step. You cannot hereafter exercise any check if you now say that Congress is untrammelled and uncontrollable. My friend says you cannot enforce any limit. He says no matter what Congress does, if in its views of so-called — what did he call it? — sociology, political economy, it establishes a limit of a minimum of $20,000 or a minimum of $100,000, this court will have nothing to say about it. I agree that it will have nothing to say about it if it now lets go its hold upon this law — upon a law

passed for such a purpose, accomplishing such a result and by such means.

I have thought that one of the fundamental objects of all civilized government was the preservation of the rights of private property. I have thought that it was the very keystone of the arch upon which all civilized government rests, and that this once abandoned, everything was at stake and in danger. That is what Mr. Webster said in 1820, at Plymouth, and I supposed that all educated, civilized men believed in that. According to the doctrines that have been propounded here this morning, even that great fundamental principle has been scattered to the winds.

It is not any part of our mission here to question the power of Congress to raise money by taxation. We believe that Congress has plenary power in the last exigencies of the government to reach every man, every dollar, every inch of ground, to secure the common defence and the general welfare; that it was the purpose of the convention that created the Constitution to give Congress that power, and that it is one of the absolute essentials of a great sovereignty which was to cover a continent and to last for untold ages. There is no doubt about that. We are perfectly aware, too, of the difficulties that lie in our way; that it is necessary for us to show, in the first place, either that the power to pass this act was not conferred upon Congress, or that in passing it Congress has exceeded the power entrusted to it by the Constitution.

One thing is certain, absolutely certain, that although the power was given Congress to tax, no power was given it to confiscate; and that, the Attorney General and his associates all admit. If this is a confiscation under the forms of law, there is no power given to Congress in the Constitution that could by any possibility enable it to validly enact such a law.

I can add nothing to the wealth of argument, the force and power of the claim presented by my two associates, that this tax is wholly void because absolutely in all its parts a direct tax not imposed by the rule of apportionment. But, as we may distrust, in view of the former decisions of this court, the willingness of the court to come to such a conclusion as

that an income tax in all its extent, levied upon all callings, levied upon all earnings as well as upon the rents of land and the income of personal property, is in the meaning of the Constitution a direct tax, I may present the case as to direct taxes upon somewhat narrower grounds, grounds consistent with every case that has yet been decided by this court, and maintained by the uniform course of the Federal government in its legislative capacity for over half a century after the adoption of the Constitution. If you should conclude that it is not possible to condemn this entire tax law as unconstitutional because entirely a direct tax, my purpose is to present, then, the only safe and practicable alternative upon which this court can place, as I believe, any decision, and which is based upon the clear distinction, the distinction which we find in the Constitution itself, between direct taxes upon the one hand, and duties, imposts, and excises upon the other.

Therefore, for the purposes of this argument, I shall assume that it may possibly be decided by this court, as it has so often been decided before, that all duties, all excises, all imposts are shut out from the class of direct taxes by the necessary meaning and effect of the Constitution, and that they are to be administered by the rule of uniformity, as they ought to be in this law and are not. I shall claim, upon the other hand, that at any rate so far as regards the direct, inevitable, necessary income, and outgrowth of real estate and of personal estate, the tax is a direct tax levied upon the proper subject of a direct tax within the meaning of the Constitution, and is therefore invalid.

First, I desire to call attention to the rules regulating the power and the methods of exercising the power of taxation, laid down in the Constitution, which are absolutely imperative upon Congress and from which by no contrivance, by employing no name, can it possibly escape.

Under the provision of section 2 of article I of the Constitution, it had already been declared that representatives and direct taxes should be apportioned among the several States according to the census, according to numbers to be ascertained by an original census, and by a decennial census

from time to time, as years rolled on. The framers had not yet, so far as concerns the arrangement of sections in the Constitution as it was finally drawn, given to Congress the general power to tax. That first provision was a restraint upon what was intended to be given by a subsequent clause, all of course finally speaking with one voice. Then the framers came to the first clause of the eighth section, which described the power of Congress, and naturally and necessarily gave to Congress plenary power of taxation, which might meet the exigencies, necessities, and demands of the Government at any period and under any stress. I agree with the Attorney General that nothing could be more comprehensive; that no other language could be used to include the entire power of taxation which it was the evident, the obvious, the necessary purpose of the framers to bestow upon the new government. "Congress shall have power to lay and collect taxes, duties, imposts, and excises." They added, however, to that clause, "but all duties, imposts, and excises shall be uniform throughout the United States," which I understand to mean exactly what it says—that all duties, imposts, and excises shall be uniform duties, uniform imposts, uniform excises throughout the United States.

The first question that suggests itself is why these words added in that particular form, especially why the word "taxes" was included in the grant of power and excluded from this particular modification of it. I am not one of those who attribute ignorance or heedlessness or acting in the dark or in a maze to the men who, after sitting four months together, evolved this piece of work. I submit that upon every reasonable rule of construction, in view of the nature and character of those men, in view of the light of the history of the confederation and of English history in which they were acting, they intended by their prescription of methods of exercising the power to cover absolutely the whole subject of taxation, and that the reason why the limitation as to uniformity, the prescription of method as to uniformity, was applied to duties, imposts, and excises was that the framers knew very well that they had already prescribed the measure for all other taxes

under the term of direct taxes. The undoubted reason why the framers of the Constitution limited the provision of the method of uniformity for the measurement of taxes to duties, imposts, and excises was that they understood that they had already provided for the measurement of all other taxes.

In respect to this, what the Attorney General says regarding the uniform conduct of the government from the beginning is entitled to our greatest respect, and I draw from it what appears to me to be a very strong argument and one that I do not remember to have heretofore seen suggested. Your Honors will remember that Mr. Justice Chase in the case of *Hylton* v. *United States* threw out the suggestion that there was some mistake about the word " taxes " in the first clause of the eighth section; that all duties, imposts and excises necessarily were taxes; and he hinted that possibly there might be some kind of a tax of which he could not then think, the nature of which he did not intimate, that might neither upon the one hand be a direct tax, nor upon the other be a duty, an impost, or an excise. That suggestion has lingered in the minds of the profession from about a hundred years ago until now, and you find it reproduced in the brief of the learned Attorney General or of his associate. They say that there may be a tax which on one side is neither a direct tax, nor on the other side a duty, impost, or excise.

Now, for the argument that I draw from it: How about the corpus of personal property? If a tax upon that were such a tax, neither direct upon the one hand nor a duty, impost, or excise on the other, then what would follow? What Mr. Justice Chase suggested, that neither rule prescribed would apply; that it would not have to be rated either according to apportionment or according to uniformity. Would it not have suggested itself to some astute mind connected with the executive or legislative departments of the government at some time since the adoption of the Constitution until now, in all the great exigencies and emergencies of the nation, that there was a tax unlimited in respect to measure, in the meting out of which there was no restraint upon Congress? Under that construction, under that theory or imagination, what has there

been from the beginning to prevent Congress from raising all the money required for the purposes of the government from the corpus of personal property throughout the United States without any rule of apportionment, without any rule of uniformity, laying it exactly as it pleased, and coming to every citizen, saying, "I find you are worth so much personal property; pay me two per cent of that." No; this has never been dreamed of — it has never been suggested to this hour — and why not? It is because everybody who thought for a moment about this subject knew that the judgment I have ascribed to the framers of the Constitution was sound and right, namely, that in providing for direct taxes and that direct taxes should be collected according to apportionment, they covered a tax upon personal property.

The income of all accumulated property, whether it be the rent of lands or the interest of bonds or the immediate outgrowth of any other specific form of personal property, is necessarily, under the Constitution, the subject of a direct tax and of no other.

One thing is absolutely certain in this Constitution, and that is that the difference between the subjects of taxation by apportionment and taxation by the rule of uniformity was considered one of vast importance by the framers of the Constitution. It was no trifling thing. They did not think either branch of this question of taxation inconsiderable or unimportant. My proposition is that real estate itself and the rent of it, the bulk of personal property and the income from it, was what was in their minds under the subject of direct taxation. I ascertain this by comparing and studying these clauses of the Constitution which I have already quoted and the other clauses of the Constitution and the whole scope and purpose of them. The mere talk of this man or that in the convention, mere talk of this man or that upon the bench of any court, unless it was a solemn adjudication upon his oath of office and the decision of a case, is of very little weight. I have found from a careful study of it very little help upon this subject in the debates of the Federal convention, and I think there are two reasons why no conclusive force, as Justice Swayne said in the *Springer case*, can be drawn from

them.  In the first place, it was not a legislative body : it was merely a deliberative body, coming voluntarily together at the invitation of Virginia and of Congress, submitting its work to Congress with a suggestion that it finally be submitted for adoption to the conventions of the several States.  In the second place, its deliberations were absolutely secret.

The first step which I take as the starting point of my argument in support of the proposition that I am submitting is that, whatever else was or was not included in the term direct tax, real estate was included, real estate in the several States, real estate that was distributed equally everywhere, found everywhere, in every State, although necessarily differing in value and differing in acreage.  From the beginning, the power to tax land has not been rested upon theories of distinctions between the increment of land, the improvement of land, and the growth or value of land; but it has been applied, according to such practical construction, to improved and unimproved real estate.  There have been three cases of a direct tax, which has never been imposed except in cases of great emergency : First, there was the direct-tax law of 1798, when trouble with France was apprehended; then the land-tax act of 1812, and the direct tax of 1861.  All were of one type.  They were not taxes on naked land; they were taxes arranged carefully upon improved and upon unimproved property, just as a land tax, if you please to call it so, a direct tax may now be imposed upon rented property and unrented and unproductive property.  What did Congress do ?  Take the first tax as a specimen of them all.  It said, first, we will tax the houses.  That is improved real property, is it not ?  That is rented real property, is it not ?  It taxed them according to their value, from $3000 ranging all the way up to $30,000, at a differing rate.  Then we will tax the slaves so much a head.  I think it was fifty cents a head.  Then we will tax all the rest of the land a dollar for a hundred acres or whatever the rule was.  So I say there is an absolute consensus, confirmed by these hundred years of history, that a direct tax upon land was not a purely naked land tax, but it was a tax, as I have said, upon all possible improvements or outgrowth of the property.

Now, we come to the second proposition, which it seems to me is equally easy to establish, and that is that the rent of real estate issuing from it is indistinguishable from a tax on the real property itself. As to this matter of rent, is a tax on rent distinguishable from a tax on land? I say that a tax on land yielding income by whatever name is in reality, in effect and substance, a tax upon the rental. I speak now, of course, of rented property. I am not foolish enough to argue that a tax on rents is the same thing as a tax on land which nobody rents. I am looking, however, at the nature of the tax; not the form, but the substance. Your Honors will observe that the tax laid by this law is a yearly tax upon the yearly rental. Can that be distinguished from a tax on land? How is a tax on land to be paid, except out of the income? How is it possible? I mean in the common, ordinary, practical business of life which the court is bound to look at. We are living under a constitutional government, are we not? We have regulated the measure of our own taxation by the Constitution. Was it intended that, although Congress could not put an unapportioned tax upon real estate, it could put an unapportioned tax upon rent of real estate and so eat all the real estate up? How can a man pay this five years' annual tax on the rent of real estate? Absolutely only out of the rental. Would any free people, if they had prohibited a land tax, submit to a tax on the rentals?

We are deciding this as a question of law, not of political economy. I say that every time the courts ever passed upon the question of an annual tax on land, by whatever name you call it, whether you call it a real-estate tax or a land tax or an income tax or whatever you please, it has been held to be a tax on the immediate ownership, upon the immediate freehold, and upon the man who was in possession thereof receiving the income. What has been the law from the beginning of the common law? What do the old writers say? "If a man seized of land in fee by his deed granteth to another the profit of those lands to have and to hold to him and his heirs and maketh livery *secundum formam chartœ*, the whole land itself doth pass. For what is the land but the profits

thereof?" That is Coke upon Littleton. That has been law ever since in every court in English Christendom. It is applied now just the same as it was in the time of Coke. It was applied in the State of New York to the matter of a devise. " A devise of the interest or of the rents and profits is a devise of the thing itself, out of which that interest or those rents and profits may issue." That is the law as administered by the Supreme Court of the State of New York when your late associate, Mr. Justice Nelson, was a member of it.

Let me call attention again to what the Attorney General says. He says: " Well, when a man has got the money in his pocket it is no longer rent." One thing I would say about that, is, that if you are going after the rent as money, the tax is on personal property and should be apportioned, as I think I shall demonstrate by and by. But the answer is that the tax does not go after the rent as money in the tax-payer's pocket. The act of 1894 specifies the rents as a cardinal part and element of this income return, and every man who goes up to make his return has to state under oath what rent he got last year. This fiction — this difference between the name and the thing, between the substance and the shadow — urged by the Attorney General is that, though you cannot tax rent, you can tax the money in the owner's pocket received from rent. If there is one factitious argument, one pretence of a reason, one attempt to make a distinction without a difference that this court has uniformly stamped upon with all its might, it is just that. How in principle does the corpus of personal property differ from a piece of real estate? I own a house to-day and sell it to-morrow, and take as its consideration a mortgage on the same property for $10,000, the value of the house. Is a tax upon the house one kind of a tax and a tax upon the proceeds of the house another? It cannot be; it is impossible. There is no real or substantial difference between a general tax on personal and on real property. No such thing has ever been decided; no such thing has ever been hinted at. A tax on personalty has all the elements of a direct tax exactly as a tax upon real estate. It is directly imposed; it is presently paid; it is ultimately borne by the

party owning it. There is no choice for him to escape from the tax but to run away. There is no volition about it, as there is in the case of any consumable commodities upon which excises are laid. Suppose a direct tax be levied upon. real and personal property in the States, could a man whose personal property was touched by it appeal to the court with any hope of success and say, "That tax on my personal property is not a direct tax, but is an excise or a duty or impost. I will pay on my real property, but I will not pay and I shall appeal to the Supreme Court to free me from paying the portion of the tax that rests upon my personal property." The court certainly would overrule such a contention. I say there is not the least distinction between such a case and that presented here.

I think you will have no difficulty in coming to the conclusion that the corpus of personal property is included within the subject of a direct tax, and that a tax thereon must be apportioned. How about income derived therefrom? I am not speaking now, of the earnings and income from labor and from any calling, trade, profession, or business. I am talking about the direct income of personal property, as illustrated by the interest on bonds. Thus the United States issues certain bonds and declares that the bond shall not be subject to taxation by any State. I am looking at the question whether a tax on the interest of the bonds is the same in nature as a tax on the bond itself. A State levies a tax. The legislature recognizes that the bond itself is protected and cannot be taxed; but it attempts to circumvent that inhibition by pretending to tax only the income after it has been collected on the plea that it has lost its identity and is part of the personal property of the owner of the bond. Would you say that, although the act of Congress said the bond should not be subject to tax, all the income therefrom and all its value might be eaten out by the State putting a tax upon the income of the bond? Of course, that would be an impossibility, and it is decisive of this question. The substance is what the Constitution provides for. The substance of right is what the court is bound to protect.

We may proceed now to inquire how the two rules, apportionment and uniformity, were intended by the makers of the Constitution to work in practical application to their respective subjects of taxation. It was then known perfectly well that apportionment was necessarily a rule of inequality. Nobody ever supposed or could contemplate that a tax levied by the rule of apportionment would result in equality of burden as to wealth, or, to state it in other words, that it would be found that the distribution of real and personal property was according to the population of the various States, or that a tax on real and personal property apportioned according to population would not bear more heavily on some than on other States.

You remember that the confederation had no power to tax; that it had been the subject of an intense struggle since 1781, culminating finally in 1786, and that the confederation was then on the point of absolute collapse when the constitutional convention came together. The confederation had demanded the impost, it had demanded the power of taxation in some form or other to save the nation, and the States never would consent. All remember the quarrel about the impost, the getting of the impost and the not getting it, and then came the compromise in the Constitution. It is not necessary to relate the history of the compromise; how it was arrived at.

Accompanying this compromise, came the provisions in regard to the power of taxation to be vested in Congress, which we are here to-day to expound. First, there was a surrender by the States to Congress of the exclusive power to levy taxes on imports. That had been the great source of revenue to all the seaboard States; it was known to be an endless resource for Congress. The States gave it up absolutely, and with it the power to regulate foreign commerce. Then, too, the States surrendered forever afterwards the right that they had had of taxing and regulating commerce between the States. How much of revenue, how much of sources and subjects of taxing power that has amounted to, let your Honors' decisions for the last ten years on interstate commerce questions decide.

That was one part of the compromise. Then came the grant
to Congress of power to lay indirect taxes, as we now call
them — a grant to Congress of the power to levy, by the rule
of uniformity, duties, imposts and excises.

I say that this rule of apportionment was designed to
operate exactly as it eventually did. What does it result in?
It results, does it not, in a law of protection for the benefit of
the holders of such property as was contemplated as the subject
of the direct taxes? I own a house in New York. I study
the Constitution and I see that it can be made the subject only
of an apportioned tax. If that apportioned tax is applied my
taxes will be less by half or a quarter or a fifth or a tenth, as
the case may be, than if it were a tax applied by the law of
uniformity. Is not that an absolute and indefeasible right of
the owner in every State just as much as if the Constitution
had provided as a part of this compromise that no taxes should
be levied by the Federal government upon real estate in any
State?

But there is another clause providing that representation
and direct taxes shall go hand in hand. What did that mean?
Why was it that the framers twice said it in the Constitution?
And it is the only thing that they did say twice. They said
it in section 2 of article I, when they provided that represen-
tatives and direct taxes should be apportioned according to
numbers, and they said it in section 9 of the same article when
they prescribed that no capitation or other direct tax should
be levied except according to the census. They were fresh
from the struggles about representation going hand in hand
with taxation, and it was for the protection of this property,
this accumulated property in the States, as against the inroad
of the vote of mere numbers, that they stipulated and insisted
upon the guaranty of apportionment — such was the funda-
mental condition of the States adopting the Constitution.

The purpose was as clear as if it had been written in so many
words that when the representatives of any State voted in
the House of Representatives, where only a tax could originate,
upon a law to impose a direct tax upon the property or the
income of property in any State, they should do it under the

restraint that according as they possessed the political power to vote the tax, it should fall upon the citizens of the State that they represented.

What an object lesson this law is as to these subjects of direct tax that I have now spoken of, namely, the rents of land and the income of personal property. Here are the other forty States, all the States representing that region that has come in under the provision that new States might be carved out of the Territories, who have voted to put this direct tax under the pretence of an income tax upon these seaboard States, throwing to the winds the restraint that the Constitution placed upon them, and practically exempting their own States. They have provided that New York, Pennsylvania, Massachusetts and New Jersey shall pay, as I told you in the beginning, five times the amount they would pay if the rule of apportionment guaranteed by the Constitution had not been utterly disregarded.

This question as to a direct tax upon the income of real and personal property has never been decided. Not only that; it has never been considered; it has never been presented to this court. When my learned friends on the other side get up and say there is nothing to debate here, we answer that the question whether a tax on the rents is in real substance and effect different from a tax on the real property itself, and whether a tax on the income of personal property is different from a tax on the corpus of personal property has never been presented here.

My friends say that we are bound to lose our case *in toto* because the questions have been adjudicated adversely to our contention. There are five cases upon which they rely.

[Mr. Choate then examined the *Hylton case; Pacific Ins. Co.* v. *Soule; Veazie Bank* v. *Fenno; Scholey* v. *Rew;* and *Springer* v. *United States;* and contended that the questions in issue here had not been decided there.]

As to the rest of this law and the provisions which operate as an excise or duty upon income derived from business or work of any kind, we contend that there is a gross violation of uniformity, and therefore that the whole law is void.

What is meant in the clause " uniform throughout the United States ? " It would seem that that is capable of solution without imputing heedlessness to Washington, Hamilton, Madison, Franklin, and the other men who sat with them in the convention. Clearly the word " uniform " means something and was inserted for some definite purpose.

In our view there is no mistake as to what the meaning of the word " uniform " is, as an essential quality of a duty, impost, or excise. It must operate alike upon the class of things or of persons subject to it. The class may be fixed and bounded by Congress in its discretion. It is for the courts to say whether this rule of uniformity has been applied within and throughout the class.

The contrast or antithesis between the rule of apportionment prescribed for direct taxes and the rule of uniformity prescribed for " duties, imposts, and excises " was designed. The contrast was intended to be complete and perfect between each element of the two rules.

The rule of apportionment was known and intended to be a rule of inequality. This inequality was inevitable and existed in the very nature of the compromise out of which it resulted. This inequality was recognized as certain to increase as one State grew in population faster than another.; hence the requirement of a decennial census to correct this inequality, so far as that might do it. But there were features of inequality as between different States which were radical and incurable by any census. There was and there could be no such coincidence between population and wealth as the rule assumed, and the divergence from any approximate coincidence would grow, as it has grown with every census.

The rule of uniformity, on the other hand, as applied to " duties, imposts and excises," was known and intended to be a rule of approximate and reasonable equality among those embraced in the class affected by it — everywhere and at all times — and no changes of population or of wealth anywhere would or could affect its force and effect.

The constitutions of nearly all the States have adopted from the United States Constitution this rule of uniformity,

and in its practical application the courts of all speak with one voice as to its meaning, that it is exactly that for which we contend.

But there is another cardinal difference between the two rules which is even more radical and far-reaching and compels the construction of the rule of uniformity for which we contend. It must be observed that the first clause of section 8, Article I, taken by itself, gave to Congress the complete and unqualified power of taxation, only limited to national purposes, but wholly unlimited as to place. As it stood alone the power extended to every inch of the territory and to every person and every thing within the dominion of the government created by the Constitution. As it stood alone Congress could have laid and collected taxes of every kind, direct and indirect, for national purposes, without regard to population or wealth or to state boundaries, restrained only by those fundamental limitations inherent in the very power of taxation and indispensable in the government of a free people; but it was no part of the plan of any of them that this power in the new government should be absolute or unqualified, except as to place and persons. As to place and persons it should forever remain unqualified and reach as far and as wide as the territory of the United States and touch every person and every thing therein. And so they proceeded to modify and to qualify this power, except as to its extent in place or space, through the whole territory of the nation, and except as to its hold upon every person and thing by prescribing the different measures by which the burden of the different kinds of taxes, direct and indirect, should be meted out. As to indirect taxes, the modification or qualification was applied by section 8. As to direct taxes, the measure was prescribed by section 2.

Thus the Constitution, in prescribing the rule of measuring direct taxes, deals with the States and with the people therein. It allots to each State its aliquot part of the total amount to be collected according to numl rs, and the quota of each is levied and collected from the property of the States, in substance though not in form, as other state taxes are collected.

But as to taxes not direct — "duties, imposts and excises — " the situation was wholly different. These, which had belonged absolutely to the States and which they had persistently refused to part with, were now surrendered to Congress — the imposts absolutely; the excises and duties on consumable commodities to a great extent — because of the impracticability of any State maintaining them against competition with other and adjoining States, and because of the "commerce" clause and the "immunities" clause in the Federal Constitution which cut them off from all manner of excises upon interstate commerce and upon incomers from other States who could no longer be treated as foreigners.

In dealing with these the Constitution no longer dealt with the States or with the citizens through the States, but directly with the individual citizen — the individual thing to be subjected to the tax. It wiped out all state lines, ignored the States entirely, and went directly for the man or the thing, and whether he or it was found in a State or in the Territories or in the District of Columbia was all one. On all these alike the purpose was to provide for the exercise of the taxing power "*throughout the United States*" whenever it should be exercised at all. In each and every part of the territory of the United States, the excise or duty laid or imposed must rest and operate.

Our construction of this clause has been acted on by the government from the beginning until now. In no tariff act — and I call especial attention to this — with all the infinite variety of classification of goods which those acts contain, never once has there been a clause in a tariff act which made the rate of duty to be paid dependent upon the person who imported the goods, whether it was a person or a corporation, whether it was a white man or a black man, whether it was a rich man or a poor man.

Rich and poor, old and young, capitalist and laborer, citizen and foreigner, corporation and individual, have been accorded the same right to import the same goods at the same rate, and we do not believe that any departure from this rule of uniformity has ever been suggested in either house of Con-

gress on the discussion of any tariff bill, and this is the rule of uniformity throughout the United States for which we contend as to all duties, excises, and imposts.

This brings me to say a few words upon a new doctrine which has been presented here by the representatives of the government and strongly urged by my friend Mr. Carter. The Attorney General says in his brief, at page 83, that the rule of uniformity has been practically violated in the act of 1894, but that the law must be regarded not as standing alone, but as a part of our general system of taxation, and that so regarded its effect is to bring about an approximation of equality of taxation. This is, as I understand it, an unequivocal admission that the law in itself is not equal or uniform in its operation, but that we may speculate that perhaps it works out uniformity of tax burden upon some theory or notion of compensation or equivalents. Has such a doctrine ever before been advanced in this court? It amounts to the claim on the part of the government that an act of Congress violating the Constitution and utterly lacking in uniformity may be upheld because some other act or the general tariff laws operate unequally. Is it true that under the Constitution you can compensate for intentional inequality of burden in one set of excises, duties, or imposts by imposing others which are inherently lacking in every essential element of uniformity? Is this court prepared to go that length and to enunciate any such construction of the Constitution? This is a doctrine worthy of a Jacobin club that proposed to govern France; it is worthy of a Czar of Russia proposing to reign with undisputed and absolute power; but it cannot be done under this Constitution.

What are the breaches of uniformity here? I shall treat them briefly in view of the clear and remarkably forcible presentation on the opening by Mr. Guthrie. In the first place, there is this exemption of everybody with an income less than $4000. What does this exemption really amount to? A man living with investments of $133,000 in bonds at 3 per cent is a subject of exemption. I hope that we shall all be able to leave our children each in as good condition

as that, and not have Congress claim that he or she should be classed among the lower middle *classes* because his or her income does not exceed $4000. My friend on the other side has made our argument easier because he has said this exemption might just as well have been $20,000, and he said it in earnest. Thus he has conceded that if this classification can stand, a man with $666,000 at 3 per cent or $500,000 at 4 per cent was a fit subject for exemption. It is, therefore, for you to decide whether that is a reasonable exemption.

If you now decline to adjudicate upon the question of reasonableness and hold that it is outside your province, no abuse hereafter when the limit is fixed at $20,000 or more can be checked. The reasonableness of the exemption is essentially a question of law. *Reagan* v. *Farmers' Loan & Trust Co.*, 154 U. S. 362, 397–399. The discretion is in Congress, but the abuse of that discretion is not remediless.

One word as to the power of the court to adjudicate upon the reasonableness of an exemption. In the *Chicago, Milwaukee, &c. Railway Company* v. *Minnesota*, 134 U. S. 418, the court said that unquestionably the rate of charge for transportation by a railroad company, involving, as it does, the element of reasonableness both as regards the company and as regards the public, is eminently a question for judicial investigation, requiring due process of law for its determination. I need not refer to the cases there cited or those like the *Reagan case*, which have followed and applied that doctrine. We claim that this court is competent and that it is its duty to judge as to whether this is a reasonable exercise of the power of exemption or whether it is arbitrary and capricious.

The next ground of exemption of which we complain is the denial of the $4000 exemption to corporations simply because they are corporations.

Could this court justify the incorporation of a clause in a tariff act that a given brand of tea, if imported by an individual, should pay a duty of ten cents, but if imported by a corporation, twenty cents, and nothing if imported by a mutual association? I have never heard any suggestion from any liv-

ing man that it could. I believe it must be absolutely conceded by everybody that it cannot. If it cannot do it as to a tariff duty, how can it do it as to an income excise?

Now I come to another ground. It is not necessary for me to dwell very elaborately upon this, because of the very clear and forcible manner in which it was presented in the opening by Mr. Guthrie and appears upon our brief. I say here was a deliberate, arbitrary, capricious (it is entitled to infinitely worse names and epithets than capricious or arbitrary) exclusion of certain great and wealthy corporations from the operation of this law, without justification, without warrant, without any principle of public policy whatever. The Attorney General says in respect of the exemption of these favored companies that there is a humane policy always acted on by civilized states. It is very curious that these civilized states, the United States of America, did not discover it until now. None of these institutions were exempted under the previous income-tax laws. Take Trinity church, for example, in New York, with its hundreds of parcels of real property and stores and houses and millions of property, from which it receives a fabulous income. Is there any public policy in exempting that income at the expense of the poorer sections of the country?

Permit me to repeat a few of the figures: Total number of mutual savings banks exempted, 646; total stock savings banks, 378. They do the same business; they take in the money of depositors for the purpose of investing it and making it bear interest with a profit upon it in the same way, and the 646 are exempted and the 378 are taxed. Total deposits in state banks and trust companies, $1,225,000,000; total deposits of savings banks, $1,748,000,000. That will give you some idea of what this exemption covers? How are those deposits used? Are they kept in the vaults of the banks? No, they are invested like anybody else's earnings, to make interest and to make profit on the money.

Now I come to the question of mutual insurance companies. My friend, Mr. Carter, got up a new idea. He said mutual companies were organized not to save the poor, but for the sole purpose of saving expenses and dividing losses. That is

his argument, and those, I think, were his very words. We had them taken down, at any rate. Here are his very words: "An organization," he said, "to divide the losses." So, I suppose, he thinks they are benevolent and charitable organizations. I should like to have him go to his friend the president of the Mutual Life Insurance Company in New York, whose company has accumulations of property, real and personal, amounting to $204,000,000, and tell him that this was an exemption secured for the purpose of enabling them to divide the losses that came upon them in the transaction of their business. To divide the losses! Where is that phrase he uses? Mr. Carter said: "They carry on the business simply to divide the losses among themselves."

Why, if the court please, the total property exempted of these mutual companies that merely carry on their business to divide the losses among themselves appears by the census reports to be over $2,000,000,000 !

Now, is that within the exercise of a reasonable discretion on grounds of public policy, or is it caprice — is it arbitrariness?

I have trespassed altogether too long upon the attention of the court. There is nothing that stands in the way of the decision of this court which we urge. I do not mean to say there are not individual dicta. If you try to drive a case through dicta it is like trying to get yourself through a barbed-wire fence without injury to your garments; but I say there has been no case decided in this court that will in the least interfere. These questions have never been weighed, have never been considered; certainly they have never been decided.

I will say just one word before I conclude about these municipal bonds, briefly to state the grounds on which we say they ought to be exempted, and that is exactly the ground on which United States bonds are exempted from a state tax. It is because it interferes with the sovereign power and the exercise of sovereign power by the States themselves. What is the answer to this? My friends on the other side say, why if you put it in a general income tax it will not be felt. So they said about the rents, if you put them into a general income tax it is not a tax on rents, it is not an unap-

portioned tax. What possible difference in principle is there between a tax on the bond and a tax on its income?

But I have more than trespassed upon the kind indulgence of the court. I have felt the responsibility of this case as I have never felt one before and never expect to again. I do not believe that any member of this court ever has sat or ever will sit to hear and decide a case the consequences of which will be so far-reaching as this — not even the venerable member who survives from the early days of the civil war, and has sat upon every question of reconstruction, of national destiny, of state destiny that has come up during the last thirty years. No member of this court will live long enough to hear a case which will involve a question of more importance than this, the preservation of the fundamental rights of private property and equality before the law, and the ability of the people of these United States to rely upon the guaranties of the Constitution. If it be true, as my friend said in closing, that the passions of the people are aroused on this subject, if it be true that a mighty army of sixty million citizens is likely to be incensed by this decision, it is the more vital to the future welfare of this country that this court again resolutely and courageously declare, as Marshall did, that it *has* the power to set aside an act of Congress violative of the Constitution, and that it will not hesitate in executing that power, no matter what the threatened consequences of popular or populistic wrath may be. With the deepest earnestness and confidence we submit that all patriotic Americans must pray that our views shall prevail. We could not magnify the scope of your decision, whatever it may be. No mortal could rise above "the height of this great argument."

MR. CHIEF JUSTICE FULLER, after stating the case as above reported, delivered the opinion of the court:

The jurisdiction of a court of equity to prevent any threatened breach of trust in the misapplication or diversion of the funds of a corporation by illegal payments out of its capital or profits has been frequently sustained. *Dodge* v. *Woolsey,* 18 How. 331; *Hawes* v. *Oakland,* 104 U. S. 450.

As in *Dodge* v. *Woolsey*, this bill proceeds on the ground that the defendants would be guilty of such breach of trust or duty in voluntarily making returns for the imposition of, and paying, an unconstitutional tax; and also on allegations of threatened multiplicity of suits and irreparable injury.

The objection of adequate remedy at law was not raised below, nor is it now raised by appellees, if it could be entertained at all at this stage of the proceedings; and, so far as it was within the power of the government to do so, the question of jurisdiction, for the purposes of the case, was explicitly waived on the argument. The relief sought was in respect of voluntary action by the defendant company, and not in respect of the assessment and collection themselves. Under these circumstances, we should not be justified in declining to proceed to judgment upon the merits. *Pelton* v. *National Bank*, 101 U. S. 143, 148; *Cummings* v. *National Bank*, 101 U. S. 153, 157; *Reynes* v. *Dumont*, 130 U. S. 354.

Since the opinion in *Marbury* v. *Madison*, 1 Cranch, 137, 177, was delivered, it has not been doubted that it is within judicial competency, by express provisions of the Constitution or by necessary inference and implication, to determine whether a given law of the United States is or is not made in pursuance of the Constitution, and to hold it valid or void accordingly. "If," said Chief Justice Marshall, "both the law and the Constitution apply to a particular case, so that the court must either decide that case conformably to the law, disregarding the Constitution; or conformably to the Constitution, disregarding the law; the court must determine which of these conflicting rules governs the case. This is of the very essence of judicial duty." And the Chief Justice added that the doctrine "that courts must close their eyes on the Constitution, and see only the law," "would subvert the very foundation of all written constitutions." Necessarily the power to declare a law unconstitutional is always exercised with reluctance; but the duty to do so, in a proper case, cannot be declined, and must be discharged in accordance with the deliberate judgment of the tribunal in which the validity of the enactment is directly drawn in question.

The contention of the complainant is:

First. That the law in question, in imposing a tax on the income or rents of real estate, imposes a tax upon the real estate itself; and in imposing a tax on the interest or other income of bonds or other personal property held for the purposes of income or ordinarily yielding income, imposes a tax upon the personal estate itself; that such tax is a direct tax, and void because imposed without regard to the rule of apportionment ; and that by reason thereof the whole law is invalidated.

Second. That the law is invalid, because imposing indirect taxes in violation of the constitutional requirement of uniformity ; and therein also in violation of the implied limitation upon taxation that all tax laws must apply equally, impartially, and uniformly to all similarly situated. Under the second head it is contended that the rule of uniformity is violated in that the law taxes the income of certain corporations, companies, and associations, no matter how created or organized, at a higher rate than the incomes of individuals or partnerships derived from precisely similar property or business ; in that it exempts from the operation of the act and from the burden of taxation, numerous corporations, companies, and associations having similar property and carrying on similar business to those expressly taxed ; in that it denies to individuals deriving their income from shares in certain corporations, companies, and associations the benefit of the exemption of $4000 granted to other persons interested in similar property and business; in the exemption of $4000; in the exemption of building and loan associations, savings banks, mutual life, fire, marine, and accident insurance companies, existing solely for the pecuniary profit of their members; these and other exemptions being alleged to be purely arbitrary and capricious, justified by no public purpose, and of such magnitude as to invalidate the entire enactment; and in other particulars.

Third. That the law is invalid so far as imposing a tax upon income received from state and municipal bonds.

The Constitution provides that representatives and direct

taxes shall be apportioned among the several States according to numbers, and that no direct tax shall be laid except according to the enumeration provided for; and also that all duties, imposts and excises shall be uniform throughout the United States.

The men who framed and adopted that instrument had just emerged from the struggle for independence whose rallying cry had been that "taxation and representation go together."

The mother country had taught the colonists, in the contests waged to establish that taxes could not be imposed by the sovereign except as they were granted by the representatives of the realm, that self-taxation constituted the main security against oppression. As Burke declared, in his speech on Conciliation with America, the defenders of the excellence of the English constitution "took infinite pains to inculcate, as a fundamental principle, that, in all monarchies, the people must, in effect, themselves, mediately or immediately, possess the power of granting their own money, or no shadow of liberty could subsist." The principle was that the consent of those who were expected to pay it was essential to the validity of any tax.

The States were about, for all national purposes embraced in the Constitution, to become one, united under the same sovereign authority, and governed by the same laws. But as they still retained their jurisdiction over all persons and things within their territorial limits, except where surrendered to the general government or restrained by the Constitution, they were careful to see to it that taxation and representation should go together, so that the sovereignty reserved should not be impaired, and that when Congress, and especially the House of Representatives, where it was specifically provided that all revenue bills must originate, voted a tax upon property, it should be with the consciousness, and under the responsibility, that in so doing the tax so voted would proportionately fall upon the immediate constituents of those who imposed it.

More than this, by the Constitution the States not only gave to the Nation the concurrent power to tax persons and

property directly, but they surrendered their own. power to levy taxes on imports and to regulate commerce. All the thirteen were seaboard States, but they varied in maritime importance, and differences existed between them in population, in wealth, in the character of property and of business interests. Moreover, they looked forward to the coming of new States from the great West into the vast empire of their anticipations. So when the wealthier States as between themselves and their less favored associates, and all as between themselves and those who were to come, gave up for the common good the great sources of revenue derived through commerce, they did so in reliance on the protection afforded by restrictions on the grant of power.

Thus, in the matter of taxation, the Constitution recognizes the two great classes of direct and indirect taxes, and lays down two rules by which their imposition must be governed, namely: The rule of apportionment as to direct taxes, and the rule of uniformity as to duties, imposts and excises.

The rule of uniformity was not prescribed to the exercise of the power granted by the first paragraph of section eight, to lay and collect taxes, because the rule of apportionment as to taxes had already been laid down in the third paragraph of the second section.

And this view was expressed by Mr. Chief Justice Chase in *The License Tax Cases*, 5 Wall. 462, 471, when he said: "It is true that the power of Congress to tax is a very extensive power. It is given in the Constitution, with only one exception and only two qualifications. Congress cannot tax exports, and it must impose direct taxes by the rule of apportionment, and indirect taxes by the rule of uniformity. Thus limited, and thus only, it reaches every subject, and may be exercised at discretion."

And although there have been from time to time intimations that there might be some tax which was not a direct tax nor included under the words "duties, imposts and excises," such a tax for more than one hundred years of national existence has as yet remained undiscovered, notwithstanding the stress of particular circumstances has invited thorough investigation into sources of revenue.

The first question to be considered is whether a tax on the rents or income of real estate is a direct tax within the meaning of the Constitution. Ordinarily all taxes paid primarily by persons who can shift the burden upon some one else, or who are under no legal compulsion to pay them, are considered indirect taxes; but a tax upon property holders in respect of their estates, whether real or personal, or of the income yielded by such estates, and the payment of which cannot be avoided, are direct taxes. Nevertheless, it may be admitted that although this definition of direct taxes is *prima facie* correct, and to be applied in the consideration of the question before us, yet that the Constitution may bear a different meaning, and that such different meaning must be recognized. But in arriving at any conclusion upon this point, we are at liberty to refer to the historical circumstances attending the framing and adoption of the Constitution as well as the entire frame and scheme of the instrument, and the consequences naturally attendant upon the one construction or the other.

We inquire, therefore, what, at the time the Constitution was framed and adopted, were recognized as direct taxes? What did those who framed and adopted it understand the terms to designate and include?

We must remember that the fifty-five members of the constitutional convention were men of great sagacity, fully conversant with governmental problems, deeply conscious of the nature of their task, and profoundly convinced that they were laying the foundations of a vast future empire. "To many in the assembly the work of the great French magistrate on the 'Spirit of Laws,' of which Washington with his own hand had copied an abstract by Madison, was the favorite manual; some of them had made an analysis of all federal governments in ancient and modern times, and a few were well versed in the best English, Swiss, and Dutch writers on government. They had immediately before them the example of Great Britain; and they had a still better school of political wisdom in the republican constitutions of their several States, which many of them had assisted to frame." 2 Bancroft's Hist. Const. 9.

The Federalist demonstrates the value attached by Hamilton,

Madison, and Jay to historical experience, and shows that they had made a careful study of many forms of government. Many of the framers were particularly versed in the literature of the period, Franklin, Wilson, and Hamilton for example. Turgot had published in 1764 his work on taxation, and in 1766 his essay on "The Formation and Distribution of Wealth," while Adam Smith's "Wealth of Nations" was published in 1776. Franklin in 1766 had said upon his examination before the House of Commons that : "An external tax is a duty laid on commodities imported; that duty is added to the first cost and other charges on the commodity, and, when it is offered to sale makes a part of the price. If the people do not like it at that price, they refuse it; they are not obliged to pay it. But an internal tax is forced from the people without their consent, if not laid by their own representatives. The stamp act says, we shall have no commerce, make no exchange of property with each other, neither purchase nor grant, nor recover debts; we shall neither marry nor make our wills, unless we pay such and such sums; and thus it is intended to extort our money from us, or ruin us by the consequences of refusing to pay." 16 Parl. Hist. 144.

They were, of course, familiar with the modes of taxation pursued in the several States. From the report of Oliver Wolcott, when Secretary of the Treasury, on direct taxes, to the House of Representatives, December 14, 1796, his most important state paper, (Am. State Papers, 1 Finance, 431,) and the various state laws then existing, it appears that prior to the adoption of the Constitution nearly all the States imposed a poll tax, taxes on land, on cattle of all kinds, and various kinds of personal property, and that, in addition, Massachusetts, Connecticut, Pennsylvania, Delaware, New Jersey, Virginia, and South Carolina assessed their citizens upon their profits from professions, trades, and employments.

Congress under the articles of confederation had no actual operative power of taxation. It could call upon the States for their respective contributions or quotas as previously determined on; but in case of the failure or omission of the States to furnish such contribution, there were no means of

compulsion, as Congress had no power whatever to lay any tax upon individuals. This imperatively demanded a remedy; but the opposition to granting the power of direct taxation in addition to the substantially exclusive power of laying imposts and duties was so strong that it required the convention, in securing effective powers of taxation to the Federal government, to use the utmost care and skill to so harmonize conflicting interests that the ratification of the instrument could be obtained.

The situation and the result are thus described by Mr. Chief Justice Chase in *Lane County* v. *Oregon*, 7 Wall. 71, 76: "The people of the United States constitute one nation, under one government, and this government, within the scope of the powers with which it is invested, is supreme. On the other hand, the people of each State compose a State, having its own government, and endowed with all the functions essential to separate and independent existence. The States disunited might continue to exist. Without the States in union there could be no such political body as the United States. Both the States and the United States existed before the Constitution. The people, through that instrument, established a more perfect union by substituting a national government, acting, with ample power, directly upon the citizens, instead of the confederate government, which acted with powers, greatly restricted, only upon the States. But in many articles of the Constitution the necessary existence of the States, and, within their proper spheres, the independent authority of the States, is distinctly recognized. To them nearly the whole charge of interior regulation is committed or left; to them and to the people all powers not expressly delegated to the national government are reserved. The general condition was well stated by Mr. Madison in the Federalist, thus: 'The Federal and state governments are in fact but different agents and trustees of the people, constituted with different powers and designated for different purposes.' Now, to the existence of the States, themselves necessary to the existence of the United States, the power of taxation is indispensable. It is an essential function of

government. It was exercised by the colonies; and when the colonies became States, both before and after the formation of the confederation, it was exercised by the new governments. Under the Articles of Confederation the government of the United States was limited in the exercise of this power to requisitions upon the States, while the whole power of direct and indirect taxation of persons and property, whether by taxes on polls, or duties on imports, or duties on internal production, manufacture, or use, was acknowledged to belong exclusively to the States, without any other limitation than that of non-interference with certain treaties made by Congress. The Constitution, it is true, greatly changed this condition of things. It gave the power to tax, both directly and indirectly, to the national government, and, subject to the one prohibition of any tax upon exports and to the conditions of uniformity in respect to indirect and of proportion in respect to direct taxes, the power was given without any express reservation. On the other hand, no power to tax exports, or imports except for a single purpose and to an insignificant extent, or to lay any duty on tonnage, was permitted to the States. In respect, however, to property, business, and persons, within their respective limits, their power of taxation remained and remains entire. It is indeed a concurrent power, and in the case of a tax on the same subject by both governments, the claim of the United States, as the supreme authority, must be preferred; but with this qualification it is absolute. The extent to which it shall be exercised, the subjects upon which it shall be exercised, and the mode in which it shall be exercised, are all equally within the discretion of the legislatures to which the States commit the exercise of the power. That discretion is restrained only by the will of the people expressed in the state constitutions or through elections, and by the condition that it must not be so used as to burden or embarrass the operations of the national government. There is nothing in the Constitution which contemplates or authorizes any direct abridgment of this power by national legislation. To the extent just indicated it is as complete in the States as the like

power, *within the limits of the Constitution*, is complete in Congress."

On May 29, 1787, Charles Pinckney presented his draft of a proposed constitution, which provided that the proportion of direct taxes should be regulated by the whole number of inhabitants of every description, taken in the manner prescribed by the legislature; and that no tax should be paid on articles exported from the United States.    1 Elliot, 147, 148.

Mr. Randolph's plan declared " that the right of suffrage, in the national legislature, ought to be proportioned to the quotas of contribution, or to the number of free inhabitants, as the one or the other may seem best, in different cases."    1 Elliot, 143.

On June 15, Mr. Paterson submitted several resolutions, among which was one proposing that the United States in Congress should be authorized to make requisitions in proportion to the whole number of white and other free citizens and inhabitants, including those bound to servitude for a term of years, and three-fifths of all other persons, except Indians not taxed.    1 Elliot, 175, 176.

On the ninth of July the proposition that the legislature be authorized to regulate the number of representatives according to wealth and inhabitants was approved, and on the eleventh it was voted that "in order to ascertain the alterations that may happen in the population and wealth of the several States, a census shall be taken ; " although the resolution of which this formed a part was defeated.    5 Elliot (Madison Papers), 288, 295 ; 1 Elliot, 200.

On July 12, Gouverneur Morris moved to add to the clause empowering the legislature to vary the representation according to the amount of wealth and number of the inhabitants, a proviso that taxation should be in proportion to representation, and, admitting that some objections lay against his proposition, which would be removed by limiting it to direct taxation, since " with regard to indirect taxes on exports and imports, and on consumption, the rule would be inapplicable," varied his motion by inserting the word " direct," whereupon it passed as follows: " Provided, always, that direct taxation

ought to be proportioned to representation." 5 Elliot (Madison Papers), 302.

Amendments were proposed by Mr. Ellsworth and Mr. Wilson to the effect that the rule of contribution by direct taxation should be according to the number of white inhabitants and three-fifths of every other description, and that in order to ascertain the alterations in the direct taxation which might be required from time to time a census should be taken; the word wealth was struck out of the clause, on motion of Mr. Randolph; and the whole proposition, proportionate representation to direct taxation, and both to the white and three-fifths of the colored inhabitants, and requiring a census, was adopted.

In the course of the debates, and after the motion of Mr. Ellsworth that the first census be taken in three years after the meeting of Congress had been adopted, Mr. Madison records: "Mr. King asked what was the precise meaning of direct taxation. No one answered." But Mr. Gerry immediately moved to amend by the insertion of the clause that "from the first meeting of the legislature of the United States until a census shall be taken, all moneys for supplying the public treasury by direct taxation shall be raised from the several States according to the number of their representatives respectively in the first branch." This left for the time the matter of collection to the States. Mr. Langdon objected that this would bear unreasonably hard against New Hampshire, and Mr. Martin said that direct taxation should not be used but in cases of absolute necessity, and then the States would be the best judges of the mode. 5 Elliot (Madison Papers), 451, 453.

Thus was accomplished one of the great compromises of the Constitution, resting on the doctrine that the right of representation ought to be conceded to every community on which a tax is to be imposed, but crystallizing it in such form as to allay jealousies in respect of the future balance of power; to reconcile conflicting views in respect of the enumeration of slaves; and to remove the objection that, in adjusting a system of representation between the States, regard should be had to their relative wealth, since those who were to be most heavily

taxed ought to have a proportionate influence in the government.

The compromise, in embracing the power of direct taxation, consisted not simply in including part of the slaves in the enumeration of population, but in providing that as between State and State such taxation should be proportioned to representation.   The establishment of the same rule for the apportionment of taxes as for regulating the proportion of representatives, observed Mr. Madison in No. 54 of the Federalist, was by no means founded on the same principle, for as to the former it had reference to the proportion of wealth, and although in respect of that it was in ordinary cases a very unfit measure, it "had too recently obtained the general sanction of America, not to have found a ready preference with the convention," while the opposite interests of the States, balancing each other, would produce impartiality in enumeration. By prescribing this rule, Hamilton wrote (Federalist, No. 36) that the door was shut "to partiality or oppression," and "the abuse of this power of taxation to have been provided against with guarded circumspection ;" and obviously the operation of direct taxation on every State tended to prevent resort to that mode of supply except under pressure of necessity and to promote prudence and economy in expenditure.

We repeat that the right of the Federal government to directly assess and collect its own taxes, at least until after requisitions upon the States had been made and failed, was one of the chief points of conflict, and Massachusetts, in ratifying, recommended the adoption of an amendment in these words: " That Congress do not lay direct taxes but when the moneys arising from the impost and excise are insufficient for the public exigencies, nor then until Congress shall have first made a requisition upon the States to assess, levy, and pay, their respective proportions of such requisition, agreeably to the census fixed in the said Constitution, in such way and manner as the legislatures of the States shall think best." 1 Elliot, 322.   And in this South Carolina, New York, New Hampshire, and Rhode Island concurred.   Id. 325, 326, 329, 336.

Luther Martin, in his well-known communication to the legislature of Maryland in January, 1788, expressed his views thus: " By the power to lay and collect taxes, they may proceed to direct taxation on every individual, either by a capitation tax on their heads, or an assessment on their property. . . . Many of the members, and myself in the number, thought that states were much better judges of the circumstances of their citizens, and what sum of money could be collected from them by direct taxation, and of the manner in which it could be raised with the greatest ease and convenience to their citizens, than the general government could be; and that the general government ought not to have the power of laying direct taxes in any case but in that of the delinquency of a State."   1 Elliot, 344, 368, 369.

Ellsworth and Sherman wrote the governor of Connecticut, September 26, 1787, that it was probable " that the principal branch of revenue will be duties on imports.   What may be necessary to be raised by direct taxation is to be apportioned. on the several States, according to the number of their inhabitants; and although Congress may raise the money by their own authority, if necessary, yet that authority need not be exercised, if each State will furnish its quota."   1 Elliot, 492.

And Ellsworth, in the Connecticut convention, in discussing the power of Congress to lay taxes, pointed out that all sources of revenue, excepting the impost, still lay open to the States, and insisted that it was " necessary that the power of the general legislature should extend to all the objects of taxation, that government should be able to command all the resources of the country; because no man can tell what our exigencies may be.   Wars have now become rather wars of the purse than of the sword.   Government must therefore be able to command the whole power of the purse. . . . Direct taxation can go but little way towards raising a revenue.   To raise money in this way, people must be provident; they must constantly be laying up money to answer the demands of the collector.   But you cannot make people thus provident. If you would do anything to the purpose, you must come in when they are spending, and take a part with them. . . .

All nations have seen the necessity and propriety of raising a revenue by indirect taxation, by duties upon articles of consumption. . . . In England, the whole public revenue is about twelve millions sterling per annum. The land tax amounts to about two millions; the window and some other taxes, to about two millions more. The other eight millions are raised upon articles of consumption. . . . This Constitution defines the extent of the powers of the general government. If the general legislature should at any time overleap their limits, the judicial department is a constitutional check. If the United States go beyond their powers, if they make a law which the Constitution does not authorize, it is void; and the judicial power, the national judges, who, to secure their impartiality, are to be made independent, will declare it to be void." 2 Elliot, 191, 192, 196.

In the convention of Massachusetts by which the Constitution was ratified, the second section of article I being under consideration, Mr. King said: " It is a principle of this Constitution, that representation and taxation should go hand in hand. . . . By this rule are representation and taxation to be apportioned. And it was adopted, because it was the language of all America. According to the confederation, ratified in 1781, the sums for the general welfare and defence should be apportioned according to the surveyed lands, and improvements thereon, in the several States; but that it hath never been in the power of Congress to follow that rule, the returns from the several States being so very imperfect." 2 Elliot, 36.

Theophilus Parsons observed: " Congress have only a concurrent right with each State, in laying direct taxes, not an exclusive right; and the right of each State to direct taxation is equally extensive and perfect as the right of Congress." Id. 93. And John Adams, Dawes, Sumner, King, and Sedgwick all agreed that a direct tax would be the last source of revenue resorted to by Congress.

In the New York convention, Chancellor Livingston pointed out that when the imposts diminished and the expenses of the government increased, " they must have recourse to direct

taxes; that is, taxes on land, and specific duties." 2 Elliot, 341. And Mr. Jay, in reference to an amendment that direct taxes should not be imposed until requisition had been made and proved fruitless, argued that the amendment would involve great difficulties, and that it ought to be considered that direct taxes were of two kinds, general and specific. Id. 380, 381.

In Virginia, Mr. John Marshall said: "The objects of direct taxes are well understood; they are but few; what are they? Lands, slaves, stock of all kinds, and a few other articles of domestic property. . . . They will have the benefit of the knowledge and experience of the state legislature. They will see in what manner the legislature of Virginia collects its taxes. . . . Cannot Congress regulate the taxes so as to be equal on all parts of the community? Where is the absurdity of having thirteen revenues? Will they clash with, or injure, each other? If not, why cannot Congress make thirteen distinct laws, and impose the taxes on the general objects of taxation in each State, so as that all persons of the society shall pay equally, as they ought?" 3 Elliot, 229, 235. At that time, in Virginia, lands were taxed, and specific taxes assessed on certain specified objects. These objects were stated by Secretary Wolcott to be taxes on lands, houses in towns, slaves, stud horses, jackasses, other horses and mules, billiard tables, four-wheel riding carriages, phaetons, stage wagons, and riding carriages with two wheels; and it was undoubtedly to these objects that the future Chief Justice referred.

Mr. Randolph said: "But in this new Constitution, there is a more just and equitable rule fixed — a limitation beyond which they cannot go. Representatives and taxes go hand in hand; according to the one will the other be regulated. The number of representatives is determined by the number of inhabitants; they have nothing to do but to lay taxes accordingly." 3 Elliot, 121.

Mr. George Nicholas said: "the proportion of taxes is fixed by the number of inhabitants, and not regulated by the extent of territory, or fertility of soil. . . . Each State

will know, from its population, its proportion of any general tax. As it was.justly observed by the gentleman over the way, (Mr. Randolph), they cannot possibly exceed that proportion; they are limited and restrained expressly to it. The state legislatures have no check of this kind. Their power is uncontrolled." 3 Elliot, 243, 244.

Mr. Madison remarked that " they will be limited to fix the proportion of each State, and they must raise it in the most convenient and satisfactory manner to the public." 3 Elliot, 255.

From .these references, and they might be extended indefinitely, it is clear that the rule to govern each of the great . classes·into which taxes were divided was prescribed in view ˙ of the commonly accepted distinction between them .and of the taxes directly levied under the systems of the States. And that the difference between direct and indirect taxation was fully appreciated is supported by the congressional debates after the government was organized.

In the debates in the House of Representatives preceding the .passage of the act of Congress to lay " duties upon carriages for the conveyance of persons," approved June 5, 1794, (1 Stat. 373, c. 45,) Mr. Sedgwick said that " a capitation·tax, and taxes on land and on property and income generally, were direct charges, as well in the immediate as ultimate sources of contribution. He had considered those, and those only, as direct taxes in their operation and effects. On the other hand, a tax imposed on a specific article of personal property, and· particularly if objects of luxury, as in the case under consideration, he had never supposed had been considered a direct tax, within the meaning of the Constitution."

Mr. Dexter observed that his colleague " had stated the . meaning of direct taxes to be a capitation tax, or a general tax on all the taxable property of the citizens ; and that a gentleman from Virginia (Mr. Nicholas) thought the meaning was, that .all taxes are direct which are paid by the citizen without, being recompensed by the consumer ; but that, where the tax was only advanced and repaid by the consumer, the tax was indirect. He thought that both opinions were just,

and not inconsistent, though the gentlemen had differed about them.   He thought that a general tax on all taxable property was a direct tax, because it was paid without being recompensed by the consumer."   Annals 3d Congress, 644, 646.

At a subsequent day of the debate, Mr. Madison objected to the tax on carriages as "an unconstitutional tax," but Fisher Ames declared that he had satisfied himself that it was not a direct tax, as "the duty falls not on the possession but on the use."   Annals, 730.

Mr. Madison wrote to Jefferson on May 11, 1794: "And the tax on carriages succeeded, in spite of the Constitution, by a majority of twenty, the advocates for the principle being reinforced by the adversaries to luxuries."   "Some of the motives which they decoyed to their support ought to premonish them of the danger.   By breaking down the barriers of the Constitution, and giving sanction to the idea of sumptuary regulations, wealth may find a precarious defence in the shield of justice.   If luxury, *as such*, is to be taxed, the greatest of all luxuries, says Paine, is a great estate.   Even on the present occasion, it has been found prudent to yield to a tax on transfers of stock in the funds and in the banks."   2 Madison's Writings, 14.

But Albert Gallatin in his "Sketch of the Finances of the United States," published in November, 1796, said: "The most generally received opinion, however, is, that by direct taxes in the Constitution, those are meant which are raised on the capital or revenue of the people; by indirect, such as are raised on their expense.   As that opinion is in itself rational, and conformable to the decision which has taken place on the subject of the carriage tax, and as it appears important, for the sake of preventing future controversies, which may be not more fatal to the revenue than to the tranquility of the Union, that a fixed interpretation should be generally adopted, it will not be improper to corroborate it by quoting the author from whom the idea seems to have been borrowed."   He then quotes from   Smith's Wealth of Nations, and continues: "The remarkable coincidence of the clause of the Constitution with this passage in using the word 'capitation' as a generic

expression, including the different species of direct taxes, an acceptation of the word peculiar, it is believed, to Dr. Smith, leaves little doubt that the framers of the one had the other in view at the time, and that they, as well as he, by *direct* taxes, meant those paid *directly* from and falling *immediately* on the revenue; and by *indirect*, those which are paid *indirectly* out of the revenue by falling immediately upon the expense." 3 Gallatin's Writings, (Adams's ed.) 74, 75.

The act provided in its first section " that there shall be levied, collected, and paid upon all carriages for the conveyance of persons, which shall be kept by or for any person for his or her own use, or to be let out to hire or for the conveyance of passengers, the several duties and rates following," and then followed a fixed yearly rate on every coach; chariot; phaeton and coachee; every four-wheel and every two-wheel top carriage; and upon every other two-wheel carriage; varying according to the vehicle.

In *Hylton* v. *United States*, 3 Dall. 171, decided in March, 1796, this court held the act to be constitutional, because not laying a direct tax. Chief Justice Ellsworth and Mr. Justice Cushing took no part in the decision, and Mr. Justice Wilson gave no reasons.

Mr. Justice Chase said that he was inclined to think, but of this he did not. " give a judicial opinion," that " the direct taxes contemplated by the Constitution, are only two, to wit, a capitation, or poll tax, simply, without regard to property, profession, or any other circumstance; and a tax on land;" and that he doubted " whether a tax, by a general assessment of personal property, within the United States, is included within the term direct tax." But he thought that " an annual tax on carriages for the conveyance of persons, may be considered as within the power granted to Congress to lay duties. The term duty, is the most comprehensive next to the generical term tax; and practically in Great Britain, (whence we take our general ideas of taxes, duties, imposts, excises, customs, etc.,) embraces taxes on stamps, tolls for passage, etc., and is not confined to taxes on importation only. It seems to me, that a tax on expense is an indirect

tax; and I think, an annual tax on a carriage for the conveyance of persons, is of that kind; because a carriage is a consumable commodity; and such annual tax on it, is on the expense of the owner."

Mr. Justice Paterson said that "the Constitution declares, that a capitation tax is a direct tax; and, both in theory and practice, a tax on land is deemed to be a direct tax. . . . It is not necessary to determine whether a tax on the product of land be a direct or indirect tax. Perhaps, the immediate product of land, in its original and crude state, ought to be considered as the land itself; it makes part of it; or else the provision made against taxing exports would be easily eluded. Land, independently of its produce, is of no value. . . . Whether direct taxes, in the sense of the Constitution, comprehend any other tax than a capitation tax, and taxes on land, is a questionable point. . . . But as it is not before the court, it would be improper to give any decisive opinion upon it." And he concluded: " All taxes on expenses or consumption are indirect taxes. A tax on carriages is of this kind, and of course is not a direct tax." This conclusion he fortified by reading extracts from Adam Smith on the taxation of consumable commodities.

Mr. Justice Iredell said: "There is no necessity, or propriety, in determining what is or is not, a direct, or indirect, tax in all cases. Some difficulties may occur which we do not at present foresee. Perhaps a direct tax, in the sense of the Constitution, can mean nothing but a tax on something inseparably annexed to the soil; something capable of apportionment under all such circumstances. A land or a poll tax may be considered of this description. . . . In regard to other articles, there may possibly be considerable doubt. It is sufficient, on the present occasion, for the court to be satisfied, that this is not a direct tax contemplated by the Constitution, in order to affirm the present judgment."

It will be perceived that each of the justices, while suggesting doubt whether anything but a capitation or a land tax was a direct tax within the meaning of the Constitution, distinctly avoided expressing an opinion upon that question or

laying down a comprehensive definition, but confined his opinion to the case before the court.

The general line of observation was obviously influenced by Mr. Hamilton's brief for the government, in which he said: "The following are presumed to be the only direct taxes: Capitation or poll taxes, taxes on lands and buildings, general assessments, whether on the whole property of individuals, or on their whole real or personal estate. All else must of necessity be considered as indirect taxes." 7 Hamilton's Works, (Lodge's ed.) 332.

Mr. Hamilton also argued: "If the meaning of the word 'excise' is to be sought in a British statute, it will be found to include the duty on carriages, which is there considered as an 'excise.' . . . An argument results from this, though not perhaps a conclusive one, yet, where so important a distinction in the Constitution is to be realized, it is fair to seek the meaning of terms in the statutory language of that country from which our jurisprudence is derived." Id. 333.

If the question had related to an income tax, the reference would have been fatal, as such taxes have been always classed by the law of Great Britain as direct taxes.

The above act was to be enforced for two years, but before it expired was repealed as was the similar act of May 28, 1796, c. 37, which expired August 31, 1801, 1 Stat. 478, 482.

By the act of July 14, 1798, when a war with France was supposed to be impending, a direct tax of two millions of dollars was apportioned to the States respectively, in the manner prescribed, which tax was to be collected by officers of the United States and assessed upon "dwelling houses, lands, and slaves," according to the valuations and enumerations to be made pursuant to the act of July 9, 1798, entitled "An act to provide for the valuation of lands and dwelling houses and the enumeration of slaves within the United States." 1 Stat. 597, c. 75; Id. 580, c. 70. Under these acts every dwelling house was assessed according to a prescribed value, and the sum of fifty cents upon every slave enumerated, and the residue of the sum apportioned was directed to be assessed upon the lands within each State according to the valuation

made pursuant to the prior act and at such rate per centum as would be sufficient to produce said remainder. By the act of August 2, 1813, a direct tax of three millions of dollars was laid and apportioned to the States respectively, and reference had to the prior act of July 22, 1813, which provided. that whenever a direct tax should be laid by the authority of the United States the same should be assessed and laid " on the value of all lands, lots of ground with their improvements, dwelling houses, and slaves, which several articles subject to taxation shall be enumerated and valued by the respective assessors at the rate each of them is worth in money." 3 Stat. 53, c. 37; Id. 22, c. 16. The act of January 9, 1815, laid a direct tax of six millions of dollars, which was apportioned, assessed, and laid as in the prior act on all lands, lots of grounds with their improvements, dwelling houses, and slaves. These acts are attributable to the war of 1812.

The act of August 5, 1861, (12 Stat. 292, 294, c. 45,) imposed a tax of twenty millions of dollars, which was apportioned and to be levied wholly on real estate, and also levied taxes on incomes whether derived from property or profession, trade. or vocation, (12 Stat. 309,) and this was followed by the acts of July 1, 1862, (12 Stat. 432, 473, c. 119;) March 3, 1863, (12 Stat. 713, 723, c. 74;) June 30, 1864, (13 Stat. 223, 281, c. 173;) March 3, 1865, (13 Stat. 469, 479, c. 78;) March 10, 1866, (14 Stat. 4, c. 15;) July 13, 1866, (14 Stat. 98, 137, c. 184;) March 2, 1867, (14 Stat. 471, 477, c. 169;) and July 14, 1870, (16 Stat. 256, c. 255). The differences between the latter acts and that of August 15, 1894, call for no remark in this connection. These acts grew out of the war of the rebellion, and were, to use the language of Mr. Justice Miller, "part of the system of taxing incomes, earnings, and profits adopted during the late war, and abandoned as soon after that war was ended as it could be done safely." *Railroad Company* v. *Collector*, 100 U. S. 595, 598.

From the foregoing it is apparent: 1. That the distinction between direct and indirect taxation was well understood by the framers of the Constitution and those who adopted it. 2. That under the state systems of taxation all taxes on

real estate or personal property or the rents or income thereof were regarded as direct taxes. 3. That the rules of apportionment and of uniformity were adopted in view of that distinction and those systems. 4. That whether the tax on carriages was direct or indirect was disputed, but the tax was sustained as a tax on the use and an excise. 5. That the original expectation was that the power of direct taxation would be exercised only in extraordinary exigencies, and down to August 15, 1894, this expectation has been realized. The act of that date was passed in a time of profound peace, and if we assume that no special exigency called for unusual legislation, and that resort to this mode of taxation is to become an ordinary and usual means of supply, that fact furnishes an additional reason for circumspection and care in disposing of the case.

We proceed then to examine certain decisions of this court under the acts of 1861 and following years, in which it is claimed that this court has heretofore adjudicated that taxes like those under consideration are not direct taxes and subject to the rule of apportionment, and that we are bound to accept the rulings thus asserted to have been made as conclusive in the premises. Is this contention well founded as respects the question now under examination? Doubtless the doctrine of *stare decisis* is a salutary one, and to be adhered to on all proper occasions, but it only arises in respect of decisions directly upon the points in issue.

The language of Chief Justice Marshall, in *Cohens* v. *Virginia*, 6 Wheat. 264, 399, may profitably again be quoted: " It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used. If they go beyond the case, they may be respected, but ought not to control the judgment in a subsequent suit when the very point is presented for decision. The reason of this maxim is obvious. The question actually before the court is investigated with care, and considered in its full extent. Other principles which may serve to illustrate it, are considered in their relation to the case decided, but their possible bearing on all other cases is seldom completely investigated."

So in *Carroll* v. *Lessee of Carroll,* 16 How. 275, 286, where a statute of the State of Maryland came under review, Mr. Justice Curtis said : " If the construction put by the court of a State upon one of its statutes was not a matter in judgment, if it might have been decided either way without affecting. any right brought into question, then, according to the princi. ples of the common law, an opinion on such a question is not a decision. To make it so, there must have been an applica- tion of the judicial mind to the precise question necessary to be determined to fix the rights of the parties and decide to whom the property in contestation belongs. And therefore this court, and other courts organized under the common law, has never held itself bound by any part of an opinion, in any case, which was not needful to the ascertainment of the right or title in question between the parties."

Nor is the language of Mr. Chief Justice Taney inapposite, as expressed in *The Genesee Chief*, 12 How. 443, 455, wherein it was held that the lakes and navigable waters connecting them are within the scope of admiralty and maritime jurisdic- tion as known and understood in the United States when the Constitution was adopted, and the preceding case of *The Thomas Jefferson*, 10 Wheat. 428, was overruled. The Chief Justice said : " It was under the influence of these precedents and this usage, that the case of *The Thomas Jefferson*, 10 Wheat. 428, was decided in this court; and the jurisdiction of the courts of admiralty of the United States declared to be limited to the ebb and flow of the tide. *The Steamboat Or- leans* v. *Phoebus*, 11 Pet. 175, afterwards followed this case, merely as a point decided. It is the decision in the case of *The Thomas Jefferson* which mainly embarrasses the court in the present inquiry. We are sensible of the great weight to which it is entitled. But at the same time we are convinced that, if we follow it, we follow an erroneous decision into which the court fell, when the great importance of the ques- tion as it now presents itself could not be foreseen; and the subject did not therefore receive that deliberate consideration which at this time would have been given to it by the emi- nent men who presided here when that case was decided.

For the decision was made in 1825, when the commerce on the rivers of the West and on the Lakes was in its infancy, and of little importance, and but little regarded compared with that of the present day. Moreover, the nature of the questions concerning the extent of the admiralty jurisdiction, which have arisen in this court, were not calculated to call its attention particularly to the one we are now considering."

Manifestly, as this court is clothed with the power, and entrusted with the duty, to maintain the fundamental law of the Constitution, the discharge of that duty requires it not to extend any decision upon a constitutional question if it is convinced that error in principle might supervene.

Let us examine the cases referred to in the light of these observations.

In *Pacific Insurance Co.* v. *Soule*, 7 Wall. 433, the validity of a tax which was described as "upon the business of an insurance company" was sustained on the ground that it was "a duty or excise," and came within the decision in *Hylton's case*. The arguments for the insurance company were elaborate and took a wide range, but the decision rested on narrow ground, and turned on the distinction between an excise duty and a tax strictly so termed, regarding the former a charge for a privilege, or on the transaction of business, without any necessary reference to the amount of property belonging to those on whom the charge might fall, although it might be increased or diminished by the extent to which the privilege was exercised or the business done. This was in accordance with *Society for Savings* v. *Coite*, 6 Wall. 594; *Provident Institution* v. *Massachusetts*, 6 Wall. 611; and *Hamilton Company* v. *Massachusetts*, 6 Wall. 632; in which cases there was a difference of opinion on the question whether the tax under consideration was a tax on the property and not upon the franchise or privilege. And see *Van Allen* v. *The Assessors*, 3 Wall. 573; *Home Insurance Co.* v. *New York*, 134 U. S. 594; *Pullman Co.* v. *Pennsylvania*, 141 U. S. 18.

In *Veazie Bank* v. *Fenno*, 8 Wall. 533, 544, 546, a tax was laid on the circulation of state banks or national banks paying out the notes of individuals or state banks, and it was

held that it might well be classed under the head of duties, and as falling within the same category as *Soule's case*, 8 Wall. 547. It was declared to be of the same nature as excise taxation on freight receipts, bills of lading, and passenger tickets issued by a railroad company. Referring to the discussions in the convention which framed the Constitution, Mr. Chief Justice Chase observed that what was said there " doubtless shows uncertainty as to the true meaning of the term direct tax; but it indicates also an understanding that direct taxes were such as may be levied by capitation, and on lands and appurtenances; or, perhaps, by valuation and assessment of personal property upon general lists. For these were the subjects from which the States at that time usually raised their principal supplies." And in respect of the opinions in *Hylton's case*, the Chief Justice said: " It may further be taken as established upon the testimony of Paterson, that the words direct taxes, as used in the Constitution, comprehended only capitation taxes and taxes on land, and perhaps taxes on personal property by general valuation and assessment of the various descriptions possessed within the several States."

In *National Bank* v. *United States*, 101 U. S. 1, involving the constitutionality of § 3413 of the Revised Statutes, enacting that " every national banking association, state bank, or banker, or association, shall pay a tax of ten per centum on the amount of notes of any town, city, or municipal corporation, paid out by them," *Veazie Bank* v. *Fenno* was cited with approval to the point that Congress, having undertaken to provide a currency for the whole country, might, to secure the benefit of it to the people, restrain, by suitable enactments, the circulation as money of any notes not issued under its authority; and Mr. Chief Justice Waite, speaking for the court, said: " The tax thus laid is not on the obligation, but on its use in a particular way."

*Scholey* v. *Rew*, 23 Wall. 331, was the case of a succession tax which the court held to be " plainly an excise tax or duty " upon the devolution of the estate or the right to become beneficially entitled to the same, or the income thereof, in

possession or expectancy." It was like the succession tax of
a State, held constitutional in *Mager* v. *Grima*, 8 How. 490;
and the distinction between the power of a State and the
power of the United States to regulate the succession of prop-
erty was not referred to, and does not appear to have been
in the mind of the court. The opinion stated that the act of
Parliament, from which the particular provision under con-
sideration was borrowed, had received substantially the same
construction, and cases under that act hold that a succession
duty is not a tax upon income or upon property, but on the
actual benefit derived by the individual, determined as pre-
scribed. *In re Elwes*, 3 H. & N. 719; *Attorney-General* v.
*Sefton*, 2 H. & C. 362; *S. C.* (H. L.) 3 H. & C. 1023; 11 H.
L. Cas. 257.

In *Railroad Company* v. *Collector*, 100 U. S. 595, 596, the
validity of a tax collected of a corporation upon the interest
paid by it upon its bonds was held to be "essentially an excise
on the business of the class of corporations mentioned in the
statute." And Mr. Justice Miller, in delivering the opinion,
said : "As the sum involved in this suit is small, and the law
under which the tax in question was collected has long since
been repealed, the case is of little consequence as regards any
principle involved in it as a rule of future action."

All these cases are distinguishable from that in hand, and
this brings us to consider that of *Springer* v. *United States*,
102 U. S. 586, 602, chiefly relied on and urged upon us as
decisive.

That was an action of ejectment brought on a tax deed
issued to the United States on sale of defendant's real estate
for income taxes. The defendant contended that the deed
was void because the tax was a direct tax, not levied in accord-
ance with the Constitution. Unless the tax were wholly
invalid, the defence failed.

The statement of the case in the report shows that Springer
returned a certain amount as his net income for the particular
year, but does not give the details of what his income, gains,
and profits consisted in.

The original record discloses that the income was not

derived in any degree from real estate but was in part professional as attorney-at-law and the rest interest on United States bonds. It would seem probable that the court did not feel called upon to advert to the distinction between the latter and the former source of income, as the validity of the tax as to either would sustain the action.

The opinion thus concludes: "Our conclusions are, that *direct taxes*, within the meaning of the Constitution, are only capitation taxes, as expressed in that instrument, and taxes on real estate; and that the tax of which the plaintiff in error complains is within the category of an excise or duty."

While this language is broad enough to cover the interest as well as the professional earnings, the case would have been more significant as a precedent if the distinction had been brought out in the report and commented on in arriving at judgment, for a tax on professional receipts might be treated as an excise or duty, and therefore indirect, when a tax on the income of personalty might be held to be direct.

Be this as it may, it is conceded in all these cases, from that of Hylton to that of Springer, that taxes on land are direct taxes, and in none of them is it determined that taxes on rents or income derived from land are not taxes on land.

We admit that it may not unreasonably be said that logically, if taxes on the rents, issues and profits of real estate are equivalent to taxes on real estate, and are therefore direct taxes, taxes on the income of personal property as such are equivalent to taxes on such property, and therefore direct taxes. But we are considering the rule *stare decisis*, and we must decline to hold ourselves bound to extend the scope of decisions — none of which discussed the question whether a tax on the income from personalty is equivalent to a tax on that personalty, but all of which held real estate liable to direct taxation only — so as to sustain a tax on the income of realty on the ground of being an excise or duty.

As no capitation, or other direct, tax was to be laid otherwise than in proportion to the population, some other direct tax than a capitation tax (and it might well enough be argued some other tax of the same kind as a capitation tax) must be

referred to, and it has always been considered that a tax upon real estate *eo nomine* or upon its owners in respect thereof is a direct tax within the meaning of the Constitution. But is there any distinction between the real estate itself or its owners in respect of it and the rents or income of the real estate coming to the owners as the natural and ordinary incident of their ownership?

If the Constitution had provided that Congress should not levy any tax upon the real estate of any citizen of any State, could it be contended that Congress could put an annual tax for five or any other number of years upon the rent or income of the real estate? And if, as the Constitution now reads, no unapportioned tax can be imposed upon real estate, can Congress without apportionment nevertheless impose taxes upon such real estate under the guise of an annual tax upon its rents or income?

As according to the feudal law, the whole beneficial interest in the land consisted in the right to take the rents and profits, the general rule has always been, in the language of Coke, that " if a man seized of land in fee by his deed granteth to another the profits of those lands, to have and to hold to him and his heirs, and maketh livery *secundum formam chartæ*, the whole land itself doth pass. For what is the land but the profits thereof?" Co. Lit. 45. And that a devise of the rents and profits or of the income of lands passes the land itself both at law and in equity. 1 Jarm. on Wills, (5th ed.,) *798 and cases cited.

The requirement of the Constitution is that no direct tax shall be laid otherwise than by apportionment — the prohibition is not against direct taxes on land, from which the implication is sought to be drawn that indirect taxes on land would be constitutional, but it is against all direct taxes — and it is admitted that a tax on real estate is a direct tax. Unless, therefore, a tax upon rents or income issuing out of lands is intrinsically so different from a tax on the land itself that it belongs to a wholly different class of taxes, such taxes must be regarded as falling within the same category as a tax on real estate *eo nomine*. The name of the tax is unimpor-

tant. The real question is, is there any basis upon which to rest the contention that real estate belongs to one of the two great classes of taxes, and the rent or income which is the incident of its ownership belongs to the other? We are unable to perceive any ground for the alleged distinction. An annual tax upon the annual value or annual user of real estate appears to us the same in substance as an annual tax on the real estate, which would be paid out of the rent or income. This law taxes the income received from land and the growth or produce of the land. Mr. Justice Paterson observed in *Hylton's case,* "land, independently of its produce, is of no value;" and certainly had no thought that direct taxes were confined to unproductive land.

If it be true that by varying the form the substance may be changed, it is not easy to see that anything would remain of the limitations of the Constitution, or of the rule of taxation and representation, so carefully recognized and guarded in favor of the citizens of each State. But constitutional provisions cannot be thus evaded. It is the substance and not the form which controls, as has indeed been established by repeated decisions of this court. Thus in *Brown* v. *Maryland,* 12 Wheat. 419, 444, it was held that the tax on the occupation of an importer was the same as a tax on imports and therefore void. And Chief Justice Marshall said: "It is impossible to conceal from ourselves, that this is varying the form, without varying the substance. It is treating a prohibition which is general, as if it were confined to a particular mode of doing the forbidden thing. All must perceive, that a tax on the sale of an article, imported only for sale, is a tax on the article itself."

In *Weston* v. *Charleston,* 2 Pet. 449, it was held that a tax on the income of United States securities was a tax on the securities themselves, and equally inadmissible. The ordinance of the city of Charleston involved in that case was exceedingly obscure; but the opinions of Mr. Justice Thompson and Mr. Justice Johnson, who dissented, make it clear that the levy was upon the interest of the bonds and not upon the bonds, and they held that it was an income tax, and as

such sustainable; but the majority of the court, Chief Justice Marshall delivering the opinion, overruled that contention.

So in *Dobbins* v. *Commissioners*, 16 Pet. 435, it was decided that the income from an official position could not be taxed if the office itself was exempt.

In *Almy* v. *California*, 24 How. 169, it was held that a duty on a bill of lading was the same thing as a duty on the article which it represented; in *Railroad Co.* v. *Jackson*, 7 Wall. 262, that a tax upon the interest payable on bonds was a tax not upon the debtor, but upon the security; and in *Cook* v. *Pennsylvania*, 97 U. S. 566, that a tax upon the amount of sales of goods made by an auctioneer was a tax upon the goods sold.

In *Philadelphia Steamship Co.* v. *Pennsylvania*, 122 U. S. 326, and *Leloup* v. *Mobile*, 127 U. S. 640, it was held that a tax on income received from interstate commerce was a tax upon the commerce itself, and therefore unauthorized. And so, although it is thoroughly settled that where by way of duties laid on the transportation of the subjects of interstate commerce, and on the receipts derived therefrom, or on the occupation or business of carrying it on, a tax is levied by a State on interstate commerce, such taxation amounts to a regulation of such commerce, and cannot be sustained, yet the property in a State belonging to a corporation, whether foreign or domestic, engaged in foreign or domestic commerce, may be taxed, and when the tax is substantially a mere tax on property and not one imposed on the privilege of doing interstate commerce, the exaction may be sustained. "The substance, and not the shadow, determines the validity of the exercise of the power." *Postal Telegraph Co.* v. *Adams*, 155 U. S. 688, 698.

Nothing can be clearer than that what the Constitution intended to guard against was the exercise by the general government of the power of directly taxing persons and property within any State through a majority made up from the other States. It is true that the effect of requiring direct taxes to be apportioned among the States in proportion to their population is necessarily that the amount of taxes on the individual

taxpayer in a State having the taxable subject-matter to a larger extent in proportion to its population than another State has, would be less than in such other State, but this inequality must be held to have been contemplated, and was manifestly designed to operate to restrain the exercise of the power of direct taxation to extraordinary emergencies, and to prevent an attack upon accumulated property by mere force of numbers.

It is not doubted that property owners ought to contribute in just measure to the expenses of the government. As to the States and their municipalities, this is reached largely through the imposition of direct taxes. As to the Federal government, it is attained in part through excises and indirect taxes upon luxuries and consumption generally, to which direct taxation may be added to the extent the rule of apportionment allows. And through one mode or the other, the entire wealth of the country, real and personal, may be made, as it should be, to contribute to the common defence and general welfare.

But the acceptance of the rule of apportionment was one of the compromises which made the adoption of the Constitution possible, and secured the creation of that dual form of government, so elastic and so strong, which has thus far survived in unabated vigor. If, by calling a tax indirect when it is essentially direct, the rule of protection could be frittered away, one of the great landmarks defining the boundary between the Nation and the States of which it is composed, would have disappeared, and with it one of the bulwarks of private rights and private property.

We are of opinion that the law in question, so far as it levies a tax on the rents or income of real estate, is in violation of the Constitution, and is invalid.

Another question is directly presented by the record as to the validity of the tax levied by the act upon the income derived from municipal bonds. The averment in the bill is that the defendant company owns two millions of the municipal bonds of the city of New York, from which it derives an annual income of $60,000, and that the directors of the company intend to return and pay the taxes on the income so derived.

The Constitution contemplates the independent exercise by

the Nation and the State, severally, of their constitutional powers.

As the States cannot tax the powers, the operations, or the property of the United States, nor the means which they employ to carry their powers into execution, so it has been held that the United States have no power under the Constitution to tax either the instrumentalities or the property of a State.

A municipal corporation is the representative of the State and one of the instrumentalities of the state government. It was long ago determined that the property and revenues of municipal corporations are not subjects of Federal taxation. *Collector* v. *Day*, 11 Wall. 113, 124; *United States* v. *Railroad Company*, 17 Wall. 322, 332. In *Collector* v. *Day*, it was adjudged that Congress had no power, even by an act taxing all incomes, to levy a tax upon the salaries of judicial officers of a State, for reasons similar to those on which it had been held in *Dobbins* v. *Commissioners*, 16 Pet. 435, that a State could not tax the salaries of officers of the United States. Mr. Justice Nelson, in delivering judgment, said : " The general government, and the States, although both exist within the same territorial limits, are separate and distinct sovereignties, acting separately and independently of each other, within their respective spheres. The former in its appropriate sphere is supreme ; but the States within the limits of their powers not granted, or, in the language of the tenth amendment, ' reserved,' are as independent of the general government as that government within its sphere is independent of the States."

This is quoted in *Van Brocklin* v. *Tennessee*, 117 U. S. 151, 178, and the opinion continues : " Applying the same principles, this court, in *United States* v. *Railroad Company*, 17 Wall. 322, held that a municipal corporation within a State could not be taxed by the United States on the dividends or interest of stock or bonds held by it in a railroad or canal company, because the municipal corporation was a representative of the State, created by the State to exercise a limited portion of its powers of government, and therefore its revenues, like those of the State itself, were not taxable by the United States. The revenues thus adjudged to be exempt from Federal taxa-

tion were not themselves appropriated to any specific public use, nor derived from property held by the State or by the municipal corporation for any specific public use, but were part of the general income of that corporation, held for the public use in no other sense than all property and income, belonging to it in its municipal character, must be so held. The reasons for exempting all the property and income of a State, or of a municipal corporation, which is a political division of the State, from Federal taxation, equally require the exemption of all the property and income of the national government from state taxation."

In *Mercantile Bank* v. *New York*, 121 U. S. 138, 162, this court said: "Bonds issued by the State of New York, or under its authority by its public municipal bodies, are means for carrying on the work of the government, and are not taxable even by the United States, and it is not a part of the policy of the government which issues them to subject them to taxation for its own purposes."

The question in *Bonaparte* v. *Tax Court*, 104 U. S. 592, was whether the registered public debt of one State, exempt from taxation by that State or actually taxed there, was taxable by another State when owned by a citizen of the latter, and it was held that there was no provision of the Constitution of the United States which prohibited such taxation. The States had not covenanted that this could not be done, whereas, under the fundamental law, as to the power to borrow money, neither the United States on the one hand, nor the States on the other, can interfere with that power as possessed by each and an essential element of the sovereignty of each.

The law under consideration provides "that nothing herein contained shall apply to States, counties or municipalities." It is contended that although the property or revenues of the States or their instrumentalities cannot be taxed, nevertheless 'the income derived from state, county, and municipal securities can be taxed. But we think the same want of power to tax the property or revenues of the States or their instrumentalities exists in relation to a tax on the income from their securities, and for the same reason, and that reason

is given by Chief Justice Marshall in *Weston* v. *Charleston,* 2 Pet. 449, 468, where he said : "The right to tax the contract to any extent, when made, must operate upon the power to borrow before it is exercised, and have a sensible influence on the contract. The extent of this influence, depends on the will of a distinct government. To any extent, however inconsiderable, it is a burthen on the operations of government. It may be carried to an extent which shall arrest them entirely. . . . The tax on government stock is thought by this court to be a tax on the contract, a tax on the power to borrow money on the credit of the United States, and consequently to be repugnant to the Constitution." Applying this language to these municipal securities, it is obvious that taxation on the interest therefrom would operate on the power to borrow before it is exercised, and would have a sensible influence on the contract, and that the tax in question is a tax on the power of the States and their instrumentalities to borrow money, and consequently repugnant to the Constitution.

Upon each of the other questions argued at the bar, to wit, 1, Whether the void provisions as to rents and income from real estate invalidated the whole act? 2, Whether as to the income from personal property as such, the act is unconstitutional as laying direct taxes? 3, Whether any part of the tax, if not considered as a direct tax, is invalid for want of uniformity on either of the grounds suggested? — the justices who heard the argument are equally divided, and, therefore, no opinion is expressed.

*The result is that the decree of the Circuit Court is reversed and the cause remanded with directions to enter a decree in favor of the complainant in respect only of the voluntary payment of the tax on the rents and income of the real estate of the defendant company, and of that which it holds in trust, and on the income from the municipal bonds owned or so held by it.*

MR. JUSTICE FIELD.

I also desire to place my opinion on record upon some of the important questions discussed in relation to the direct and indirect taxes proposed by the income tax law of 1894.

Several suits have been instituted in state and Federal courts, both at law and in equity, to test the validity of the provisions of the law, the determination of which will necessitate careful and extended consideration.

The subject of taxation in the new government which was to be established created great interest in the convention which framed the Constitution, and was the cause of much difference of opinion among its members and earnest contention between the States. The great source of weakness of the confederation was its inability to levy taxes of any kind for the support of its government. To raise revenue it was obliged to make requisitions upon the States, which were respected or disregarded at their pleasure. Great embarrassments followed the consequent inability to obtain the necessary funds to carry on the government. One of the principal objects of the proposed new government was to obviate this defect of the confederacy by conferring authority upon the new government by which taxes could be directly laid whenever desired. Great difficulty in accomplishing this object was found to exist. The States bordering on the ocean were unwilling to give up their right to lay duties upon imports which were their chief source of revenue. The other States, on the other hand, were unwilling to make any agreement for the levying of taxes directly upon real and personal property, the smaller States fearing that they would be overborne by unequal burdens forced upon them by the action of the larger States. In this condition of things great embarrassment was felt by the members of the convention. It was feared at times that the effort to form a new government would fail. But happily a compromise was effected by an agreement that direct taxes should be laid by Congress by *apportioning them among the States according to their representation.* In return for this concession by some of the States, the other States bordering on navigable waters consented to relinquish to the new government the control of duties, imposts, and excises, and the regulation of commerce, with the condition that the duties, imposts, and excises should be *uniform throughout the United States.* So that, on the one

hand, anything like oppression. or undue advantage of any one State over the others would be prevented by the apportionment of the direct taxes among the States according to their representation, and, on the other hand, anything like oppression or hardship in the levying of duties, imposts, and excises would be avoided by the provision that they should be uniform throughout the United States.   This compromise was essential to the continued union and harmony of the States.   It protected every State from being controlled in its taxation by the superior numbers of one or more other States.

The Constitution accordingly, when completed, divided the taxes which might be levied under the authority of Congress into those which were direct and those which were indirect. Direct taxes, in a general and large sense, may be described as taxes derived immediately from the person, or from real or personal property, without any recourse therefrom to other sources for reimbursement.   In a more restricted sense, they have sometimes been confined to taxes on real property, including the rents and income derived therefrom.   Such taxes are conceded to be direct taxes, however taxes on other property are designated, and they are to be apportioned among the States of the Union according to their respective numbers. The second section of article I of the Constitution declares that representatives and direct taxes shall be thus apportioned. .It had been a favorite doctrine in England and in the colonies, before the adoption of the Constitution, that taxation and representation should go together.   The Constitution prescribes such apportionment among the several States according to their respective numbers, to be determined by adding to the whole number of free persons, including those bound to service for a term of years, and excluding Indians not taxed, three-fifths of all other persons.

Some decisions of this court have qualified or thrown doubts upon the exact meaning of the words " direct taxes."   Thus in *Springer* v. *United States*, 102 U. S. 586, it was held that a tax upon gains, profits, and income was an excise or duty and not a direct tax within the meaning of the Constitution, and

that its imposition was not therefore unconstitutional.   And in *Pacific Insurance Co.* v. *Soule,* 7 Wall. 433, it was held that an income tax or duty upon the amounts insured, renewed or continued by insurance companies, upon the gross amounts of premiums received by them and upon assessments made by them, and upon dividends and undistributed sums, was not a direct tax but a duty or excise.

In the discussions on the subject of direct taxes in the British Parliament an income tax has been generally designated as a direct tax, differing in that respect from the decision of this court in *Springer* v. *United States.*   But whether the latter can be accepted as correct or otherwise, it does not affect the tax upon real property and its rents and income as a direct tax.   Such a tax is by universal consent recognized to be a direct tax.

As stated, the rents and income of real property are included in the designation of direct taxes as part of the real property. Such has been the law in England for centuries, and in this country from the early settlement of the colonies; and it is strange that any member of the legal profession should, at this day, question a doctrine which has always been thus accepted by common-law lawyers.   It is so declared in approved treatises upon real property and in accepted authorities on particular branches of real estate law, and has been so announced in decisions in the English courts and our own courts without number.   Thus, in Washburn on Real Property, it is said that "a devise of the rents and profits of land, or the income of land, is equivalent to a devise of the land itself, and will be for life or in fee, according to the limitation expressed in the devise."   Vol. 2, p. 695, § 30.

In Jarman on Wills, Vol. 1, page 740, it is laid down that "a devise of the rents and profits or of the income of land passes the land itself both at law and in equity; a rule, it is said, founded on the feudal law, according to which the whole beneficial interest in the land consisted in the right to take the rents and profits.   And since the act 1 Vict. c. 26, such a devise carries the fee simple; but before that act it carried no more than an estate for life unless words of inheritance were

added." Mr. Jarman cites numerous authorities in support of his statement. *South* v. *Alleine*, 1 Salk. 228; *Doe d. Goldin* v. *Lakeman*, 2 B. & Ad. 30, 42; *Johnson* v. *Arnold*, 1 Ves. Sen. 171; *Baines* v. *Dixon*, 1 Ves. Sen. 42; *Mannox* v. *Greener*, L. R. 14 Eq. 456; *Blann* v. *Bell*, 2 De G., M. & G. 781; *Plenty* v. *West*, 6 C. B. 201.

Coke upon Littleton says: "If a man seised of lands in fee by his deed granteth to another the profit of those lands, to have and to hold to him and his heires, and maketh livery *secundum formam chartae*, the whole land itselfe, doth passe; for what is the land but the profits thereof?" Lib. 1, cap. 1, § 1, p. 4*b*.

In *Doe d. Goldin* v. *Lakeman*, Lord Tenterden, Chief Justice of the Court of King's Bench, to the same effect said: "It is an established rule that a devise of the rents and profits is a devise of the land." And in *Johnson* v. *Arnold*, Lord Chancellor Hardwicke reiterated the doctrine that a "devise of the profits of lands is a devise of the lands themselves."

The same rule is announced in this country; the Court of Errors of New York in *Paterson* v. *Ellis*, 11 Wend. 259, 298, holding that the "devise of the interest or of the rents and profits is a devise of the thing itself, out of which that interest or those rents and profits may issue;" and the Supreme Court of Massachusetts, in *Reed* v. *Reed*, 9 Mass. 372, 374, that "a devise of the income of lands is the same in its effect as a devise of the lands." The same view of the law was expressed in *Anderson* v. *Greble*, 1 Ashmead (Penn.) 136, 138, King, the president of the court, stating: "I take it to be a well-settled rule of law, that by a devise of the rent, profits, and income of land, the land itself passes." Similar adjudications might be repeated almost indefinitely. One may have the reports of the English courts examined for several centuries without finding a single decision or even a dictum of their judges in conflict with them. And what answer do we receive to these adjudications? Those rejecting them furnish no proof that the framers of the Constitution did not follow them, as the great body of the people of the country then did. An incident which occurred in this court and room twenty

years ago, may have become a precedent. To a powerful argument then being made by a distinguished counsel, on a public question, one of the judges exclaimed that there was a conclusive answer to his position and that was that the court was of a different opinion. Those who decline to recognize the adjudications cited may likewise consider that they have a conclusive answer to them in the fact that they also are of a different opinion. I do not think so. The law as expounded for centuries cannot be set aside or disregarded because some of the judges are now of a different opinion from those who, a century ago, followed it in framing our Constitution.

Hamilton, speaking on the subject, asks : " What, in fact, is property but a fiction, without the beneficial use of it ? " And adds: " In many cases, indeed, the *income or annuity* is the property itself." 3 Hamilton's Works, Putnam's ed. 34.

It must be conceded that whatever affects any element that gives an article its value, in the eye of the law affects the article itself.

In *Brown* v. *Maryland*, 12 Wheat. 419, 444, it was held that a tax on the occupation of an importer is the same as a tax on his imports, and as such was invalid. It was contended that the State might tax occupations and that this was nothing more, but the court said, by Chief Justice Marshall (p. 444): " It is impossible to conceal from ourselves, that this is varying the form without varying the substance. It is treating a prohibition, which is general, as if it were confined to a particular mode of doing the forbidden thing. All must perceive, that a tax on the sale of an article, imported only for sale, is a tax on the article itself."

In *Weston* v. *Charleston*, 2 Pet. 449, it was held that a tax upon stock issued for loans to the United States was a tax upon the loans themselves and equally invalid. In *Dobbins* v. *Commissioners*, 16 Pet. 435, it was held that the salary of an officer of the United States could not be taxed, if the office was itself exempt. In *Almy* v. *California*, 24 How. 169, it was held that a duty on a bill of lading was the same thing as a duty on the article transported. In *Cook* v. *Pennsylvania*, 97 U. S. 566, it was held that a tax upon the amount

of sales of goods made by an auctioneer was a tax upon the goods sold. In *Philadelphia & Southern Steamship Co.* v. *Pennsylvania*, 122 U. S. 326, and *Leloup* v. *Mobile*, 127 U. S. 640, 648, it was held that a tax upon the income received from interstate commerce was a tax upon the commerce itself, and equally unauthorized. The same doctrine was held in *People* v. *Commissioners of Taxes*, 90 N. Y. 63; *State Freight Tax*, 15 Wall. 232, 274; *Welton* v. *Missouri*, 91 U. S. 275, 278, and in *Fargo* v. *Michigan*, 121 U. S. 230.

The law, so far as it imposes a tax upon land by taxation of the rents and income thereof, must therefore fail, as it does not follow the rule of apportionment. The Constitution is imperative in its directions on this subject, and admits of no departure from them.

But the law is not invalid merely in its disregard of the rule of apportionment of the direct tax levied. There is another and an equally cogent objection to it. In taxing incomes other than rents and profits of real estate it disregards the rule of uniformity which is prescribed in such cases by the Constitution. The eighth section of the first article of the Constitution declares that " the Congress shall have power to lay and collect taxes, duties, imposts, and excises, to pay the debts and provide for the common defence and general welfare of the United States; *but all duties, imposts, and excises shall be uniform throughout the United States.*" Excises are a species of tax consisting generally of duties laid upon the manufacture, sale, or consumption of commodities within the country, or upon certain callings or occupations, often taking the form of exactions for licenses to pursue them. The taxes created by the law under consideration as applied to savings banks, insurance companies, whether of fire, life, or marine, to building or other associations, or to the conduct of any other kind of business, are excise taxes, and fall within the requirement, so far as they are laid by Congress, that they must be uniform throughout the United States.

The uniformity thus required is the uniformity throughout the United States of the duty, impost, and excise levied. That is, the tax levied cannot be one sum upon an article at one

place and a different sum upon the same article at another place. The duty received must be the same at all places throughout the United States, proportioned to the quantity of the article disposed of or the extent of the business done. If, for instance, one kind of wine or grain or produce has a certain duty laid upon it proportioned to its quantity in New York, it must have a like duty proportioned to its quantity when imported at Charleston or San Francisco, or if a tax be laid upon a certain kind of business proportioned to its extent at one place, it must be a like tax on the same kind of business proportioned to its extent at another place. In that sense the duty must be uniform throughout the United States.

It is contended by the government that the Constitution only requires an uniformity geographical in its character. That position would be satisfied if the same duty were laid in all the States, however variant it might be in different places of the same State. But it could not be sustained in the latter case without defeating the equality, which is an essential element of the uniformity required, so far as the same is practicable.

In *United States* v. *Singer*, 15 Wall. 111, 121, a tax was imposed upon a distiller, in the nature of an excise, and the question arose whether in its imposition upon different distillers the uniformity of the tax was preserved, and the court said: "The law is not in our judgment subject to any constitutional objection. The tax imposed upon the distiller is in the nature of an excise, and the only limitation upon the power of Congress in the imposition of taxes of this character is that they shall be ' uniform throughout the United States.' The tax here is uniform in its operation; *that is, it is assessed equally upon all manufacturers of spirits wherever they are.* The law does not establish one rule for one distiller and a different rule for another, but the same rule for all alike."

In the *Head Money Cases*, 112 U. S. 580, 594, a tax was imposed upon the owners of steam vessels for each passenger landed at New York from a foreign port, and it was objected that the tax was not levied by any rule of uniformity, but the court, by Justice Miller, replied: " The tax is uniform when

it operates with the same force and effect in *every* place where the subject of it is found. The tax in this case, which, as far as it can be called a tax, is an excise duty on the business of bringing passengers from foreign countries into this, by ocean navigation, is uniform and operates precisely alike in every port of the United States where such passengers can be landed." In the decision in that case, in the Circuit Court, 18 Fed. Rep. 135, 139, Mr. Justice Blatchford, in addition to pointing out that " the act was not passed in the exercise of the power of laying taxes," but was a regulation of commerce, used the following language : "Aside from this, the tax applies uniformly to all steam and sail vessels coming to all ports in the United States, from all foreign ports, with all alien passengers. The tax being a license tax on the business, *the rule of uniformity is sufficiently observed if the tax extends to all persons of the class selected by Congress; that is, to all owners of such vessels.* Congress has the exclusive power of selecting the class. It has regulated that particular branch of commerce which concerns the bringing of alien passengers," and that taxes shall be levied upon such property as shall be prescribed by law. The object of this provision was to prevent unjust discriminations. It prevents property from being classified and taxed as classed, by different rules. All kinds of property must be taxed uniformly, or be entirely exempt. The uniformity must be coextensive with the territory to which the tax applies.

Mr. Justice Miller, in his lectures on the Constitution, (N. Y. 1891) pp. 240, 241, said of taxes levied by Congress : " The tax must be uniform on the *particular article;* and it is uniform, within the meaning of the constitutional requirement, if it is made to bear the *same percentage* over all the United States. That is manifestly the meaning of this word, as used in this clause. The framers of the Constitution could not have meant to say that the government, in raising its revenues, should not be allowed to discriminate between the *articles* which it should tax." In discussing generally the requirement of uniformity found in state constitutions, he said : " The difficulties in the way of this construction have, however, been very largely obviated by the meaning of the word

'uniform,' which has been adopted, holding that the uniformity must *refer to articles of the same class. That is, different articles may be taxed at different amounts, provided the rate is uniform on the same class everywhere, with all people, and at all times.*"

One of the learned counsel puts it very clearly when he says that the correct meaning of the provisions requiring duties, imposts, and excises to be " uniform throughout the United States " is, that the law imposing them should " have an equal *and* uniform application in every part of the Union."

If there were any doubt as to the intention of the States to make the grant of the right to impose indirect taxes subject to the condition that such taxes shall be in all respects uniform and impartial, that doubt, as said by counsel, should be resolved in the interest of justice, in favor of the taxpayer.

Exemptions from the operation of a tax always create inequalities. Those not exempted must, in the end, bear an additional burden or pay more than their share. A law containing arbitrary exemptions can in no just sense be termed uniform. In my judgment, Congress has rightfully no power, at the expense of others, owning property of a like character, to sustain private trading corporations, such as building and loan associations, savings banks, and mutual life, fire, marine, and accident insurance companies, formed under the laws of the various States, which advance no national purpose or public interest and exist solely for the pecuniary profit of their members.

Where property is exempt from taxation, the exemption, as has been justly stated, must be supported by some consideration that the public, and not private, interests will be advanced by it. Private corporations and private enterprises cannot be aided under the pretence that it is the exercise of the discretion of the legislature to exempt them. *Loan Association v. Topeka,* 20 Wall. 655; *Parkersburg v. Brown,* 106 U. S. 487; *Barbour v. Louisville Board of Trade,* 82 Kentucky, 645, 654, 655; *Lexington v. McQuillan's Heirs,* 9 Dana, 513, 516, 517; and *Sutton's Heirs v. Louisville,* 5 Dana, 28, 31.

Cooley, in his treatise on Taxation, ( 2d ed. 215,) justly

observes that: " It is difficult to conceive of a justifiable exemption law which should select single individuals or corporations, or single articles of property, and, taking them out of the class to which they belong, make them the subject of capricious legislative favor. Such favoritism could make no pretence to equality; it would lack the semblance of legitimate tax legislation."

The income tax law under consideration is marked by discriminating features which affect the whole law. It discriminates between those who receive an income of four thousand dollars and those who do not. It thus vitiates, in my judgment, by this arbitrary discrimination, the whole legislation. Hamilton says in one of his papers, (the Continentalist,) " the genius of liberty reprobates everything arbitrary or .discretionary in taxation. It exacts that every man, by a definite and general rule, should know what proportion of his property the State demands; whatever liberty we may boast of in theory, it cannot exist in fact while [arbitrary] assessments continue." 1 Hamilton's Works, ed. 1885, 270. The legislation, in the discrimination it makes, is class legislation. Whenever a distinction is made in the burdens a law imposes or in the benefits it confers on any citizens by reason of their birth, or wealth, or religion, it is class legislation, and leads inevitably to oppression and abuses, and to general unrest and disturbance in society. It was hoped and believed that the great amendments to the Constitution which followed the late civil war had rendered such legislation impossible for all future time. But the objectionable legislation reappears in the act under consideration. It is the same in essential character as that of the English income statute of 1691, which taxed Protestants at a certain rate, Catholics, as a class, at double the rate of Protestants, and Jews at another and separate rate. Under wise and constitutional legislation every citizen should contribute his proportion, however small the sum, to the support of the government, and it is no kindness to urge any of our citizens to escape from that obligation. If he contributes the smallest mite of his earnings to that purpose he will have a greater regard for the government and more self-respect

for himself feeling that though he is poor in fact, he is not a pauper of his government. And it is to be hoped that, whatever woes and embarrassments may betide our people, they may never lose their manliness and self-respect. Those qualities preserved, they will ultimately triumph over all reverses of fortune.

There is nothing in the nature of the corporations or associations exempted in the present act, or in their method of doing business, which can be claimed to be of a public or benevolent nature. They differ in no essential characteristic in their business from "all other corporations, companies, or associations doing business for profit in the United States." Act of August 15, 1894, c. 349, § 32.

A few words as to some of them, the extent of their capital and business, and of the exceptions made to their taxation:

1st. *As to mutual savings banks.* — Under income tax laws prior to 1870, these institutions were specifically taxed. Under the new law, certain institutions of this class are exempt, provided the shareholders do not participate in the profits, and interest and dividends are only paid to the depositors. No limit is fixed to the property and income thus exempted —it may be $100,000 or $100,000,000. One of the counsel engaged in this case read to us during the argument from the report of the Comptroller of the Currency, sent by the President to Congress December 3, 1894, a statement to the effect that the total number of mutual savings banks exempted was 646, and the total number of stock savings banks was 378, and showed that they did the same character of business and took in the money of depositors for the purpose of making it bear interest, with profit upon it in the same way; and yet the 646 are exempt and the 378 are taxed. He also showed that the total deposits in savings banks were $1,748,000,000.

2d. *As to mutual insurance corporations.* — These companies were taxed under previous income tax laws. They do business somewhat differently from other companies; but they conduct a strictly private business in which the public has no interest, and have been often held not to be benevolent or

The sole condition for exempting them under the present law is declared to be that they make loans to or divide their profits among their members, or depositors or policy-holders. Every corporation is carried on, however, for the benefit of its members, whether stockholders, or depositors, or policy-holders. If it is carried on for the benefit of its shareholders, every dollar of income is taxed; if it is carried on for the benefit of its policy-holders or depositors, who are but another class of shareholders, it is wholly exempted. In the State of New York the act exempts the income from over $1,000,000,000 of property of these companies. The leading mutual life insurance company has property exceeding $204,000,000 in value, the income of which is wholly exempted. The insertion of the exemption is stated by counsel to have saved that institution fully $200,000 a year over other insurance companies and associations, having similar property and carrying on the same business, simply because such other companies or associations divide their profits among their shareholders instead of their policy-holders.

3d. *As to building and loan associations.* — The property of these institutions is exempted from taxation to the extent of millions. They are in no sense benevolent or charitable institutions, and are conducted solely for the pecuniary profit of their members. Their assets exceed the capital stock of the national banks of the country. One, in Dayton, Ohio, has a capital of $10,000,000, and Pennsylvania has $65,000,000 invested in these associations. The census report submitted to Congress by the President, May 1, 1894, shows that their property in the United States amounts to over $628,000,000. Why should these institutions and their immense accumulations of property be singled out for the special favor of Congress and be freed from their just, equal, and proportionate share of taxation when others engaged under different names, in similar business, are subjected to taxation by this law? The aggregate amount of the saving to these associations, by reason of their exemption, is over $600,000 a year. If this statement of the exemptions of corporations under the law of Congress, taken from the carefully prepared briefs of counsel

and from reports to Congress, will not satisfy parties interested in this case that the act in question disregards, in almost every line and provision, the rule of uniformity required by the Constitution, then "neither will they be persuaded, though one rose from the dead." That there should be any question or any doubt on the subject surpasses my comprehension. Take the case of mutual savings banks and stock savings banks. They do the same character of business, and in the same way use the money of depositors, loaning it at interest for profit, yet 646 of them, under the law before us, are exempt from taxation on their income and 378 are taxed upon it. How the tax on the income of one kind of these banks can be said to be laid upon any principle of uniformity, when the other is exempt from all taxation, I repeat, surpasses my comprehension.

But there are other considerations against the law which are equally decisive. They relate to the uniformity and equality required in all taxation, national and State; to the invalidity of taxation by the United States of the income of the bonds and securities of the States and of their municipal bodies; and the invalidity of the taxation of the salaries of the judges of the United States courts.

As stated by counsel: "There is no such thing in the theory of our national government as unlimited power of taxation in Congress. There are limitations," as he justly observes, "of its powers arising out of the essential nature of all free governments; there are reservations of individual rights, without which society could not exist, and which are respected by every government. The right of taxation is subject to these limitations." *Loan Association* v. *Topeka,* 20 Wall. 655, and *Parkersburg* v. *Brown,* 106 U. S. 487.

The inherent and fundamental nature and character of a tax is that of a contribution to the support of the government, levied upon the principle of equal and uniform apportionment among the persons taxed, and any other exaction does not come within the legal definition of a tax.

This inherent limitation upon the taxing power forbids the imposition of taxes which are unequal in their operation upon

similar kinds of property, and necessarily strikes down the gross and arbitrary distinctions in the income law as passed by Congress. The law, as we have seen, distinguishes in the taxation between corporations by exempting the property of some of them from taxation and levying the tax on the property of others when the corporations do not materially differ from one another in the character of their business or in the protection required by the government. Trifling differences in their modes of business, but not in their results, are made the ground and occasion of the greatest possible differences in the amount of taxes levied upon their income, showing that the action of the legislative power upon them has been arbitrary and capricious and sometimes merely fanciful.

There was another position taken in this case which is not the least surprising to me of the many advanced by the upholders of the law, and that is, that if this court shall declare that the exemptions and exceptions from taxation, extended to the various corporations mentioned, fire, life, and marine insurance companies, and to mutual savings banks, building, and loan associations, violate the requirement of uniformity, and are therefore void, the tax as to such corporations can be enforced, and that the law will stand as though the exemptions had never been inserted. This position does not, in my judgment, rest upon any solid foundation of law or principle. The abrogation or repeal of an unconstitutional or illegal provision does not operate to create and give force to any enactment or part of an enactment which Congress has not sanctioned and promulgated. Seeming support of this singular position is attributed to the decision of this court in *Huntington* v. *Worthen*, 120 U. S. 97. But the examination of that case will show that it does not give the slightest sanction to such a doctrine. There the constitution of Arkansas had provided that all property subject to taxation should be taxed according to its value, to be ascertained in such manner as the general assembly should direct, making the same equal and uniform throughout the State, and certain public property was declared by statute to be exempt from taxation, which statute was subsequently held to be unconstitutional. The court decided that the unconsti-

tutional part of the enactment, which was separable from the remainder, could be omitted and the remainder enforced; a doctrine undoubtedly sound, and which has never, that I am aware of, been questioned. But that is entirely different from the position here taken, that exempted things can be taxed by striking out their exemption.

The law of 1894 says there shall be assessed, levied, and collected, "*except as herein otherwise provided*," two per centum of the amount, etc. If the exceptions are stricken out there is nothing to be assessed and collected except what Congress has otherwise affirmatively ordered. Nothing less can have the force of law. This court is impotent to pass any law on the subject: It has no legislative power. I am unable, therefore, to see how we can, by declaring an exemption or exception invalid, thereby give effect to provisions as though they were never exempted. The court by declaring the exemptions invalid cannot by any conceivable ingenuity give operative force as enacting clauses to the exempting provisions. That result is not within the power of man.

The law is also invalid in its provisions authorizing the taxation of the bonds and securities of the States and of their municipal bodies. It is objected that the cases pending before us do not allege any threatened attempt to tax the bonds or securities of the State, but only of municipal bodies of the States. The law applies to both kinds of bonds and securities, those of the States as well as those of municipal bodies, and the law of Congress, we are examining, being of a public nature, affecting the whole community, having been brought before us and assailed as unconstitutional in some of its provisions, we are at liberty, and I think it is our duty to refer to other unconstitutional features brought to our notice in examining the law, though the particular points of their objection may not have been mentioned by counsel. These bonds and securities are as important to the performance of the duties of the State as like bonds and securities of the United States are important to the performance of their duties, and are as exempt from the taxation of the United States as the former are exempt from the taxation of the States. As stated by Judge

Cooley in his work on the principles of constitutional law: "The power to tax, whether by the United States or by the States, is to be construed in the light of, and limited by, the fact, that the States and the Union are inseparable, and that the Constitution contemplates the perpetual maintenance of each with all its constitutional powers, unembarrassed and unimpaired by any action of the other. The taxing power of the Federal government does not therefore extend to the means or agencies through or by the employment of which the States perform their essential functions, since, if these were within its reach, they might be embarrassed, and perhaps wholly paralyzed, by the burdens it should impose. 'That the power to tax involves the power to destroy; that the power to destroy may defeat and render useless the power to create; that there is a plain repugnance in conferring on one government a power to control the constitutional measures of another, which other, in respect to those very measures, is declared to be supreme over that which exerts the control, — are propositions not to be denied.' It is true that taxation does not necessarily and unavoidably destroy, and that to carry it to the excess of destruction would be an abuse not to be anticipated; but the very power would take from the States a portion of their intended liberty of independent action within the sphere of their powers, and would constitute to the State a perpetual danger of embarrassment and possible annihilation. The Constitution contemplates no such shackles upon state powers, and by implication forbids them."

The Internal Revenue Act of June 30, 1864, in section 122, provided that railroad and certain other companies specified, indebted for money for which bonds had been issued, upon which interest was stipulated to be paid, should be subject to pay a tax of five per cent on the amount of all such interest, to be paid by the corporations and by them deducted from the interest payable to the holders of such bonds; and the question arose in *United States* v. *Railroad Co.*, 17 Wall. 322, 327, whether the tax imposed could be thus collected from the revenues of a city owning such bonds. This court answered the question as follows: "There is no dispute about the gen-

eral rules of the law applicable to this subject. The power of taxation by the Federal government upon the subjects and in the manner prescribed by the act we are considering, is undoubted. There are, however, certain departments which are excepted from the general power. The right of the States to administer their own affairs through their legislative, executive, and judicial departments, in their own manner through their own agencies, is conceded by the uniform decisions of this court, and by the practice of the Federal government from its organization. This carries with it an exemption of those agencies and instruments from the taxing power of the Federal government. If they may be taxed lightly, they may be taxed heavily; if justly, oppressively. Their operation may be impeded and may be destroyed, if any interference is permitted. Hence, the beginning of such taxation is not allowed on the one side, is not claimed on the other."

And again: " A municipal corporation like the city of Baltimore is a representative not only of the State, but it is a portion of its governmental power. It is one of its creatures, made for a specific purpose, to exercise within a limited sphere the powers of the State. The State may withdraw these local powers of government at pleasure, and may, through its legislature or other appointed channels, govern the local territory as it governs the State at large. It may enlarge or contract its powers or destroy its existence. As a portion of the State in the exercise of a limited portion of the powers of the State, its revenues, like those of the State, are not subject to taxation."

In *Collector* v. *Day*, 11 Wall. 113, 124, the court, speaking by Mr. Justice Nelson, said: " The general government, and the States, although both exist within the same territorial limits, are separate and distinct sovereignties, acting separately and independently of each other, within their respective spheres. The former in its appropriate sphere is supreme; but the States within the limits of their powers not granted, or, in the language of the tenth amendment, 'reserved,' are as independent of the general government as that government within its sphere is independent of the States."

According to the census reports the bonds and securities of the States amount to the sum of $1,243,268,000, on which the income or interest exceeds the sum of $65,000,000 per annum, and the annual tax of two per cent upon this income or interest would be $1,300,000.

The law of Congress is also invalid in that it authorizes a tax upon the salaries of the judges of the courts of the United States, against the declaration of the Constitution that their compensation shall not be diminished during their continuance in office.   The law declares that a tax of two per cent shall be assessed, levied, and collected and paid annually upon the gains, profits, and income received in the preceding calendar year, by every citizen of the United States, whether said gains, profits, or income be derived from any kind of property, rents, interest, dividends, or *salaries*, or from any profession, trade, employment, or vocation, carried on within the United States or elsewhere, or from any source whatever.   The annual salary of a justice of the Supreme Court of the United States is ten thousand dollars, and this act levies a tax of two per cent on six thousand dollars of this amount, and imposes a penalty upon those who do not make the payment, or return the amount for taxation.

The same objection, as presented to a consideration of the objection to the taxation of the bonds and securities of the States, as not being specially taken in the cases before us, is urged here to a consideration of the objection to the taxation by the law of the salaries of the judges of the courts of the United States.   The answer given to that objection may be also given to the present one.   The law of Congress being of a public nature, affecting the interests of the whole community, and attacked for its unconstitutionality in certain particulars, may be considered with reference to other unconstitutional provisions called to our attention upon examining the law, though not specifically noticed in the objections taken in the records or briefs of counsel, that the Constitution may not be violated from the carelessness or oversight of counsel in any particular.   See *O'Neil* v. *Vermont*, 144 U. S. 323, 359.

Besides, there is a duty which this court owes to the one

hundred other United. States judges who have small salaries, and who having their compensation reduced by the tax may be seriously affected by the law. .

The Constitution of the United States provides in the first section of article III that: "The judicial power of the United States, shall be vested in one Supreme Court, and in such inferior courts as the Congress may from time to time ordain and establish. The judges, both of the Supreme and inferior courts, shall hold their offices during good behavior, and shall, at stated times, receive for their services, a compensation, *which shall not be diminished during their continuance in office.*" The act of Congress under discussion imposes, as said, a tax on six thousand dollars of this compensation, and therefore diminishes, each year, the compensation provided for every justice. How a similar law of Congress was regarded thirty years ago may be shown by the following incident in which the justices of this court were assessed at three per cent upon their salaries. Against this Chief Justice Taney protested in a letter to Mr. Chase, then Secretary of the Treasury, appealing to the above article in the Constitution, and adding: "If it [his salary] can be diminished to that extent by the means of a tax, it may, in the same way, be reduced from time to time, at the pleasure of the legislature." He explained in his letter the object of the constitutional inhibition thus:—

"The judiciary is one of the three great departments of the government created and established by the Constitution. Its duties and powers are specifically set forth, and are of a character that require it to be perfectly independent of the other departments. And in order to place it beyond the reach, and above even the suspicion, of any such influence, the power to reduce their compensation is expressly withheld from Congress *and excepted from their powers of legislation.*

"Language could not be more plain than that used in the Constitution. It is, moreover, one of its most important and essential provisions. For the articles which limit the powers of the legislative and executive branches of the government, and those which provide safeguards for the protection of the citizen in his person and property, would be of little value

without a judiciary to uphold and maintain them which was free from every influence, direct or indirect, that might by possibility, in times of political excitement, warp their judgment.

" Upon these grounds I regard an act of Congress retaining in the Treasury a portion of the compensation of the judges as unconstitutional and void."

This letter of Chief Justice Taney was addressed to Mr. Chase, then Secretary of the Treasury and afterwards the successor of Mr. Taney as Chief Justice. It was dated February 16, 1863, but as no notice was taken of it, on the 10th of March following, at the request of the Chief Justice, the Court ordered that his letter to the Secretary of the Treasury be entered on the records of the court, and it was so entered. See Appendix, *post*, 701. And in the Memoir of the Chief Justice it is stated that the letter was, by this order, preserved " to testify to future ages that in war, no less than in peace, Chief Justice Taney strove to protect the Constitution from violation."

Subsequently, in 1869, and during the administration of President Grant, when Mr. Boutwell was Secretary of the Treasury and Mr. Hoar, of Massachusetts, was Attorney General, there were in several of the statutes of the United States, for the assessment and collection of internal revenue, provisions for taxing the salaries of all civil officers of the United States, which included, in their literal application, the salaries of the President and of the judges of the United States. The question arose whether the law which imposed such a tax upon them was constitutional. The opinion of the Attorney General thereon was requested by the Secretary of the Treasury. The Attorney General, in reply, gave an elaborate opinion advising the Secretary of the Treasury that no income tax could be lawfully assessed and collected upon the salaries of those officers who were in office at the time the statute imposing the tax was passed, holding on this subject the views expressed by Chief Justice Taney. His opinion is published in volume XIII of the Opinions of the Attorneys General, at page 161. I am informed that it has been fol-

lowed ever since without question by the department supervising or directing the collection of the public revenue.

Here I close my opinion. I could not say less in view of questions of such gravity that go down to the very foundation of the government. If the provisions of the Constitution can be set aside by an act of Congress, where is the course of usurpation to end? The present assault upon capital is but the beginning. It will be but the stepping-stone to others, larger and more sweeping, till our political contests will become a war of the poor against the rich; a war constantly growing in intensity and bitterness.

"If the court sanctions the power of discriminating taxation, and nullifies the uniformity mandate of the Constitution," as said by one who has been all his life a student of our institutions, "it will mark the hour when the sure decadence of our present government will commence." If the purely arbitrary limitation of $4000 in the present law can be sustained, none having less than that amount of income being assessed or taxed for the support of the government, the limitation of future Congresses may be fixed at a much larger sum, at five or ten or twenty thousand dollars, parties possessing an income of that amount alone being bound to bear the burdens of government; or the limitation may be designated at such an amount as a board of "walking delegates" may deem necessary. There is no safety in allowing the limitation to be adjusted except in strict compliance with the mandates of the Constitution which require its taxation, if imposed by direct taxes, to be apportioned among the States according to their representation, and if imposed by indirect taxes, to be uniform in operation and, so far as practicable, in proportion to their property, equal upon all citizens. Unless the rule of the Constitution governs, a majority may fix the limitation at such rate as will not include any of their own number.

I am of opinion that the whole law of 1894 should be declared void and without any binding force — that part which relates to the tax on the rents, profits or income from real estate, that is, so much as constitutes part of the direct tax, because, not imposed by the rule of apportionment according

to the representation of the States, as prescribed by the Constitution — and that part which imposes a tax upon the bonds and securities of the several States, and upon the bonds and securities of their municipal bodies, and upon the salaries of judges of the courts of the United States, as being beyond the power of Congress; and that part which lays duties, imposts, and excises, as void in not providing for the uniformity required by the Constitution in such cases.

MR. JUSTICE WHITE, with whom concurred MR. JUSTICE HARLAN, dissenting.

My brief judicial experience has convinced me that the custom of filing long dissenting opinions is one "more honored in the breach than in the observance." The only purpose which an elaborate dissent can accomplish, if any, is to weaken the effect of the opinion of the majority, and thus engender want of confidence in the conclusions of courts of last resort. This consideration would impel me to content myself with simply recording my dissent in the present case, were it not for the fact that I consider that the result of the opinion of the court just announced is to overthrow a long and consistent line of decisions, and to deny to the legislative department of the government the possession of a power conceded to it by universal consensus for one hundred years, and which has been recognized by repeated adjudications of this court. The issues presented are as follows:

Complainant, as a stockholder in a corporation, avers that the latter will voluntarily pay the income tax, levied under the recent act of Congress; that such tax is unconstitutional; and that its voluntary payment will seriously affect his interest by defeating his right to test the validity of the exaction, and also lead to a multiplicity of suits against the corporation. The prayer of the bill is as follows: First. That it may be decreed that the provisions known as "The Income Tax Law," incorporated in the act of Congress, passed August 15, 1894, are unconstitutional, null, and void. Second. That the defendant be restrained from voluntarily complying with the provisions of that act by making its returns and statements,

and paying the tax. The bill, therefore, presents two substantial questions for decision : the right of the plaintiff to relief in the form in which he claims it; and his right to relief on the merits.

The decisions of this court hold that the collection of a tax levied by the government of the United States, will not be restrained by its courts. *Cheatham* v. *United States*, 92 U. S. 85; *Snyder* v. *Marks*, 109 U. S. 189. See also *Elliott* v. *Swartwout*, 10 Pet. 137; *City of Philadelphia* v. *The Collector*, 5 Wall. 720; *Hornthall* v. *The Collector*, 9 Wall. 560. The same authorities have established the rule that the proper course, in a case of illegal taxation, is to pay the tax under protest or with notice of suit, and then bring an action against the officer who collected it. The statute law of the United States, in express terms, gives a party who has paid a tax under protest the right to sue for its recovery. Rev. Stat. § 3226.

The act of 1867 forbids the maintenance of any suit "for the purpose of restraining the assessment or collection of any tax." The provisions of this act are now found in Rev. Stat. § 3224.

The complainant is seeking to do the very thing which, according to the statute and the decisions above referred to, may not be done. If the corporator cannot have the collection of the tax enjoined it seems obvious that he cannot have the corporation enjoined from paying it, and thus do by indirection what he cannot do directly.

It is said that such relief as is here sought has been frequently allowed. The cases relied on are *Dodge* v. *Woolsey*, 18 How. 331, and *Hawes* v. *Oakland*, 104 U. S. 450. Neither of these authorities, I submit, is in point. In *Dodge* v. *Woolsey*, the main question at issue was the validity of a state tax, and that case did not involve the act of Congress to which I have referred. *Hawes* v. *Oakland* was a controversy between a stockholder and a corporation, and had no reference whatever to taxation.

The complainant's attempt to establish a right to relief upon the ground that this is not a suit to enjoin the tax, but

one to enjoin the corporation from paying it, involves the fallacy already pointed out — that is, that a party can exercise a right indirectly which he cannot assert directly — that he can compel his agent, through process of this court, to violate an act of Congress.

The rule which forbids the granting of an injunction to restrain the collection of a tax is founded on broad reasons of public policy and should not be ignored. In *Cheatham* v. *United States*, 92 U. S. 85, 89, which involved the validity of an income tax levied under an act of Congress prior to the one here in issue, this court, through Mr. Justice Miller, said:

"If there existed in the courts, state or National, any general power of impeding or controlling the collection of taxes, or relieving the hardship incident to taxation, the very existence of the government might be placed in the power of a hostile judiciary. *Dows* v. *The City of Chicago*, 11 Wall. 108. While a free course of remonstrance and appeal is allowed within the departments before the money is finally exacted, the general government has wisely made the payment of the tax claimed, whether of customs or of internal revenue, a condition precedent to a resort to the courts by the party against whom the tax is assessed. In the internal revenue branch it has further prescribed that no such suit shall be brought until the remedy by appeal has been tried; and, if brought after this, it must be within six months after the decision on the appeal. We regard this as a condition on which alone the government consents to litigate the lawfulness of the original tax. It is not a hard condition. Few governments have conceded such a right on any condition. If the compliance with this condition requires the party aggrieved to pay the money, he must do it." 92 U. S. 85, 89.

Again, in *Railroad Tax Cases*, 92 U. S. 575, 613, the court said: "That there might be no misunderstanding of the universality of this principle, it was expressly enacted, in 1867, that 'no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court.' Rev. Stat. sect. 3224. And though this was intended to apply alone to taxes levied by the United States, it shows the sense

of Congress of the evils to be feared if courts of justice could, *in any case,* interfere with the process of collecting the taxes on which the government depends for its continued existence. It is a wise policy. It is founded in the simple philosophy derived from the experience of ages, that the payment of taxes has to be enforced by summary and stringent means against a reluctant and often adverse sentiment; and to do this successfully, other instrumentalities and other modes of procedure are necessary, than those which belong to courts of justice. See *Cheatham* v. *Norvell,* decided at this term; *Nicoll* v. *United States,* 7 Wall. 122; *Dows* v. *Chicago,* 11 Wall. 108."

The contention that a right to equitable relief arises from the fact that the corporator is without remedy unless such relief be granted him is, I think, without foundation. This court has repeatedly said that the illegality of a tax is not ground for the issuance of an injunction against its collection if there be an adequate remedy at law open to the payer. *Dows* v. *City of Chicago,* 11 Wall. 108; *Hannewinkle* v. *Georgetown,* 15 Wall. 547; *Board of Liquidation* v. *McComb,* 92 U. S. 531; *State Railroad Tax Cases,* 92 U. S. 575; *Union Pacific Railway* v. *Cheyenne,* 113 U. S. 516; *Milwaukee* v. *Koeffler,* 116 U. S. 219; *Pacific Express Co.* v. *Seibert,* 142 U. S. 339 — as in the case where the state statute, by which the tax is imposed, allows a suit for its recovery after payment under protest. *Shelton* v. *Platt,* 139 U. S. 591; *Allen* v. *Pullman's Palace Car Co.,* 139 U. S. 658.

The decision here is, that this court will allow, on the theory of equitable right, a remedy expressly forbidden by the statutes of the United States, though it has denied the existence of such a remedy in the case of a tax levied by a State.

Will it be said that, although a stockholder cannot have a corporation enjoined from paying a state tax where the state statute gives him the right to sue for its recovery, yet when the United States not only gives him such right, but, in addition, forbids the issue of an injunction to prevent the payment of Federal taxes, the court will allow to the stock-

holder a remedy against the United States tax which it refuses against the state tax?

The assertion that this is only a suit to prevent the voluntary payment of the tax suggests that the court may, by an order operating directly upon the defendant corporation, accomplish a result which the statute manifestly intended should not be accomplished by suit in any court. A final judgment forbidding the corporation from paying the tax will have the effect to prevent its collection, for it could not be that the court would permit a tax to be collected from a corporation which it had enjoined from paying. I take it to be beyond dispute that the collection of the tax in question cannot be restrained by any proceeding or suit, whatever its form, directly against the officer charged with the duty of collecting such tax. Can the statute be evaded, in a suit between a corporation and a stockholder, by a judgment forbidding the former from paying the tax, the collection of which cannot be restrained by suit in any court? Suppose, notwithstanding the final judgment just rendered, the collector proceeds to collect from the defendant corporation the taxes which the court declares, in this suit, cannot be legally assessed upon it. If that final judgment is sufficient in law to justify resistance against such collection, then we have a case in which a suit has been maintained to restrain the *collection* of taxes. If such judgment does not conclude the collector, who was not a party to the suit in which it was rendered, then it is of no value to the plaintiff. In other words, no form of expression can conceal the fact that the real object of this suit is to prevent the collection of taxes imposed by Congress, notwithstanding the express statutory requirement that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court." Either the decision of the constitutional question is necessary, or it is not. If it is necessary, then the court, by way of granting equitable relief, does the very thing which the act of Congress forbids. If it is unnecessary, then the court decides the act of Congress here asserted unconstitutional, without being obliged to do so by the requirements of the case before it.

This brings me to the consideration of the merits of the cause.

The constitutional provisions respecting Federal taxation are four in number, and are as follows:

1. "Representatives and direct taxes shall be apportioned among the several States, which may be included within this Union, according to their respective numbers, which shall be determined by adding to the whole number of free persons, including those bound to service for a term of years and excluding Indians not taxed, three-fifths of all other persons." Art. I, sec. 2, clause 3. (The Fourteenth Amendment modified this provision, so that the whole number of persons in each State should be counted, "Indians not taxed" excluded.)

2. "The Congress shall have power to lay and collect taxes, duties, imposts, and excises, to pay the debts and provide for the common defence and general welfare of the United States; but all duties, imposts, and excises shall be uniform throughout the United States." Art. I, sec. 8, clause 1.

3 "No capitation or other direct tax shall be laid, unless in proportion to the census or enumeration hereinbefore directed to be taken." Art. I, sec. 9, clause 4.

4. "No tax or duty shall be laid on articles exported from any State." Art. I, sec. 9, clause 5.

It has been suggested that, as the above provisions ordain the apportionment of direct taxes, and authorize Congress to "lay and collect taxes, duties, imposts, and excises," therefore, there is a class of taxes which are neither direct, and are not duties, imposts, and excises, and are exempt from the rule of apportionment on the one hand or of uniformity on the other. The soundness of this suggestion need not be discussed, as the words, "duties, imposts, and excises," in conjunction with the reference to direct taxes, adequately convey all power of taxation to the Federal government.

It is not necessary to pursue this branch of the argument, since it is unquestioned that the provisions of the Constitution vest in the United States plenary powers of taxation, that is, all the powers which belong to a government as such, except

that of taxing exports. The court in this case so says, and quotes approvingly the language of this court, speaking through Mr. Chief Justice Chase, in *License Tax Cases*, 5 Wall. 462, 471, as follows :

"It is true that the power of Congress to tax is a very extensive power. It is given in the Constitution with only one exception and only two qualifications. Congress cannot tax exports, and it must impose direct taxes by the rule of apportionment, and indirect taxes by the rule of uniformity. Thus limited and thus only, it reaches every subject and may be exercised at discretion."

In deciding, then, the question of whether the income tax violates the Constitution, we have to determine not the exsitence of a power in Congress, but whether an admittedly unlimited power to tax (the income tax not being a tax on exports) has been used according to the restrictions as to methods for its exercise, found in the Constitution. Not power, it must be borne in mind, but the manner of its use is the only issue presented in this case. The limitations in regard to the mode of direct taxation imposed by the Constitution are that capitation and other direct taxes shall be apportioned among the States according to their respective numbers, while duties, imposts, and excises must be uniform throughout the United States. The meaning of the word "uniform" in the Constitution need not be examined, as the court is divided upon that subject, and no expression of opinion thereon is conveyed or intended to be conveyed in this dissent.

In considering whether we are to regard an income tax as "direct" or otherwise, it will, in my opinion, serve no useful purpose, at this late period of our political history, to seek to ascertain the meaning of the word "direct" in the Constitution by resorting to the theoretical opinions on taxation found in the writings of some economists prior to the adoption of the Constitution or since. These economists teach that the question of whether a tax is direct or indirect, depends not upon whether it is directly levied upon a person but upon whether, when so levied, it may be ultimately shifted from the person

in question to the consumer, thus becoming, while direct in the method of its application, indirect in its final results, because it reaches the person who really pays it only indirectly. I say it will serve no useful purpose to examine these writers, because whatever may have been the value of their opinions as to the economic sense of the word " direct," they cannot now afford any criterion for determining its meaning in the Constitution, inasmuch as an authoritative and conclusive construction has been given to that term, as there used by an interpretation adopted shortly after the formation of the Constitution by the legislative department of the government, and approved by the Executive; by the adoption of that interpretation from that time to the present without question, and its exemplification and enforcement in many legislative enactments, and its acceptance by the authoritative text-writers on the Constitution; by the sanction of that interpretation, in a decision of this court rendered shortly after the Constitution was adopted; and finally by the repeated reiteration and affirmance of that interpretation, so that it has become imbedded in our jurisprudence, and therefore may be considered almost a part of the written Constitution itself.

Instead, therefore, of following counsel in their references to economic writers and their discussion of the motives and thoughts which may or may not have been present in the minds of some of the framers of the Constitution, as if the question before us were one of first impression, I shall confine myself to a demonstration of the truth of the propositions just laid down.

By the act of June 5, 1794, c. 45, 1 Stat. 373, Congress levied, without reference to apportionment, a tax on carriages "for the conveyance of persons." The act provided "that there shall be levied, collected, and paid upon all carriages for the conveyance of persons which shall be kept by, or for any person for his or her own use, or to be let out to hire, or for the conveying of passengers, the several duties and rates following;" and then came a yearly tax on every "coach, chariot, phaeton, and coachee, every four-wheeled and every

two-wheeled top carriage, and upon every other two-wheeled carriage," varying in amount according to the vehicle.

The debates which took place at the passage of that act are meagrely preserved. It may, however, be inferred from them that some considered that, whether a tax was "direct" or not in the sense of the Constitution, depended upon whether it was levied on the object or on its use. The carriage tax was defended by a few on the ground that it was a tax on consumption. Mr. Madison opposed it as unconstitutional, evidently upon the conception that the word "direct" in the Constitution was to be considered as having the same meaning as that which had been attached to it by some economic writers. His view was not sustained, and the act passed by a large majority — forty-nine to twenty-two. It received the approval of Washington. The Congress which passed this law numbered among its members many who sat in the convention which framed the Constitution. It is moreover safe to say that each member of that Congress, even although he had not been in the convention, had, in some way, either directly or indirectly, been an influential actor in the events which led up to the birth of that instrument. It is impossible to make an analysis of this act which will not show that its provisions constitute a rejection of the economic construction of the word "direct," and this result equally follows, whether the tax be treated as laid on the carriage itself or on its use by the owner. If viewed in one light, then the imposition of the tax on the owner of the carriage, because of his ownership, necessarily constituted a direct tax under the rule as laid down by economists. So, also, the imposition of a burden of taxation on the owner for the use by him of his own carriage made the tax direct according to the same rule. The tax having been imposed without apportionment, it follows that those who voted for its enactment must have given to the word direct, in the Constitution, a different significance from that which is affixed to it by the economists referred to.

The validity of this carriage tax was considered by this court in *Hylton* v. *The United States*, 3 Dall. 171. Chief Justice Ellsworth and Mr. Justice Cushing took no part in

the decision. Mr. Justice Wilson stated that he had, in the Circuit Court of Virginia, expressed his opinion in favor of the constitutionality of the tax. Mr. Justice Chase, Mr. Justice Paterson, and Mr. Justice Iredell each expressed the reasons for his conclusions. The tax though laid, as I have said, on the carriage, was held not to be a direct tax under the Constitution. Two of the judges who sat in that case (Mr. Justice Paterson and Mr. Justice Wilson) had been distinguished members of the constitutional convention. Excerpts from the observations of the justices are given in the opinion of the court. Mr. Justice Paterson, in addition to the language there quoted, spoke as follows, p. 177 (the italics being mine):

"*I never entertained a doubt that the principal, I will not say the only, objects that the framers of the Constitution contemplated as falling within the rule of apportionment were a capitation tax and a tax on land.* Local considerations, and the particular circumstances and relative situation of the States, naturally lead to this view of the subject. The provision was made in favor of the Southern States. They possessed a large number of slaves; they had extensive tracts of territory, thinly settled, and not very productive. A majority of the States had but few slaves, and several of them a limited territory, well settled, and in a high state of cultivation. The Southern States, if no provision had been introduced in the Constitution, would have been wholly at the mercy of the other States. Congress, in such case, might tax slaves at discretion or arbitrarily, and land in every part of the Union after the same rate or measure — so much a head in the first instance and so much an acre in the second. To guard them against imposition in these particulars was the reason of introducing the clause in the Constitution, which directs that representatives and direct taxes shall be apportioned among the States according to their respective numbers."

It is evident that Mr. Justice Chase coincided with these views of Mr. Justice Paterson, though he was perhaps not quite so firmly settled in his convictions, for he said, p. 176:

"I am inclined to think, but of this I do not give a judicial

opinion, that the direct taxes contemplated by the Constitution are only two, to wit, a capitation or poll tax simply, without regard to property, profession, or any other circumstances, and the tax on land. I doubt whether a tax by a general assessment of personal property within the United States is included within the term 'direct tax.'"

Mr. Justice Iredell certainly entertained similar views, since he said, p. 183:

"Some difficulties may occur which we do not at present foresee. Perhaps a direct tax in the sense of the Constitution can mean nothing but a tax on something inseparably annexed to the soil; something capable of apportionment under all such circumstances. A land or poll tax may be considered of this description . . . In regard to other articles there may possibly be considerable doubt."

These opinions strongly indicate that the real convictions of the justices were that only capitation taxes and taxes on land were direct within the meaning of the Constitution, but they doubted whether some other objects of a kindred nature might not be embraced in that word. Mr. Justice Paterson had no doubt whatever of the limitation, and Justice Iredell's doubt seems to refer only to things which were inseparably connected with the soil, and which might therefore be considered, in a certain sense, as real estate.

That case, however, established that a tax levied without apportionment on an object of personal property was not a "direct tax" within the meaning of the Constitution. There can be no doubt that the enactment of this tax and its interpretation by the court, as well as the suggestion in the opinions delivered, that nothing was a direct tax within the meaning of the Constitution but a capitation tax and a tax on land, was all directly in conflict with the views of those who claimed at the time that the word "direct" in the Constitution was to be interpreted according to the views of economists. This is conclusively shown by Mr. Madison's language. He asserts not only that the act had been passed contrary to the Constitution, but that the decision of the court was likewise in violation of that instrument. Ever since the announce-

ment of the decision in that case the legislative department of the government has accepted the opinions of the justices as well as the decision itself as conclusive in regard to the meaning of the word "direct," and it has acted upon that assumption in many instances and always with Executive endorsement. All the acts passed levying direct taxes confined them practically to a direct levy on land. True in some of these acts a tax on slaves was included, but this inclusion, as has been said by this court, was probably based upon the theory that these were in some respects taxable along with the land, and, therefore, their inclusion indicated no departure by Congress from the meaning of the word "direct," necessarily resulting from the decision in the *Hylton case*, and which, moreover, had been expressly elucidated and suggested as being practically limited to capitation taxes and taxes on real estate by the justices who expressed opinions in that case.

These acts imposing direct taxes having been confined in their operation exclusively to real estate and slaves, the subject-matters indicated as the proper object of direct taxation in the *Hylton case*, are the strongest possible evidence that this suggestion was accepted as conclusive and had become a settled rule of law. Some of these acts were passed at times of great public necessity when revenue was urgently required. The fact that no other subjects were selected for the purposes of direct taxation, except those which the judges in the *Hylton case* had suggested as appropriate therefor, seems to me to lead to a conclusion which is absolutely irresistible — that the meaning thus affixed to the word "direct" at the very formation of the government was considered as having been as irrevocably determined, as if it had been written in the Constitution in express terms. As I have already observed, every authoritative writer who has discussed the Constitution from that date down to this has treated this judicial and legislative ascertainment of the meaning of the word "direct" in the Constitution as giving it a constitutional significance without reference to the theoretical distinction between "direct" and "indirect," made by some economists prior to the Constitution, or since. This doc-

trine has become a part of the horn-book of American constitutional interpretation, has been taught as elementary in all the law schools, and has never since then been anywhere authoritatively questioned. Of course, the text-books may conflict in some particulars, or indulge in reasoning not always consistent, but as to the effect of the decision in the *Hylton case*, and the meaning of the word "direct," in the Constitution, resulting therefrom, they are a unit.  I quote briefly from them.

Chancellor Kent, in his Commentaries thus states the principle:

"The construction of the powers of Congress relative to taxation was brought before the Supreme Court, in 1796, in the case of *Hylton* v. *The United States.*  By the act of 5th June, 1794, Congress laid a duty upon carriages for the conveyance of persons, and the question was whether this was a *direct* tax, within the meaning of the Constitution.  If it was not a direct tax, it was admitted to be rightly laid, under that part of the Constitution which declares that all duties, imposts, and excises shall be uniform throughout the United States; but if it was a direct tax it was not constitutionally laid, for it must then be laid according to the census, under that part of the Constitution which declares that direct taxes shall be apportioned among the several States according to numbers.  The Circuit Court in Virginia was divided in opinion on the question, but on appeal to the Supreme Court it was decided that the tax on carriages was not a direct tax, within the letter or meaning of the Constitution, and was therefore constitutionally laid.

"The question was deemed of very great importance, and was elaborately argued.  It was held that a general power was given to Congress to lay and collect taxes of every kind or nature, without any restraint.  They had plenary power over every species of taxable property, except exports.  But there were two rules prescribed for their government: the rule of uniformity, and the rule of apportionment.  Three kinds of taxes, viz., duties, imposts, and excises, were to be laid by the first rule; and capitation, and other direct taxes, by the second rule.  If there were any other species of taxes, as the

court seemed to suppose there might be, that were not direct, and not included within the words duties, imposts, or excises, they were to be laid by the rule of uniformity or not, as Congress should think proper and reasonable.

"The Constitution contemplated no taxes as direct taxes, but such as Congress could lay in proportion to the census; and the rule of apportionment could not reasonably apply to a tax on carriages, nor could the tax on carriages be laid by that rule without very great inequality and injustice. If two states, equal in census, were each to pay 8000 dollars by a tax on carriages, and in one state there were 100 carriages and in another 1000, the tax on each carriage would be ten times as much in one state as in the other.   While A, in the one state, would pay for his carriage eight .dollars, B, in the other state, would pay for his carriage eighty dollars. In this way it was shown by the court that the notion that a tax on carriages was a direct tax within the purview of the Constitution, and to be apportioned according to the census, would lead to the grossest abuse and oppression.   This argument was conclusive against the construction set up, and the tax on carriages was considered as included within the power to lay duties; and the better opinion seemed to be that the direct taxes contemplated by the Constitution were only two, viz., a capitation or poll tax and a tax on land." 1 Kent Com. 254, 56.

Story, speaking on the same subject, 1 Story Const. § 955, says: "Taxes on lands, houses, and other permanent real estate, or on parts or appurtenances thereof, have always been deemed of the same character, that is, direct taxes.   It has been seriously doubted if, in the sense of the Constitution, any taxes are direct taxes, except those on polls or on lands. Mr. Justice Chase, in *Hylton* v. *United States*, 3 Dall. 171, said: 'I am inclined to think that the direct taxes contemplated by the Constitution are only two, viz: a capitation or poll tax simply, without regard to property, profession, or other circumstances, and a tax on land.   I doubt whether a tax by a general assessment of personal property within the United States is included within the term "direct tax."' Mr. Justice Paterson in the same case said: ·It is not necessary to deter-

mine whether a tax on the produce of land be a direct or an indirect tax. Perhaps the immediate product of land, in its original and crude state, ought to be considered as a part of the land itself. When the produce is converted into a manufacture, it assumes a new shape, etc. Whether "direct taxes," in the sense of the Constitution, comprehend any other tax than a capitation tax, or a tax on land, is a questionable point, etc. I never entertained a doubt that the principal, I will not say the only, objects that the framers of the Constitution contemplated, as falling within the rule of apportionment, were a capitation tax and a tax on land.' And he proceeded to state that the rule of apportionment, both as regards representatives and as regards direct taxes, was adopted to guard the Southern States against undue impositions and oppressions in the taxing of slaves. Mr. Justice Iredell in the same case, said: 'Perhaps a direct tax, in the sense of the Constitution, can mean nothing but a tax on something inseparably annexed to the soil; something capable of apportionment under all such circumstances. A land or poll tax may be considered of this description. The latter is to be considered so, particularly under the present Constitution, on account of the slaves in the Southern States, who give a ratio in the representation in the proportion of three to five. Either of these is capable of an apportionment. In regard to other articles, there may possibly be considerable doubt.' The reasoning of the Federalist seems to lead to the same result."

Cooley, in his work on Constitutional Limitations, 595, 5th ed., marginal paging *480, thus tersely states the rule: " Direct taxes, when laid by Congress, must be apportioned among the several States according to the representative population. The term ' direct taxes ' as employed in the Constitution has a technical meaning, and embraces capitation and land taxes only."

Miller on the Constitution, 237, thus puts it: " Under the provisions already quoted the question came up as to what is a ' direct tax,' and also upon what property it is to be levied, as distinguished from any other tax. In regard to this it is sufficient to say that it is believed that no other than a capitation tax of so much per head and a land tax is a direct tax

within the meaning of the Constitution of the United States. All other taxes, except imposts, are properly called excise taxes. Direct taxes, within the meaning of the Constitution, are only capitation taxes, as expressed in that instrument, and taxes on real estate."

In Pomeroy's Constitutional Law (§ 281) we read as follows:

"It becomes necessary, therefore, to inquire a little more particularly: What are direct and what indirect taxes? Few cases on the general question of taxation have arisen and been decided by the Supreme Court for the simple reason that, until the past few years, the United States has generally been able to obtain all needful revenue from the single source of duties upon imports. There can be no doubt, however, that all the taxes provided for in the internal revenue acts now in operation are indirect.

"This subject came before the Supreme Court of the United States in a very early case, *Hylton* v. *The United States.* In the year 1794 Congress laid a tax of ten dollars on all carriages, and the rate was thus made uniform. The validity of the statute was disputed; it was claimed that the tax was direct and should have been apportioned among the states. The court decided that this tax was not direct. The reasons given for the decision are unanswerable, and would seem to cover all the provisions of the present internal revenue laws."

Hare, in his treatise on American Constitutional Law (vol. 1, pp. 249, 250), is to the like effect: "Agreeably to section 9 of article I, paragraph 4, 'no capitation or other direct tax shall be laid except in proportion to the census or enumeration hereinbefore directed to be taken;' while section 3 of the same article requires that representation and direct taxes shall be apportioned among the several States . . . according to their respective numbers. Direct taxes in the sense of the Constitution are poll taxes and taxes on land."

Burroughs on Taxation (p. 502) takes the same view: "*Direct taxes* — The kinds of taxation authorized are both direct and indirect. The construction given to the expression 'direct taxes,' is that it includes only a tax on land and a poll

tax, and this is in accord with the views of writers upon political economy."

Ordronaux, in his Constitutional Legislation, (p. 225), says:

"Congress having been given the power 'to lay and collect taxes, duties, imposts, and excises,' the above three provisions are limitations upon the exercise of this authority:

"1st. By distinguishing between direct and indirect taxes as to their mode of assessment;

"2d. By establishing a permanent freedom of trade between the States; and

"3d. By prohibiting any discrimination in favor of particular States, through revenue laws establishing a preference between their ports and those of the others.

"These provisions should be read together, because they are at the foundation of our system of national taxation.

"The two rules prescribed for the government of Congress in laying taxes are those of apportionment for direct taxes and uniformity for indirect. In the first class are to be found capitation or poll taxes and taxes on land; in the second, duties, imposts, and excises. . . .

"The provision relating to capitation taxes was made in favor of the Southern States, and for the protection of slave property. While they possessed a large number of persons of this class, they also had extensive tracts of sparsely settled and unproductive lands. At the same time an opposite condition, both as to land-territory and population, existed in a majority of the other States. Were Congress permitted to tax slaves and land in all parts of the country at a uniform rate, the Southern Slave States must have been placed at a great disadvantage. Hence, and to guard against this inequality of circumstances, there was introduced into the Constitution the further provision that 'representatives and direct taxes shall be apportioned among the States according to their respective numbers.' This changed the basis of direct taxation from a strictly monetary standard, which could not, equitably, be made uniform throughout the country, to one resting upon population, as the measure of representation. But for this Congress might have taxed slaves arbitrarily and

at its pleasure as so much property, and land uniformly throughout the Union regardless of differences in productiveness. It is not strange, therefore, that in *Hylton* v. *United States* the court said that ' the rule of apportionment is radically wrong, and cannot be supported by any solid reasoning. It ought not, therefore, to be extended by construction. Apportionment is an operation on States and involves valuations and assessments which are arbitrary, and should not be resorted to but in case of necessity.'

" Direct taxes being now well settled in their meaning, a tax on carriages left for the use of the owner is not a capitation tax ; nor a tax on the business of an insurance company ; nor a tax on a bank's circulation ; nor a tax on income ; nor a succession tax. The foregoing are not, properly speaking, direct taxes within the meaning of the Constitution, but excise taxes or duties."

Black, writing on Constitutional Law, says : " But the chief difficulty has arisen in determining what is the difference between direct taxes and such as are indirect. In general usage, and according to the terminology of political economy, a direct tax is one which is levied upon the person who is to pay it, or upon his land or personalty, or his business or income, as the case may be. An indirect tax is one assessed upon the manufacturer or dealer in the particular commodity, and paid by him ; but which really falls upon the consumer, since it is added to the market price of the commodity which he must pay. But the course of judicial decision has determined that the term ' direct,' as here applied to taxes, is to be taken in a more restricted sense. The Supreme Court has ruled 'that only land taxes and capitation taxes are ' direct ' and no others. In 1794 Congress levied a tax of ten dollars on all carriages kept for use, and it was held that this was not a direct tax. And so also an income tax is not to be considered direct. Neither is a tax on the circulation of state banks, nor a succession tax, imposed upon every ' devolution of title to real estate.' " Opinions cited on page 162.

Not only have the other departments of the government accepted the significance attached to the word " direct " in the

*Hylton case* by their actions as to direct taxes, but they have also relied on it as conclusive in their dealings with indirect taxes by levying them solely upon objects which the judges in that case declared were not objects of direct taxation. Thus the affirmance by the Federal legislature and executive of the doctrine established as a result of the *Hylton case* has been twofold.

From 1861 to 1870 many laws levying taxes on income were enacted, as follows: Act of August 5, 1861, c. 45, 12 Stat. 292, 309, 311; Act of July 1, 1862, c. 119, 12 Stat. 432, 473, 475; Act of March 3, 1863, c. 74, 12 Stat. 713, 718, 723; Act of June 30, 1864, c. 173, 13 Stat. 223, 281, 285; Act of March 3, 1865, c. 78, 13 Stat. 469, 479, 481; Act of March 10, 1866, c. 15, 14 Stat. 4, 5; Act of July 13, 1866, c. 184, 14 Stat. 98, 137, 140; Act of March 2, 1867, c. 169, 14 Stat. 471, 477, 480; Act of July 14, 1870, c. 255, 16 Stat. 256, 261.

The statutes above referred to all cover income and every conceivable source of revenue from which it could result — rentals from real estate, products of personal property, the profits of business or professions.

The validity of these laws has been tested before this court. The first case on the subject was that of the *Pacific Insurance Company* v. *Soule*, 7 Wall. 433, 443. The controversy in that case arose under the ninth section of the act of July 13, 1866, 14 Stat. 137, 140, which imposed a tax on "all dividends in scrip and money, thereafter declared due, wherever and whenever the same shall be payable, to stockholders, policy holders, or depositors or parties whatsoever, including non-residents whether citizens or aliens, as part of the earnings, incomes, or gains of any bank, trust company, savings institution, and of any fire, marine, life, or inland insurance company, either stock or mutual, under whatever name or style known or called in the United States or Territories, whether specially incorporated or existing under general laws, and on all undistributed sum or sums made or added during the year to their surplus or contingent funds."

It will be seen that the tax imposed was levied on the income of insurance companies as a unit, including every possible

source of revenue, whether from personal or real property, from business gains or otherwise. The case was presented here on a certificate of division of opinion below. One of the questions propounded was " whether the taxes paid by the plaintiff and sought to be recovered in this action are not direct taxes within the meaning of the Constitution of the United States?" The issue, therefore, necessarily brought before this court was whether an act imposing an income tax on every possible source of revenue was valid or invalid. The case was carefully, ably, elaborately, and learnedly argued. The brief on behalf of the company, filed by Mr. Wills, was supported by another signed by Mr. W. O. Bartlett, which covered every aspect of the contention. It rested the weight of its argument against the statute on the fact that it included the rents of real estate among the sources of income taxed, and therefore put a direct tax upon the land. Able as have been the arguments at bar in the present case, an examination of those then presented will disclose the fact that every view here urged was there pressed upon the court with the greatest ability, and after exhaustive research, equalled but not surpassed by the eloquence and learning which has accompanied the presentation of this case. Indeed, it may be said that the principal authorities cited and relied on now can be found in the arguments which were then submitted. It may be added that the case on behalf of the government was presented by Attorney General Evarts.

The court answered all the contentions by deciding the generic question of the validity of the tax, thus passing necessarily upon every issue raised, as the whole necessarily includes every one of its parts. I quote the reasoning applicable to the matter now in hand:

" The sixth question is : ' Whether the taxes paid by the plaintiff, and sought to be recovered back in this action, are not *direct taxes*, within the meaning of the Constitution of the United States.' In considering this subject it is proper to advert to the several provisions of the Constitution relating to taxation by Congress. ' Representatives and direct taxes shall be apportioned among the several States which shall be in-

cluded in this Union according to their respective numbers,' etc. 'Congress shall have power to lay and collect taxes, duties, imposts, and excises, to pay the debts and provide for the common defence and general welfare of the United States; but all duties, imposts, and excises shall be uniform throughout the United States.' 'No capitation or other direct tax shall be laid, unless in proportion to the census or enumeration hereinbefore directed to be taken.' 'No tax or duty shall be laid on articles exported from any State.'

" These clauses contain the entire grant of the taxing power by the organic law, with the limitations which that instrument imposes.

" The national government, though supreme within its own sphere, is one of limited jurisdiction and specific functions. It has no faculties but such as the Constitution has given it, either expressly or incidentally by necessary intendment. Whenever any act done under its authority is challenged, the proper sanction must be found in its charter, or the act is *ultra vires* and void. This test must be applied in the examination of the question before us. If the tax to which it refers is a 'direct tax,' it is clear that it has not been laid in conformity to the requirements of the Constitution. It is, therefore, necessary to ascertain to which of the categories named in the eighth section of the first article it belongs.

" What are *direct taxes* was elaborately argued and considered by this court in *Hylton* v. *United States*, decided in the year 1796. One of the members of the court, Justice Wilson, had been a distinguished member of the convention which framed the Constitution. It was unanimously held by the four justices who heard the argument that a tax upon carriages kept by the owner for his own use was not a *direct tax*. Justice Chase said : ' I am inclined to think, but of this I do not give a judicial opinion, that the direct taxes contemplated by the Constitution are only two, to wit, a capitation or poll tax simply, without regard to property, profession, or any other circumstances, and a tax on land.' Paterson, Justice, followed in the same line of remark. He said: 'I never entertained a doubt that the principal — I will not say

the only — object the framers of the Constitution contemplated as falling within the rule of apportionment was a capitation tax or a tax on land. . . . The Constitution declares that a capitation tax is a direct tax; and both in theory and practice a tax on land is deemed to be a direct tax. In this way the terms "direct taxes" and "capitation and other direct taxes" are satisfied.'

"The views expressed in this case are adopted by Chancellor Kent and Justice Story, in their examination of the subject. Duties are defined by Tomlin to be things due and recoverable by law. The term, in its widest signification, is hardly less comprehensive than 'taxes.' It is applied, in its most restricted meaning, to customs ; and in that sense is nearly the synonym of 'imposts.'

"Impost is a duty on imported goods and merchandise. In a larger sense, it is any tax or imposition. Cowell says it is distinguished from custom, 'because custom is rather the profit which the prince makes on goods shipped out.' Mr. Madison considered the terms 'duties' and 'imposts' in these clauses as synonymous. Judge Tucker thought 'they were probably intended to comprehend every species of tax or contribution not included under the ordinary terms, "taxes and excises."''

"Excise is defined to be an inland imposition, sometimes upon the consumption of the commodity, and sometimes upon the retail sale; sometimes upon the manufacturer, and sometimes upon the vendor.

"The taxing power is given in the most comprehensive terms. The only limitations imposed are : That *direct taxes*, including the capitation tax, shall be apportioned; that duties, imposts, and excises shall be uniform ; and that no duties shall be imposed upon articles exported from any State. With these exceptions, the exercise of the power is, in all respects, unfettered.

"If a tax upon carriages, kept for his own use by the owner, is not a direct tax, we can see no ground upon which a tax upon the business of an insurance company can be held to belong to that class of revenue charges.

"It has been held that Congress may require direct taxes to

be laid and collected in the Territories as well as in the States.

"The consequences which would follow the apportionment of the tax in question among the States and Territories of the Union, in the manner prescribed by the Constitution, must not be overlooked. They are very obvious. Where such corporations are numerous and rich, it might be light; where none exist, it could not be collected; where they are few and poor, it would fall upon them with such weight as to involve annihilation. It cannot be supposed that the framers of the Constitution intended that any tax should be apportioned, the collection of which on that principle would be attended with such results. The consequences are fatal to the proposition.

"To the question under consideration it must be answered, that the tax to which it relates is not a direct tax, but a duty or excise; that it was obligatory on the plaintiff to pay it.

"The other questions certified up are deemed to be sufficiently answered by the answers given to the first and sixth questions."

This opinion, it seems to me, closes the door to discussion in regard to the meaning of the word "direct" in the Constitution, and renders unnecessary a resort to the conflicting opinions of the framers, or to the theories of the economists. It adopts that construction of the word which confines it to capitation taxes and a tax on land, and necessarily rejects the contention that that word was to be construed in accordance with the economic theory of shifting a tax from the shoulders of the person upon whom it was immediately levied to those of some other person. This decision, moreover, is of great importance because it is an authoritative reaffirmance of the *Hylton case*, and an approval of the suggestions there made by the justices, and constitutes another sanction given by this court to the interpretation of the Constitution adopted by the legislative, executive, and judicial departments of the government, and thereafter continuously acted upon.

Not long thereafter, in *Veazie Bank* v. *Fenno*, 8 Wall. 533, 541, 546, the question of the application of the word "direct" was again submitted to this court. The issue there was whether a tax on the circulation of state banks was "direct" within

the meaning of the Constitution. It was ably argued by the most distinguished counsel; Reverdy Johnson and Caleb Cushing representing the bank, and Attorney General Hoar the United States. The brief of Mr. Cushing again presented nearly every point now urged upon our consideration. It cited copiously from the opinions of Adam Smith and others. The constitutionality of the tax was maintained by the government on the ground that the meaning of the word "direct" in the Constitution, as interpreted by the *Hylton case*, as enforced by the continuous legislative construction, and as sanctioned by the consensus of opinion already referred to, was finally settled. Those who assailed the tax there urged, as is done here, that the *Hylton case* was not conclusive, because the only question decided was the particular matter at issue, and insisted that the suggestions of the judges were mere *dicta*, and not to be followed. They said that *Hylton* v. *United States* adjudged one point alone, which was that a tax on a carriage was not a direct tax, and that from the utterances of the judges in the case it was obvious that the general question of what was a direct tax was but crudely considered. Thus the argument there presented to this court the very view of the *Hylton case* which has been reiterated in the argument here, and which is sustained now. What did this court say then, speaking through Chief Justice Chase, as to these arguments? I take very fully from its opinion:

" Much diversity of opinion has always prevailed upon the question, what are direct taxes? Attempts to answer it by reference to the definitions of political economists have been frequently made, but without satisfactory results. The enumeration of the different kinds of taxes which Congress was authorized to impose was probably made with very little reference to their speculations. The great work of Adam Smith, the first comprehensive treatise on political economy in the English language, had then been recently published; but in this work, though there are passages which refer to the characteristic difference between direct and indirect taxation, there is nothing which affords any valuable light on the use of the words 'direct taxes' in the Constitution.

" We are obliged, therefore, to resort to historical evidence, and to seek the meaning of the words in the use and in the opinion of those whose relations to the government, and means of knowledge, warranted them in speaking with authority.

" And considered in this light, the meaning and application of the rule, as to direct taxes, appears to us quite clear.

" It is, as we think, distinctly shown in every act of Congress on the subject.

" In each of these acts, a gross sum was laid upon the United States, and the total amount was apportioned to the several States according to their respective numbers of inhabitants, as ascertained by the last preceding census. Having been apportioned, provision was made for the imposition of the tax upon the subjects specified in the act, fixing its total sum.

" In 1798, when the first direct tax was imposed, the total amount was fixed at two millions of dollars; in 1813, the amount of the second direct tax was fixed at three millions; in 1815, the amount of the third at six millions, and it made an annual tax; in 1816, the provision making the tax annual was repealed by the repeal of the first section of the act of 1815, and the total amount was fixed for that year at three millions of dollars. No other direct tax was imposed until 1861, when a direct tax of twenty millions of dollars was laid and made annual; but the provision making it annual was suspended, and no tax, except that first laid, was ever apportioned. In each instance, the total sum was apportioned among the States, by the constitutional rule, and was assessed at prescribed rates on the subjects of the tax. These subjects, in 1798, 1813, 1815, 1816, were lands, improvements, dwelling houses, and slaves, and in 1861 lands, improvements, and dwelling houses only. Under the act of 1798 slaves were assessed at fifty cents on each; under the other acts, according to valuation by assessors.

" This review shows that personal property, contracts, occupations, and the like have never been regarded by Congress as proper subjects of direct tax. It has been supposed that slaves must be considered as an exception to this observation. But the exception is rather apparent than real. As persons, slaves

were proper subjects of a capitation tax, which is described in the Constitution as a direct tax; as property they were, by the laws of some, if not most, of the States classed as real property, descendible to heirs.  Under the first view they would be subject to the tax of 1798, as a capitation tax; under the latter, they would be subject to the taxation of the other years as realty.  That the latter view was that taken by the framers of the acts, after 1798, becomes highly probable, when it is considered that, in the States where slaves were held, much of the value which would otherwise have attached to land passed into the slaves.  If, indeed, the land only had been valued without the slaves, the land would have been subject to much heavier proportional imposition in those States than in States where there were no slaves; for the proportion of tax imposed on each State was determined by population, without reference to the subjects on which it was to be assessed.

" The fact, then, that slaves were valued, under the acts referred to, far from showing, as some have supposed, that Congress regarded personal property as a proper object of direct taxation under the Constitution, shows only that Congress, after 1798, regarded slaves, for the purposes of taxation, as realty.

" It may be rightly affirmed, therefore, that in the practical construction of the Constitution by Congress direct taxes have been limited to taxes on land and appurtenances and taxes on polls or capitation taxes.

" And this construction is entitled to great consideration, especially in the absence of anything adverse to it in the discussions of the convention which framed and of the conventions which ratified the Constitution.   . . .

" This view received the sanction of this court two years before the enactment of the first law imposing direct taxes *eo nomine.*"

The court then reviews the *Hylton case*, repudiates the attack made upon it, reaffirms the construction placed on it by the legislative, executive, and judicial departments, and expressly adheres to the ruling in the insurance company case, to which I have referred.  Summing up, it said:

"It follows necessarily that the power to tax without apportionment extends to all other objects. Taxes on other objects are included under the heads of taxes not direct, duties, imposts, and excises, and must be laid and collected by the rule of uniformity. The tax under consideration is a tax on bank circulation, and may very well be classed under the head of duties. Certainly it is not, in the sense of the Constitution, a direct tax. It may be said to come within the same category of taxation as the tax on incomes of insurance companies, which this court, at the last term, in the case of *Pacific Insurance Company* v. *Soule*, held not to be a direct tax."

This case was, so far as the question of direct taxation is concerned, decided by an undivided court; for, although Mr. Justice Nelson dissented from the opinion, it was not on the ground that the tax was a direct tax, but on another question.

Some years after this decision the matter again came here for adjudication, in the case of *Scholey* v. *Rew,* 23 Wall. 331, 346. The issue there involved was the validity of a tax placed by a United States statute on the right to take real estate by inheritance. The collection of the tax was resisted on the ground that it was direct. The brief expressly urged this contention, and said the tax in question was a tax on land, if ever there was one. It discussed the *Hylton case*, referred to the language used by the various judges, and sought to place upon it the construction which we are now urged to give it, and which has been so often rejected by this court.

This court again by its unanimous judgment answered all these contentions. I quote its language:

"Support to the first objection is attempted to be drawn from that clause of the Constitution which provides that direct taxes shall be apportioned among the several States which may be included within the Union, according to their respective numbers; and also from the clause which provides that no capitation or other direct tax shall be laid unless in proportion to the census or amended enumeration; but it is clear that the tax or duty levied by the act under consideration is not a direct tax within the meaning of either of those

provisions. Instead of that it is plainly an excise tax or duty, authorized by section eight of article one, which vests the power in Congress to lay and collect taxes, duties, imposts, and excises, to pay the debts, and provide for the common defence and general welfare. . . .

"Indirect taxes, such as duties of impost and excises and every other description of the same, must be uniform, and direct taxes must be laid in proportion to the census or enumeration as remodelled in the Fourteenth Amendment. Taxes on lands, houses, and other permanent real estate have always been deemed to be direct taxes, and capitation taxes, by the express words of the Constitution, are within the same category, but it never has been decided that any other legal exactions for the support of the Federal government fall within the condition that unless laid in proportion to numbers the assessment is invalid.

"Whether direct taxes, in the sense of the Constitution, comprehend any other tax than a capitation tax and a tax on land is a question not absolutely decided, nor is it necessary to determine it in the present case, as it is expressly decided that the term does not include the tax on income which cannot be distinguished in principle from a succession tax such as the one involved in the present controversy."

What language could more clearly and forcibly reaffirm the previous rulings of the court upon this subject? What stronger endorsement could be given to the construction of the Constitution, which had been given in the *Hylton case,* and which had been adopted and adhered to by all branches of the government, almost from the hour of its establishment? It is worthy of note that the court here treated the decision in the *Hylton case* as conveying the view that the only direct taxes were "taxes on land and appurtenance." In so doing it necessarily again adopted the suggestion of the justices there made, thus making them the adjudged conclusions of this court. It is too late now to destroy the force of the opinions in that case by qualifying them as mere *dicta* when they have again and again been expressly approved by this court.

If there were left a doubt as to what this established con-

struction is, it seems to be entirely removed by the case of *Springer* v. *United States*, 102 U. S. 586, 602. Springer was assessed for an income tax on his professional earnings and on the interest on United States bonds. He declined to pay. His real estate was sold in consequence. The suit involved the validity of the tax, as a basis for the sale. Again every question now presented was urged upon this court. The brief of the plaintiff in error, Springer, made the most copious references to the economic writers, Continental and English. It cited the opinions of the framers of the Constitution. It contained extracts from the journals of the convention, and marshalled the authorities in extensive and impressive array. It reiterated the argument against the validity of an income tax which included rentals. It is also asserted that the *Hylton case* was not authority, because the expressions of the judges, in regard to anything except the carriage tax, were mere *dicta*.

The court adhered to the ruling announced in the previous cases and held that the tax was not direct within the meaning of the Constitution. It reëxamined and answered everything advanced here, and said, in summing up the case:

"Our conclusions are that *direct taxes*, within the meaning of the Constitution, are only capitation taxes, as expressed in that instrument, and taxes on real estate; and that the tax of which the plaintiff in error complained is within the category of an excise or duty."

The facts, then, are briefly these: At the very birth of the government a contention arose as to the meaning of the word "direct." The controversy was determined by the legislative and executive departments of the government. Their action came to this court for review, and it was approved. Every judge of this court who expressed an opinion, made use of language which clearly showed that he thought the word "direct" in the Constitution applied only to capitation taxes and taxes directly on land. Thereafter the construction thus given was accepted everywhere as definitive. The matter came again and again to this court, and in every case the original ruling was adhered to. The suggestions made in the *Hylton case* were adopted here, and,

in the last case here . decided, reviewing all the others, this court said that direct taxes within the meaning of the Constitution were only taxes on land and capitation taxes. And now, after a hundred years, after long-continued action by other departments of the government, and after repeated adjudications of this court, this interpretation is overthrown, and the Congress is declared not to have a power of taxation which may at some time, as it has in the past, prove necessary to the very existence of the government. By what process of reasoning is this to be done? By resort to theories, in order to construe the word "direct" in its economic sense, instead of in accordance with its meaning in the Constitution, when the very result of the history which I have thus briefly recounted is to show that the economic construction of the word was repudiated by the framers themselves, and has been time and time again rejected by this court; by a resort to the language of the framers and a review of their opinions, although the facts plainly show that they themselves settled the question which the court now virtually unsettles. In view of all that has taken place and of the many decisions of this court, the matter at issue here ought to be regarded as closed forever.

The injustice and harm which must always result from overthrowing a long and settled practice sanctioned by the decisions of this court, could not be better illustrated than by the example which this case affords. Under the income tax laws which prevailed in the past for many years, and which covered every conceivable source of income, rentals from real estate, and everything else, vast sums were collected from the people of the United States. The decision here rendered announces that those sums were wrongfully taken, and thereby, it seems to me, creates a claim in equity and good conscience against the government for an enormous amount of money. Thus, from the change of view by this court, it happens that an act of Congress, passed for the purpose of raising revenue, in strict conformity with the practice of the government from the earliest time and in accordance with the oft-repeated decisions of this court, furnishes the

occasion for creating a claim against the government for hundreds of millions of dollars; I say, creating a claim, because if the government be in good conscience bound to refund that which has been taken from the citizen in violation of the Constitution, although the technical right may have disappeared by lapse of time, or because the decisions of this court have misled the citizen to his grievous injury, the equity endures, and will present itself to the conscience of the government. This consequence shows how necessary it is that the court should not overthrow its past decisions. A distinguished writer aptly points out the wrong which must result to society from a shifting judicial interpretation. He says:

"If rules and maxims of law were to ebb and flow with the taste of the judge, or to assume that shape which in his fancy best becomes the times; if the decisions of one case were not to be ruled by, or depend at all upon former determinations in other cases of a like nature, I should be glad to know what person would venture to purchase an estate without first having the judgment of a court of justice respecting the identical title which he means to purchase? No reliance could be had upon precedents; former resolutions upon titles of the same kind could afford him no assurance at all. Nay, even a decision of a court of justice upon the very identical title would be nothing more than a precarious temporary security; the principle upon which it was founded might, in the course of a few years become antiquated; the same title might be again drawn into dispute; the taste and fashion of the times might be improved, and on that ground a future judge might hold himself at liberty (if not consider it his duty) to pay as little regard to the maxims and decisions of his predecessor as that predecessor did to the maxims and decisions of those who went before him." Fearne on Contingent Remainders, London ed. 1801, p. 264.

The disastrous consequences to flow from disregarding settled decisions thus cogently described must evidently become greatly magnified in a case like the present, when the opinion of the court affects fundamental principles of the government by denying an essential power of taxation

long conceded to exist and often exerted by Congress. If it was necessary that the previous decisions of this court should be repudiated, the power to amend the Constitution existed and should have been availed of. Since the *Hylton case* was decided the Constitution has been repeatedly amended. The construction which confined the word "direct" to capitation and land taxes was not changed by these amendments, and it should not now be reversed by what seems to me to be a judicial amendment of the Constitution.

The finding of the court in this case, that the inclusion of rentals from real estate in an income tax makes it direct to that extent is, in my judgment, conclusively denied by the authorities, to which I have referred, and which establish the validity of an income tax in itself. Hence, I submit, the decision necessarily reverses the settled rule which it seemingly adopts in part. Can there be serious doubt that the question of the validity of an income tax, in which the rentals of real estate are included, is covered by the decisions which say that an income tax is generically indirect, and that therefore it is valid without apportionment? I mean, of course, could there be any such doubt were it not for the present opinion of the court? Before undertaking to answer this question I deem it necessary to consider some arguments advanced or suggestions made.

1st. The opinions of Turgot and Smith and other economists are cited, and it is said their views were known to the framers of the Constitution ; and we are then referred to the opinions of the framers themselves. The object of the collocation of these two sources of authority is to show that there was a concurrence between them as to the meaning of the word "direct." But, in order to reach this conclusion, we are compelled to overlook the fact that this court has always held, as appears from the preceding cases, that the opinions of the economists threw little or no light on the interpretation of the word "direct" as found in the Constitution. And the whole effect of the decisions of this court is to establish the proposition that the word has a different significance in the Constitution from that which Smith and Turgot have given to it when used in a general economic sense. Indeed, it seems to me

that the conclusion deduced from this line of thought itself demonstrates its own unsoundness. What is that conclusion? That the framers well understood the meaning of "direct."

Now, it seems evident that the framers, who well understood the meaning of this word, have themselves declared in the most positive way that it shall not be here construed in the sense of Smith and Turgot. The Congress which passed the carriage-tax act was composed largely of men who had participated in framing the Constitution. That act was approved by Washington, who had presided over the deliberations of the convention. Certainly Washington himself, and the majority of the framers, if they well understood the sense in which the word "direct" was used, would have declined to adopt and approve a taxing act, which clearly violated the provisions of the Constitution, if the word "direct" as therein used, had the meaning which must be attached to it, if read by the light of the theories of Turgot and Adam Smith. As has already been noted, all the judges who expressed opinions in the *Hylton case* suggested that "direct," in the constitutional sense, referred only to taxes on land and capitation taxes. Could they have possibly made this suggestion if the word had been used as Smith and Turgot used it? It is immaterial whether the suggestions of the judges were *dicta* or not. They could not certainly have made this intimation, if they understood the meaning of the word "direct," as being that which it must have imported if construed according to the writers mentioned. Take the language of Mr. Justice Paterson : "*I never entertained a doubt that the principal, I will not say the only, objects that the framers of the Constitution contemplated as falling within the rule of apportionment were a capitation tax and a tax on land.*" He had borne a conspicuous part in the convention. Can we say that he understood the meaning of the framers, and yet after the lapse of a hundred years, fritter away that language, uttered by him from this bench in the first great case in which this court was called upon to interpret the meaning of the word "direct?" It cannot be said that his language was used carelessly or without a knowledge of its great import. The debate upon the passage

of the carriage-tax act had manifested divergence of opinion as to the meaning of the word "direct." The magnitude of the issue is shown by all contemporaneous authority to have been deeply felt and its far-reaching consequence was appreciated. Those controversies came here for settlement and were then determined with a full knowledge of the importance of the issues. They should not be now reopened.

The argument, then, it seems to me, reduces itself to this: That the framers well knew the meaning of the word "direct;" that so well understanding it they practically interpreted it in such a way as to plainly indicate that it had a sense contrary to that now given to it in the view adopted by the court. Although they thus comprehended the meaning of the word and interpreted it at an early day, their interpretation is now to be overthrown by resorting to the economists whose construction was repudiated by them. It is thus demonstrable that the conclusion deduced from the premise that the framers well understood the meaning of the word "direct," involves a fallacy. In other words, that it draws a faulty conclusion, even if the predicate upon which the conclusion is rested be fully admitted. But I do not admit the premise. The views of the framers cited in the argument conclusively show that they did not well understand, but were in great doubt as to the meaning of the word "direct." The use of the word was the result of a compromise. It was accepted as the solution of a difficulty which threatened to frustrate the hopes of those who looked upon the formation of a new government as absolutely necessary to escape the condition of weakness which the Articles of Confederation had shown. Those who accepted the compromise viewed the word in different lights and expected different results to flow from its adoption. This was the natural result of the struggle which was terminated by the adoption of the provision as to representation and direct taxes. That warfare of opinion had been engendered by the existence of slavery in some of the States, and was the consequence of the conflict of interest thus brought about. In reaching a settlement, the minds of those who acted on it were naturally concerned in the main with the cause of the

contention and not with the other things, which had been previously settled by the convention. Thus, whilst there was in all probability clearness of vision as to the meaning of the word "direct," in relation to its bearing on slave property, there was inattention in regard to other things, and there were, therefore, diverse opinions as to its proper signification. That such was the case in regard to many other clauses of the Constitution has been shown to be the case by those great controversies of the past which have been peacefully settled by the adjudications of this court. Whilst this difference undoubtedly existed, as to the effect to be given the word "direct," the consensus of the majority of the framers as to its meaning was shown by the passage of the carriage-tax act. That consensus found adequate expression in the opinions of the justices in the *Hylton case*, and in the decree of this court there rendered. The passage of that act, those opinions and that decree, settled the proposition that the word applied only to capitation taxes and taxes on land.

Nor does the fact that there was difference in the minds of the framers as to the meaning of the word "direct" weaken the binding force of the interpretation placed upon that word from the beginning. For, if such difference existed, it is certainly sound to hold that a contemporaneous solution of a doubtful question, which has been often confirmed by this court, should not now be reversed. The framers of the Constitution, the members of the earliest Congress, the illustrious man first called to the office of Chief Executive, the jurists who first sat in this court, two of whom had borne a great part in the labors of the convention, all of whom dealt with this doubtful question, surely occupied a higher vantage ground for its correct solution than do those of our day. Here then is the dilemma: if the framers understood the meaning of the word "direct" in the Constitution, the practical effect which they gave to it should remain undisturbed; if they were in doubt as to the meaning, the interpretation long since authoritatively affixed to it should be upheld.

2d. Nor do I think any light is thrown upon the question of whether the tax here under consideration is direct or indi-

rect, by referring to the principle of " taxation without representation," and the great struggle of our forefathers for its enforcement. It cannot be said that the Congress which passed this act was not the representative body fixed by the Constitution. Nor can it be contended that the struggle for the enforcement of the principle involved the contention that representation should be in exact proportion to the wealth taxed. If the argument be used in order to draw the inference that, because in this instance, the indirect tax imposed will operate differently through various sections of the country, therefore that tax should be treated as direct, it seems to me it is unsound. The right to tax, and not the effects which may follow from its lawful exercise, is the only judicial question which this court is called upon to consider. If an indirect tax, which the Constitution has not subjected to the rule of apportionment, is to be held to be a direct tax, because it will bear upon aggregations of property in different sections of the country, according to the extent of such aggregations, then the power is denied to Congress to do that which the Constitution authorizes, because the exercise of a lawful power is supposed to work out a result which, in the opinion of the court, was not contemplated by the fathers. If this be sound, then every question which has been determined in our past history is now still open for judicial reconstruction. The justness of tariff legislation has turned upon the assertion on the one hand, denied on the other, that it operated unequally on the inhabitants of different sections of the country. Those who opposed such legislation have always contended that its necessary effect was not only to put the whole burden upon one section, but also to directly enrich certain of our citizens at the expense of the rest, and thus build up great fortunes to the benefit of the few and the detriment of the many. Whether this economic contention be true or untrue is not the question. Of course, I intimate no view on the subject. Will it be said that if to-morrow the personnel of this court should be changed, it could deny the power to enact tariff legislation which has been admitted to exist in Congress from the beginning, upon the ground that such legislation beneficially affects one section or set of people

to the detriment of others, within the spirit of the Constitution, and therefore constitutes a direct tax?

3d. Nor, in my judgment, does any force result from the argument that the framers expected direct taxes to be rarely resorted to, and, as the present tax was imposed without public necessity, it should be declared void.

It seems to me that this statement begs the whole question, for it assumes that the act now before us levies a direct tax, whereas the question whether the tax is direct or not is the very issue involved in this case. If Congress now deems it advisable to resort to certain forms of indirect taxation which have been frequently, though not continuously, availed of in the past, I cannot see that its so doing affords any reason for converting an indirect into a direct tax in order to nullify the legislative will. The policy of any particular method of taxation, or the presence of an exigency which requires its adoption, is a purely legislative question. It seems to me that it violates the elementary distinction between the two departments of the government to allow an opinion of this court upon the necessity or expediency of a tax to affect or control our determination of the existence of the power to impose it.

But I pass from these considerations to approach the question whether the inclusion of rentals from real estate in an income tax renders such a tax to that extent " direct " under the Constitution, because it constitutes the imposition of a direct tax on the land itself.

*Does the inclusion of the rentals from real estate in the sum going to make up the aggregate income from which (in order to arrive at taxable income) is to be deducted insurance, repairs, losses in business, and four thousand dollars exemption, make the tax on income so ascertained a direct tax on such real estate ?*

In answering this question we must necessarily accept the interpretation of the word "direct" authoritatively given by the history of the government and the decisions of this court just cited. To adopt that interpretation for the general purposes of an income tax, and then repudiate it because of one of the elements of which it is composed, would violate every

elementary rule of construction.   So, also, to seemingly accept that interpretation and then resort to the framers and the economists in order to limit its application and give it a different significance is equivalent to its destruction and amounts to repudiating it without directly doing so.   Under the settled interpretation of the word we ascertain whether a tax be direct or not by considering whether it is a tax on land or a capitation tax.   And the tax on land, to be within the provision for apportionment, must be direct.   Therefore we have two things to take into account: is it a tax on land and is it direct thereon or so immediately on the land as to be equivalent to a direct levy upon it?   To say that any burden on land, even though indirect, must be apportioned is not only to incorporate a new provision in the Constitution, but is also to obliterate all the decisions to which I have referred, by construing them as holding that although the Constitution forbids only a direct tax on land without apportionment, it must be so interpreted as to bring an indirect tax on land within its inhibition.

It is said that a tax on the rentals is a tax on the land, as if the act here under consideration imposed an immediate tax on the rentals.   This statement, I submit, is a misconception of the issue.   The point involved is whether a tax on net income, when such income is made up by aggregating all sources of revenue and deducting repairs, insurance, losses in business, exemptions, etc., becomes to the extent to which real estate revenues may have entered into the gross income, a direct tax on the land itself.   In other words, does that which reaches an income, and thereby reaches rentals indirectly, and reaches the land by a double indirection, amount to direct levy on the land itself?   It seems to me the question when thus accurately stated furnishes its own negative response.   Indeed, I do not see how the issue can be stated precisely and logically without making it apparent on its face that the inclusion of rental from real property in income is nothing more than an indirect tax upon the land.

It must be borne in mind that we are dealing not with the want of power in Congress to assess real estate at all; on

the contrary, as I have shown at the outset, Congress has plenary power to reach real estate both directly and indirectly. If it taxes real estate directly, the Constitution commands that such direct imposition shall be apportioned. But because an excise or other indirect tax, imposed without apportionment, has an indirect effect upon real estate, no violation of the Constitution is committed, because the Constitution has left Congress untrammelled by any rule of apportionment as to indirect taxes — imposts, duties, and excises. The opinions in the *Hylton case*, so often approved and reiterated, the unanimous views of the text-writers, all show that a tax on land, to be direct, must be an assessment of the land itself, either by quantity or valuation. Here there is no such assessment. It is well also to bear in mind, in considering whether the tax is direct on the land, the fact that if land yields no rental it contributes nothing to the income. If it is vacant, the law does not force the owner to add the rental value to his taxable income. And so it is if he occupies it himself.

The citation made by counsel from Coke on Littleton, upon which so much stress is laid, seems to me to have no relevancy. The fact that where one delivers or agrees to give or transfer land with all the fruits and revenues, it will be presumed to be a conveyance of the land, in no way supports the proposition that an *indirect* tax on the rental of land is a *direct* burden on the land itself.

Nor can I see the application of *Brown* v. *Maryland*, 12 Wheat. 419; *Weston* v. *Charleston*, 2 Pet. 449; *Dobbins* v. *Erie County Commissioners*, 16 Pet. 435; *Almy* v. *California*, 24 How. 169; *Cook* v. *Pennsylvania*, 97 U. S. 566; *Railroad Co.* v. *Jackson*, 7 Wall. 262; *Philadelphia &c. Steamship Co.* v. *Pennsylvania*, 122 U. S. 326; *Leloup* v. *Mobile*, 127 U. S. 640; *Postal Telegraph Co.* v. *Adams*, 155 U. S. 688. All these cases involve the question whether, under the Constitution, if no power existed to tax at all, either directly or indirectly, an indirect tax would be unconstitutional. These cases would be apposite to this if Congress had no power to tax real estate. Were such the case, it might be that the imposition of an excise by Congress which reached real estate indirectly would

necessarily violate the Constitution, because as it had no power in the premises, every attempt to tax direct or indirectly would be null. Here, on the contrary, it is not denied that the power to tax exists in Congress, but the question is, is the tax direct or indirect in the constitutional sense?

But it is unnecessary to follow the argument further; for, if I understand the opinions of this court already referred to, they absolutely settle the proposition that an inclusion of the rentals of real estate in an income tax does not violate the Constitution. At the risk of repetition, I propose to go over the cases again for the purpose of demonstrating this. In doing so, let it be understood at the outset that I do not question the authority of *Cohens* v. *Virginia*, or *Carroll* v. *Lessee of Carroll*, or any other of the cases referred to in argument of counsel. These great opinions hold that an adjudication need not be extended beyond the principles which it decides. Whilst conceding this, it is submitted that, if decided cases do directly, affirmatively, and necessarily, in principle, adjudicate the very question here involved, then under the very text of the opinions referred to by the court, they should conclude this question. In the first case, that of *Hylton*, is there any possibility by the subtlest ingenuity to reconcile the decision here announced with what was there established?

In the second case, *Insurance Company* v. *Soule*, the levy was upon the company, its premiums, its dividends, and net gains from all sources. The case was certified to this court, and the statement made by the judges in explanation of the question which they propounded says: "The amount of said premiums, dividends, and net gains were truly stated in said lists or returns." Original Record, p. 27.

It will thus be seen that the issue there presented was not whether an income tax on business gains was valid, but whether an income tax on gains from business and all other net gains was constitutional. Under this state of facts the question put to the court was: "Whether the taxes paid by the plaintiff, and sought to be recovered back, in this action, are not direct taxes within the meaning of the Constitution of the United States."

This tax covered revenue of every possible nature, and it therefore appears self-evident that the court could not have upheld the statute without deciding that the income derived from realty, as well as that derived from every other source, might be taxed without apportionment. It is obvious that if the court had considered that any particular subject-matter which the statute reached was not constitutionally included, it would have been obliged by every rule of safe judicial conduct to qualify its answer as to this particular subject.

It is impossible for me to conceive that the court did not embrace in its ruling the constitutionality of an income tax which included rentals from real estate, since, without passing upon that question, it could not have decided the issue presented. And another reason why it is logically impossible that this question of the validity of the inclusion of the rental of real estate in an income tax could have been overlooked by the court is found in the fact to which I could have already adverted, that this was one of the principal points urged upon its attention, and the argument covered all the ground which has been occupied here — indeed, the very citation from Coke upon Littleton, now urged as conclusive, was there made also in the brief of counsel. And although the return of income involved in that case was made "in block," the very fact that the burden of the argument was that to include rentals from real estate, in income subject to taxation, made such tax *pro tanto* direct, seems to me to indicate that such rentals had entered into the return made by the corporation.

Again, in the case of *Scholey* v. *Rew*, the tax in question was laid directly on the right to take real estate by inheritance, a right which the United States had no power to control. The case could not have been decided, in any point of view, without holding a tax upon that right was not direct, and that, therefore, it could be levied without apportionment. It is manifest that the court could not have overlooked the question whether this was a direct tax on the land or not, because in the argument of counsel it was said, if there was any tax in the world that was a tax on real estate which was

direct, that was the one. The court said it was not, and sustained the law. I repeat that the tax there was put directly upon the right to inherit, which Congress had no power to regulate or control. The case was therefore greatly stronger than that here presented, for Congress has a right to tax real estate directly with apportionment. That decision cannot be explained away by saying that the court overlooked the fact that Congress had no power to tax the devolution of real estate, and treated it as a tax on such devolution. Will it be said of the distinguished men who then adorned this bench, that although the argument was pressed upon them that this tax was levied directly on the real estate, they ignored the elementary principle that the control of the inheritance of realty is a state and not a Federal function? But even if the case proceeded upon the theory that the tax was on the devolution of the real estate and was therefore not direct, is it not absolutely decisive of this controversy? If to put a burden of taxation on the right to take real estate by inheritance reaches realty only by indirection, how can it be said that a tax on the income, the result of all sources of revenue, including rentals, after deducting losses and expenses, which thus reaches the rentals indirectly, and the real estate indirectly through the rentals, is a direct tax on the real estate itself?

So, it is manifest in the *Springer case* that the same question was necessarily decided. It seems obvious that the court intended in that case to decide the whole question, including the right to tax rental from real estate without apportionment. It was elaborately and carefully argued there that as the law included the rentals of land in the income taxed, and such inclusion was unconstitutional, this, therefore, destroyed that part of the law which imposed the tax on the revenues of personal property. Will it be said, in view of the fact that in this very case four of the judges of this court think that the inclusion of the rentals from real estate in an income tax renders the whole law invalid, that the question of the inclusion of rentals was of no moment there, because the return there did not contain a mention of such rentals? Were

the great judges who then composed this court so neglectful that they did not see the importance of a question which is now considered by some of its members so vital that the result in their opinion is to annul the whole law, more especially when that question was pressed upon the court in argument with all possible vigor and earnestness? But I think that the opinion in the *Springer case* clearly shows that the court did consider this question of importance, that it did intend to pass upon it, and that it deemed that it had decided all the questions affecting the validity of an income tax in passing upon the main issue, which included the others as the greater includes the less.

I can discover no principle upon which these cases can be considered as any less conclusive of the right to include rentals of land in the concrete result, income, than they are as to the right to levy a general income tax. Certainly, the decisions which hold that an income tax as such is not direct, decide on principle that to include the rentals of real estate in an income tax does not make it direct. If embracing rentals in income makes a tax on income to that extent a direct tax on the land, then the same word, in the same sentence of the Constitution, has two wholly distinct constitutional meanings, and signifies one thing when applied to an income tax generally, and a different thing when applied to the portion of such a tax made up in part of rentals. That is to say, the word means one thing when applied to the greater and another when applied to the lesser tax.

My inability to agree with the court in the conclusions which it has just expressed causes me much regret. Great as is my respect for any view by it announced, I cannot resist the conviction that its opinion and decree in this case virtually annuls its previous decisions in regard to the powers of Congress on the subject of taxation, and is therefore fraught with danger to the court, to each and every citizen, and to the republic. The conservation and orderly development of our institutions rests on our acceptance of the results of the past, and their use as lights to guide our steps in the future. Teach the lesson that settled principles may be overthrown

at any time, and confusion and turmoil must ultimately result. In the discharge of its function of interpreting the Constitution, this court exercises an august power. It sits removed from the contentions of political parties and the animosities of factions. It seems to me that the accomplishment of its lofty mission can only be secured by the stability of its teachings and the sanctity which surrounds them. If the permanency of its conclusions is to depend upon the personal opinions of those who, from time to time, may make up its membership, it will inevitably become a theatre of political strife, and its action will be without coherence or consistency. There is no great principle of our constitutional law, such as the nature and extent of the commerce power, or the currency power, or other powers of the Federal government, which has not been ultimately defined by the adjudications of this court after long and earnest struggle. If we are to go back to the original sources of our political system, or are to appeal to the writings of the economists in order to unsettle all these great principles, everything is lost and nothing saved to the people. The rights of every individual are guaranteed by the safeguards which have been thrown around them by our adjudications. If these are to be assailed and overthrown, as is the settled law of income taxation by this opinion, as I understand it, the rights of property, so far as the Federal Constitution is concerned, are of little worth. My strong convictions forbid that I take part in a conclusion which seems to me so full of peril to the country. I am unwilling to do so, without reference to the question of what my personal opinion upon the subject might be if the question were a new one, and was thus unaffected by the action of the framers, the history of the government, and the long line of decisions by this court. The wisdom of our forefathers in adopting a written Constitution has often been impeached upon the theory that the interpretation of a written instrument did not afford as complete protection to liberty as would be enjoyed under a Constitution made up of the traditions of a free people. Writing, it has been said, does not insure greater stability than tradition does, while it

destroys flexibility. The answer has always been that by the foresight of the fathers the construction of our written Constitution was ultimately confided to this body, which, from the nature of its judicial structure, could always be relied upon to act with perfect freedom from the influence of faction and to preserve the benefits of consistent interpretation. The fundamental conception of a judicial body is that of one hedged about by precedents which are binding on the court without regard to the personality of its members. Break down this belief in judicial continuity, and let it be felt that on great constitutional questions this court is to depart from the settled conclusions of its predecessors, and to determine them all according to the mere opinion of those who temporarily fill its bench, and our Constitution will, in my judgment, be bereft of value and become a most dangerous instrument to the rights and liberties of the people.

In regard to the right to include in an income tax the interest upon the bonds of municipal corporations, I think the decisions of this court, holding that the Federal government is without power to tax the agencies of the state government, embrace such bonds, and that this settled line of authority is conclusive upon my judgment here. It determines the question that where there is no power to tax for any purpose whatever, no direct or indirect tax can be imposed. The authorities cited in the opinion are decisive of this question. They are relevant to one case and not to the other, because, in the one case, there is full power in the Federal government to tax, the only controversy being whether the tax imposed is direct or indirect; while in the other there is no power whatever in the Federal government, and, therefore, the levy, whether direct or indirect, is beyond the taxing power.

Mr. Justice Harlan authorizes me to say that he concurs in the views herein expressed.

MR. JUSTICE HARLAN further dissenting.

I concur so entirely in the general views expressed by Mr. Justice White in reference to the questions disposed of by the

opinion and judgment of the majority, that I will do no more than indicate, without argument, the conclusions reached by me after much consideration.   Those conclusions are:

1.   Giving due effect to the statutory provision that "no suit for the purpose of restraining the assessment or collection of any tax shall be maintained in any court," Rev. Stat. § 3224, the decree below dismissing the bill should be affirmed.   As the Farmers' Loan and Trust Company could not itself maintain a suit to restrain either the assessment or collection of the tax imposed by the act of Congress, the maintenance of a suit by a stockholder to restrain that corporation and its directors from voluntarily paying such tax would tend to defeat the manifest object of the statute, and be an evasion of its provisions.   Congress intended to forbid the issuing of any process that would interfere in anywise with the prompt collection of the taxes imposed.   The present suits are mere devices to strike down a general revenue law by decrees, to which neither the government nor any officer of the United States could be rightfully made parties of record.

2.   Upon principle, and under the doctrines announced by this court in numerous cases, a duty upon the gains, profits, and income derived from the rents of land is not a "direct" tax on such land within the meaning of the constitutional provisions requiring capitation or other direct taxes to be apportioned among the several States, according to their respective numbers determined in the mode prescribed by that instrument.   Such a duty may be imposed by Congress without apportioning the same among the States according to population.

3.   While property, and the gains, profits, and income derived from property, belonging to private corporations and individuals, are subjects of taxation for the purpose of paying the debts and providing for the common defence and the general welfare of the United States, the instrumentalities employed by the States in execution of their powers are not subjects of taxation by the general government, any more than the instrumentalities of the United States are the subjects of taxation by the States; and any tax imposed directly upon interest derived from bonds issued by a municipal corporation

for public purposes, under the authority of the State whose instrumentality it is, is a burden upon the exercise of the powers of that corporation which only the State creating it may impose. In such a case it is immaterial to inquire whether the tax is, in its nature or by its operation, a direct or an indirect tax; for the instrumentalities of the States — among which, as is well settled, are municipal corporations, exercising powers and holding property for the benefit of the public — are not subjects of national taxation, in any form or for any purpose, while the property of private corporations and of individuals is subject to taxation by the general government for national purposes. So it has been frequently adjudged, and the question is no longer an open one in this court.

Upon the several questions about which the members of this court are equally divided in opinion, I deem it appropriate to withhold any expression of my views, because the opinion of the Chief Justice is silent in regard to those questions.